# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 3:19-CR-00073 |
| ) | JUDGE VARLAN |
| WANDA HAYES ) | |
| PATRICK CARNEY ) | |

## JOINT MOTION TO SUPPRESS

The Defendants, Wanda Hayes and Patrick Carney, by and through counsel, move the Court for an Order suppressing all evidence and statements in this matter, including the drugs and any alleged statements made by Defendants on the basis that they were obtained as a result of an unlawful seizure and search of the Defendants.

## FACTUAL BACKGROUND

On January 23, 2019, at approximately 7:00 a.m., Trooper William Connors of the Tennessee Highway Patrol stopped Patrick Carney and Wanda Hayes. Mr. Carney was driving Ms. Hayes's black Nissan Versa while she was in the passenger seat. The stated justification for the traffic stop was Trooper Connors' belief that Mr. Carney was driving 70 miles per hour in a 65 mile per hour zone.

When Trooper Connors turned on the police vehicle's flashing lights, the Nissan Versa pulled over to the side of the highway promptly. Trooper Connors approached the vehicle at the passenger side. He took Mr. Carney's license from him and instructed Mr. Carney to exit the Nissan and accompany him back to the patrol vehicle, where he instructed Mr. Carney to sit inside the patrol vehicle. Immediately, Trooper Connors informed Connors that he was "doing 70 in a 65 zone, but I'm not going to write you a citation for it." Then he proceeded to prolong

1

the traffic stop by engaging in a lengthy interrogation of Mr. Carney about where he was coming from, where he had been, and other travel details. He also asked about Carney's criminal history, and if he had ever been arrested. He asked how Mr. Carney knew Ms. Hayes, what their relationship was, and many details about their trip. He also asked if they were carrying any weapons, drugs, or large amounts of cash. Mr. Carney answered that they were not. Throughout the duration of this conversation, the Trooper maintained possession of Mr. Carney's license. He did not request a warrant or records check on Mr. Carney prior to or during this conversation. Nearly fifteen minutes would pass from the time the officer took Mr. Carney's license to the time he called for a warrants check. Approximately twelve minutes elapsed between the time the officer told Mr. Carney he was not going to write a speeding citation and the time he requested a warrants check.

  After allowing Mr. Carney to go back to the Nissan Versa, Trooper Connors returned to the vehicle to speak with Ms. Hayes, asking her a similar string of questions unrelated to the traffic stop. Ms. Hayes was asleep at the time of the traffic stop and remained asleep through the officer taking Mr. Carney out of the vehicle until the officer awoke her to interrogate her. Upon being awoken and immediately questioned by the officer, Ms. Hayes gave the officer an account of her travel plans which conflicted with that given by Mr. Carney.

  However, Trooper Connors did not note any nervousness, red bloodshot eyes, pulsating carotid arteries, slurred speech, avoidance of eye contact or furtive glances on the part of Ms. Hayes and Mr. Carney. Nor did he note any odor of marijuana, other drugs or substances that might have led to the belief that there were drugs in the car. Eventually the Trooper would request a warrants check, which came back as negative for both individuals.

  Nevertheless, Trooper Connors decided to further prolong the traffic stop in order to

perform a dog sniff. He led the dog around the vehicle once, and there was no visual alert by the dog. The second time he led the dog around, he pointed to specific areas of the vehicle. Near the rear passenger tire, the dog sat down briefly twice. It is not clear from the report if this was an indication of an alert, nor is it clear what the accuracy rate of the dog is. But Trooper Connors did write in his report that there had been a positive notification by the K9. Trooper Connors then proceeded to do a full search of the vehicle. During the search, he found methamphetamine in a red duffel bag in the trunk of the vehicle.

## ARGUMENT AND MEMORANDUM OF LAW

**A. Trooper Connors' estimation that the vehicle was driving above the speed limit is not reliable, and therefore he did not have reasonable suspicion to pull over the Nissan Versa.**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause." U.S. Const. Amend. IV. When considered in its totality, the traffic stop performed by Trooper Connors was not reasonable, and therefore violated the rights of Ms. Hayes and Mr. Carney.

Firstly, the basis for the traffic stop itself was questionable, because of Trooper Connors' lack of accurate methodology for measuring the speed limit, coupled with the de minimis nature of the alleged violation. His determination of the speed of the vehicle was based on "pacing". This type of pacing may be admissible, but only if the proper foundation establishes that the officer was able to get an accurate estimation of the actual speed of the vehicle. This foundation has been met where an officer paced the vehicle in question for at least one-quarter of a mile. *See State v. Woodard Joyner*, No. 02C01-9106-CR-00124,1992 WL 105973, at 2 Tenn., at Jackson, May 20, 1992. It does not appear from the video evidence in this case that Trooper Connors

3

followed and paced the Nissan for one-quarter of a mile. The video begins with Trooper Connors' car at a stand-still, perpendicular to the road. He could not have possibly taken an accurate pacing until he had accelerated to a steady rate of speed. The speed readout on the dashcam video shows that he reached 70 miles per hour for only about 8 seconds. It appears at that point that his police cruiser is gaining on the Nissan. Thus, the Nissan was driving a speed less than 70 miles per hours.

Additionally, Trooper Connor's allegation that the car was traveling five miles over the marked speed limit is belied by the video evidence. It appears in the video that the vehicle was driving the same speed as the other vehicles on the road. For the entirety of the dashcam section where the Nissan can be seen, there is a tractor-trailer travelling alongside it at the exact same speed. The Nissan does not gain on the tractor trailer. Because the violation of the speed limit that Trooper Connors alleges is *de minimis*, unless it is supported by some scientific methodology, the government cannot make a showing of probable cause.

There is precedent that *de minimis* traffic violations in Tennessee do not always suffice to meet the probable cause standard. *State v. Smith*, 484 S.W.3d 393, 403 (Tenn. 2016) In that case, the statute in question required that "vehicle[s] shall be driven as nearly as practicable entirely within a single lane." Tenn. Code Ann. § 55–8–123(1). The Court found that a motorist's "momentary crossing" of the fog line was so *de minimis* that it would not meet the standard of probable cause. The statute in question in the present case, obeying marked speed limits, is obviously more precise. The language of the speed limit statute is clear and unambiguous, and driving over the speed limit at all is a violation of the law. However, the low-level violation alleged coupled with the non-scientific measurement methods used by Trooper Connors, makes this case analogous to the reasoning in *Smith*. Pacing is not one-hundred percent accurate, and

4

obviously has a margin of error. It is an inherently subjective method of measuring speed, depending on whether the officer thinks he is gaining on or falling behind another vehicle. It is further dependent on a number of factors which can impact the accuracy of the speedometer reading. Among these are the assumptions that the vehicle had a properly calibrated speedometer and that the tire diameter at the time of the stop was the same as it was when the speedometer was calibrated. Since the video evidence demonstrates that Mr. Carney was driving in a reasonable manner and at the same speed of the flow of traffic, in all likelihood he could have been driving anywhere from 60-70 miles per hour, based on the margin of error inherent in pacing.

### B. Trooper Connor's extension of the traffic stop in order to perform a K9 search was unlawful, and violated Ms. Hayes' and Mr. Carney's Constitutional protections against unlawful search and seizure.

Law enforcement may not prolong a routine traffic stop for the purpose of performing a dog sniff absent reasonable suspicion. Importantly, once the lawful reason for the stop has been accomplished, or should have reasonably been accomplished, an officer may not extend the stop further to investigate a hunch. Thus, the lawful time for a traffic stop is limited by the time needed to handle the matter for which the stop was made. "A routine traffic stop is more like a brief stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, than an arrest, *see, e.g., Arizona v. Johnson*, 555 U.S. 323, 330, 129 S.Ct. 781, 172 L.Ed.2d 694. Its tolerable duration is determined by the seizure's "mission," which is to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1611, 191 L. Ed. 2d 492 (2015).

It is not important whether, before extending the stop, the officer has issued a ticket or not; rather, the analysis centers on whether the extension adds time to the stop. *Rodriguez v.*

5

*United States*, 135 S.Ct. 1609, 1616 (2015) (Alito, J., Kennedy, J., and Thomas, J., dissenting). In the present case, the trooper immediately abandons the original stop. The trooper observed the vehicle, called in to dispatch that he was stopping a speeder, told Mr. Carney he stopped him for speeding, and wrote on the report that he stopped the vehicle because Ms. Hayes was speeding.[1]

Within the first fifteen seconds of getting Mr. Carney into the police vehicle, the trooper tells him that he is not going to write a citation for speeding. At that point, the initial speeding investigation appears to have been ended. Any further detention from that point is an impermissible prolonging of the seizure of Mr. Carney and Ms. Hayes. The custodial interrogation of Mr. Carney which followed was, at that point, an unlawful seizure of his person. The continued detention of Ms. Hayes and Mr. Carney was not the result of the officer diligently pursuing the purpose of the original stop but instead was the result of the officer entirely abandoning the purpose of the original stop.

*Rodriguez* prohibits police from "exceeding the time needed to handle the matter for which the stop was made." *Id*. at 1612. A stop that is prolonged for the purpose of searching for further indicia of suspicion violates the Constitution's shield against unreasonable seizures. *Id*. The officer in Rodriguez wrote a traffic citation and returned Mr. Rodriguez's documents to him. After that, he asked consent to search the vehicle, to which Rodriguez stated "No." *Id.* at 1613.

Here, although Trooper Connors decided not to issue a traffic ticket, the moment at which he told Mr. Carney that he would not issue a traffic citation, the tolerable duration of the traffic stop expired. Trooper Connor's lengthy interrogation of Mr. Carney and Ms. Hayes that follows violated their Constitutional rights to be free from unreasonable seizure.

---

[1] Strangely, Trooper Connors appears to have later charged Ms. Hayes with speeding, in addition to the drug charges. She was never in fact driving the vehicle, and this oversight thus reflects a troubling lack of care and accuracy in this investigation.

6

The government cannot justify the extension of the stop by claiming that Trooper Connors needed time to conduct a warrants check, as is permissible under Rodriguez. However, the typical sequence of a proper stop—and the sequence followed by the officer in Rodriguez— is to initiate the warrants check at the outset of the stop, thus taking care of all matters reasonably related to the traffic stop as expeditiously as possible. In contrast, Trooper Connors did not even request a warrants check on Ms. Carney and Ms. Hayes until he had held and interrogated these two individuals for a full fifteen (15) minutes. An officer may not circumvent the requirements of *Rodriguez* by unreasonably neglecting to perform the task of running warrants at the outset of the stop, when he acquires the license of the driver and passengers.

Immediately after calling in the warrants check, Trooper Connors then initiates his drug dog sniff. It appears that he purposefully delayed the warrants check in order to justify his drug dog sniff, which is impermissible because it is not an expeditious use of his time. This maneuvering is an infringement on motorists' rights to be secure from unreasonable seizure. It is undoubtedly a violation of *Rodriguez's* prohibition on the extension of a traffic stop beyond its tolerable duration—which is premised on a standard of reasonableness.

### C. In addition to the *Rodriguez* violation, the stop never yielded reasonable suspicion which would have justified a K9 search and extending the stop to interrogate the defendants.

Trooper Connors did not have justification to perform the initial K9 search because he did not have reasonable suspicion to do so. Additionally, his seizure of Mr. Carney and Ms. Hayes to interrogate them was in violation of their Fourth Amendment protection against unlawful seizure. Inconsistent, and even mutually exclusive, explanations of travel plans alone do not give rise to reasonable suspicion of criminal activity; therefore, the dog sniff of the vehicle unconstitutionally prolonged the traffic stop.

7

Even if a traffic stop is "lawful at its inception," it may become unconstitutional if the stop is unreasonably extended. *United States v. Winters*, 782 F.3d 289, 296-97 (6th Cir. 2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). A traffic stop may only be extended if the officer has "a reasonable and articulable suspicion that criminal activity [is] afoot." *Id.* at 297. "[R]easonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

An unlawful seizure occurs when an officer, without reasonable suspicion, "by means of physical force or show of authority ... in some way restrain[s] the liberty of a citizen." *Terry* at 16 (1968). One's liberty is restrained when a reasonable person would not feel free to walk away and ignore the officer's requests. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

In analyzing whether an officer has reasonable suspicion of criminal activity, courts should look at the totality of the circumstances surrounding the stop, using an objective standard to determine what a reasonable officer would suspect in that same situation. *Id.* at 298. Officers may use their experience and training to make inferences which ordinary citizens might not notice. *Id.* (quoting *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008)). "Ill-defined hunches, however, are not sufficient to establish a reasonable suspicion." *Id.*

Typically, officers will list in their reports a series of factors, which, when taken as a whole, establish reasonable suspicion. Courts, however, tend to weigh each factor separately in order to determine its particular significance before analyzing the circumstances as a whole, in an effort to fully explain why each factor does or does not give rise to reasonable suspicion. *See United States v. Winters*, 782 F.3d 289 (6th Cir. 2015) (occupants' nervousness, conflicting

8

accounts of travel plans, and an unusual rental plan met reasonable suspicion standard), *United States v. Richardson*, 385 F.3d 625 (6th Cir.2004) (nervousness, trembling, lips quivering, conflicting explanations of travel plans, and one occupant's moving to the driver's seat did *not* meet reasonable suspicion standard), *United States v. Townsend*, 305 F.3d 537 (6th Cir. 2002) (unusual behavior, dubious travel plans, traveling between cities known for narcotics, number of cellphones, Bible, potential rolls of money felt during a pat down, criminal history, nervousness, clutter, and the driver was not the registered owner). The Supreme Court warns against this method of analysis, and instructs lower courts not to look at the factors "in isolation from each other." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Rather, courts must look at whether all the factors as a whole give rise to reasonable suspicion. *Winters*, 782 F.3d at 301.

It is important to note, however, that there is little to no case law where the only factor raised or discussed is inconsistent explanations of travel plans. In cases that do discuss conflicting explanations of travel plans, there are usually two or more other factors. *See Winters*, 782 F.3d 289, *Richardson*, 385 F.3d 625, *Townsend*, 305 F.3d 537. For example, in *Winters*, the officer also references nervousness and "an oddity in a rental-car contract" as factors giving rise to reasonable suspicion. 782 F.3d at 298. In *Richardson*, the court cites nervous behavior and passengers moving seats, in addition to inconsistent travel stories. 385 F.3d at 630. There are multiple factors in *Townsend*. 305 F.3d at 542-45. The courts in each of these cases rely heavily on specific facts to demonstrate how the different factors relate together.

Since the inconsistent accounts of their travel was the only factor that led to Trooper Connors' finding of probable cause, there is no precedent that this would be sufficient to give rise to the presumption that "criminal activity was afoot." In fact, *Richardson* held that inconsistent travel plans, coupled with nervousness, trembling, lips quivering, and a suspicious

9

move from the backseat to the front by a passenger did not even meet reasonable suspicion. The district court, as well as the Court of Appeals, ruled that "there was nothing inherently suspicious about the group's nervousness." *Id*. at 630.

Without more, inconsistent travel plans do not rise to the level of reasonable suspicion. There could have been a myriad of lawful reasons for which Ms. Hayes or Mr. Carney did not want to relay the details of their travel to Trooper Connors, or that they simply became nervous and misspoke. It is widely accepted that police officers make innocent people nervous, often causing them to become confused. Thus, nervousness is given little to no weight in a reasonable suspicion analysis. *See Richardson* at 630-631; *see also U.S. v. Saperstein*, 723 F.2d 1221, 1228 (6th Cir. 1983), holding that nervousness was "inherently unsuspicious and, thus, entitled to no weight in the calculation"; *see also U.S. v. Andrews*, 600 F.2d 563, 566 (6th Cir.1979) (nervousness deemed entirely consistent with behavior among innocent airport travelers and is entitled to no weight). This is particularly true when the person being questioned has just been woken up from a deep sleep to find her traveling companion gone from the car and a police officer questioning her. Such a disorienting experience is certain to have some impact on that person's ability to offer helpful and accurate answers to questions. This Honorable Court would be entitled to consider the common human experience of being awoken suddenly and experiencing momentary confusion or disorientation.

Secondly, Trooper Connors' extended interrogation was unlawful in the first place. Under *Terry* and *Mendenhall*, Trooper Connors unquestionably restrained the defendants' freedom of movement, in requesting that Mr. Carney get in his police cruiser, and interrogating the two separately. They were clearly not free to leave. Although he had not established reasonable suspicion, he persisted in fishing for suspicious facts in a manner that offends the

10

Fourth Amendment prohibition on unlawful seizures.

> **D. The custodial interrogation of Mr. Carney and Ms. Hayes absent the *Miranda* warning was improper and the statements made by Mr. Carney and Ms. Hayes should be suppressed.**

Statements made by a person subjected to custodial interrogation may not be used against that person absent an affirmative statement to the person informing them of their right to remain silent, commonly called the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). An individual held for interrogation must be clearly informed that he has the right to consult with an attorney prior to answering any questions. *Id* at 471. These protections apply when an individual is in custody or deprived of his freedom in any significant way. *Id*. at 478.

It is not necessary that a person be locked in a jail cell to be 'in custody', rather only that a reasonable person would not feel free to terminate the conversation and leave. *Terry v. Ohio*, 392 U.S. 1, 16 91968); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). An

At the time Mr. Carney was questioned by the officer, he was in custody. The officer had signaled for Mr. Carney to stop using his cruiser's blue lights, and Mr. Carney had yielded to that demand. The officer had taken Mr. Carney out of his car, instructed him to sit in the police vehicle, and had taken his driver's license away from him. At that point, a reasonable person would not have felt free to leave. Mr. Carney cannot be expected to drive away without his license – that would be itself be a crime. T.C.A. § 55-50-351. So long as the officer held Mr. Carney's license, Mr. Carney had no choice but to remain under the officer's control. *See U.S. v. Thompson*, 712 F.2d 1356, 1360 (11th Cir. 1983) (defendant was seized when officer retained his license as his only other option was to drive away without it, which would be a crime); *U.S. v. Elmore*, 595 F.2d 1036, 1041-42 (5th Cir. 1979) (defendant seized when DEA agent took his airline ticket); *U.S. v.*

*Waksal*, 709 F.2d 653 (11th Cir. 1983) (defendant seized when agent took his license and airline ticket).

Ms. Hayes was also seized and subjected to custodial interrogation. She was not free to leave, and Trooper Connors similarly took possession of her license for the duration of the time that he interrogated her. She could not have reasonably believed that she could simply walk away, down the side of the interstate.

The Sixth Circuit, in *U.S. v. Saperstein*, had occasion to examine a similar set of facts. In that case, the defendant was confronted by DEA agents in an airport. These agents asked to speak with the defendant, requesting he give them his license, his ticket, and accompany them to the DEA office. In that case, the court found that a person confronted with this request that he turn over his license and go with the agents would not have felt free to leave. *U.S. v. Saperstein*, 723 F.2d 1221, 1226 (6th Cir. 1983). *See also U.S. v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990) (finding a seizure where officers took defendant's keys, license, and registration and instructed him where to wait); *Florida v. Royer*, 460 U.S. 491, 501 (1983) (seizure occurred when agents told the defendant to accompany them to a police room and retained defendant's ticket and driver's license).

The facts of this case are no different. The trooper took and retained Mr. Carney's driver's license and moved him from his vehicle to the police vehicle. At no moment that Mr. Carney was in the front seat did he feel free to leave. No reasonable person would have felt free to leave.

Mr. Carney and later Ms. Hayes were then subjected to interrogation, which as we know is any questioning with the intent of eliciting an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The trooper was no longer investigating speeding, as that had been abandoned almost immediately. Neither was the trooper simply making conversation to pass the

12

time, as there was nothing else being done. Instead, the trooper was asking questions of Mr. Carney because the trooper believed that there was a lot of criminal activity going on through that area and he wanted to know if Mr. Carney was involved. He then asked the very same questions of Ms. Hayes, clearly seeking to uncover facts that would justify a search of the vehicle for drugs. He elicited incriminating responses from both by asking directly whether they had a laundry list of drugs in the vehicle. The entire scenario was designed to maximize the chance of being given an incriminating response. The trooper separated the two occupants of the vehicle, then asked each a series of questions about their travels. The only logical conclusion was that the purpose of this exercise was to compare the two stories to see if they would match. The tactics utilized in this investigation are especially offensive to the tenets of fairness under the Constitution when one thinks of a typical traffic violation stop (especially concerning such a negligible violation) – the duration of which is typically less than five minutes.

This was a custodial interrogation and therefore any statement made in the absence of the *Miranda* warning is inadmissible and should be suppressed.

### E. The dog sniff itself was invalid, because the government has not established the dog's reliability, and because dog searches in general are questionable after the onset of the legalization of hemp.

#### 1. The government has not established the reliability of this dog.

The government has not established that this particular drug detection dog was properly trained, and that it has a record of accurate alerts. The government may present evidence on that point at the evidentiary hearing in this matter. However, the burden is on the prosecution to establish the dog's reliability. *Florida v. Harris*, 568 U.S. 237 (2013); *see also State v. England*, 19 S.W.3d 762, 764 (Tenn. 2000); *see also State v. Bowden*, 2018 WL 2149731 (Tenn. Crim.

13

App. May 10, 2018). The Supreme Court has held that in order to make the probable cause determination, a court must consider "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris* at 248. In *Harris*, for example, the record established that "the officer was trained in narcotics detection, that the dog was trained to detect the presence of narcotics, that the dog was "certified" as a drug dog annually, and that the dog had a proven record of such drug detections." *Id*.

Generally, a dog is not required to make any specific type of alert, and certain recognizable, subjectively observable behavior changes in a dog may suffice to establish probable cause. *Bowden* at 8-9; *See also U.S. v. Holleman*, 743 F.3d 1152, 1156 (8th Cir. 2014) (requiring that officers "articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics.") However, a K9 officer may not, on the other hand, establish probable cause by referencing some subjective "body language change" of his dog that is not an established alert for that particular dog. *Id*. This type of lax standard would make a drug dog alert immune from review. *U.S. v. Wilson*, 995 F. Supp. 2d 455, 475 (W.D.N.C. 2014).

In the case of Ms. Hayes and Mr. Carney, the government has not presented any evidence establishing the reliability of this dog. More importantly, the dashcam footage that was taken by Trooper Connors' vehicle does not show the dog making any specific actions, other than sitting, on his second pass by the passenger rear wheel, that could be interpreted at a positive alert. Though sitting can be an example of a passive alert, the dog's behavior is confounding because the first time he circled the car, he made no indication whatsoever in that same area. Additionally, the methamphetamine that was eventually found was not found in the vicinity of the rear passenger wheel. Rather, it was located in the trunk—where the dog did not alert at all.

## 2. Because hemp is legal in the State of Tennessee, the drug dog's alert in this case is meaningless, since it could have been alerting to the odor of hemp.

The defendant concedes that this argument hinges on whether this particular drug dog is trained in marijuana detection. If it is, however, the alert the dog allegedly made would be meaningless in the present context given that there is no way to distinguish between marijuana and hemp. Hemp has recently been legalized in Tennessee, and the Tennessee Department of Agriculture licensed more than 2,900 hemp growers in 2019 alone.[2] Many more individuals legally possess and use hemp products in Tennessee. Marijuana and hemp are not two substances – they are, as the Tennessee Bureau of Investigation Forensic Services has put it – the same plant. According to the TBI's Assistant Director of the Laboratory Division, "It's the same plant, the same species. It feels the same. It looks the same. It reacts the same way to most chemicals". "TBI Clarifies Marijuana Testing Policies to Law Enforcement as Drug Test Requests Spike Above Last Year's Total", *Nashville Tennesseean*, October 2, 2019.

No reasonable suspicion can be had from the drug dog's alert absent proof that the dog has been trained to detect marijuana but not hemp, as well as proof that the dog understands that the law has changed and it must now ignore the smell of hemp. Although this case does not involve marijuana, there is no way to know if the dog was alerting to an odor or drugs in the car or an odor left by drugs that had previously been in the car.

Although this is an emerging area of law, it is undeniable that drug dog sniffs (at least as they are performed now) are becoming futile in the face of the legalization of hemp and marijuana products. The Supreme Court of Colorado recently determined that in light of the fact that a dog-sniff can alert to the lawful possession of marijuana, it is a "search" that must be preceded by a preliminary finding of probable cause. *People v. McKnight*, 2019 CO 36, 446 P.3d

---

[2] https://www.tn.gov/agriculture/news/2019/6/3/new-rules-for-tennessee-s-hemp-program.html

397, 410, reh'g denied (July 1, 2019). Notably, the court suppressed evidence of methamphetamine based on this premise—so its application is not limited to marijuana cases. *Id*. A Delaware superior court found that an officer's detection of the scent of raw marijuana did not create probable cause, due to the fact that the defendant could have been (and was) a lawful medical marijuana card holder in Delaware. *State v. Jernigan*, 2019 WL 2480808 (Del. Super. Ct. June 13, 2019). Likewise, any driver on the road in Tennessee could be a lawful dealer or possessor of hemp products, which have an indistinguishable scent from marijuana. Thus, any positive alert by a drug dog that is trained to sniff all illegal substances yields no conclusive information to the officer, and cannot lawfully form the basis of probable cause.

Furthermore, law enforcement offices themselves are changing their policies when it comes to drug-detection dogs. Texas police departments have begun a policy in which they still utilize drug-detection dogs, but they do not rely on a positive alert to be a "stand-alone" basis of probable cause.[3]

Assuming that Trooper Connors' K9 partner is trained to detect marijuana, and assuming that there is no proof that the change in law with respect to hemp has been adequately explained to the dog, the alert of the dog cannot be relied upon to provide probable cause. At the moment the dog alerts, there is no way for a reasonable person to tell if that alert is the result of the presence of illegal substances, or legal ones.

Thus, even if the Court finds that Trooper Connors lawfully initiated his drug dog sniff, the resulting sniff and alleged "alert" did not contribute to a finding of probable cause to allow him to proceed to a search.

---

[3] https://www.chicagotribune.com/marijuana/sns-law-and-odor-20190724-bviqlsxshrfihp3e3guvcym45i-story.html

## CONCLUSION

Based on the foregoing Constitutional violations, all statements of Mr. Carney and Ms. Hayes and evidence of illicit drugs in this matter must be suppressed.

<table>
<tr><td>

/s/ Joshua D. Hedrick,
Joshua Hedrick
*BPR # 025444*
Whitt, Cooper, Trant & Hedrick
607 Market St.
Suite 1100
Knoxville, TN 37902
(865) 524-8106

Attorney for Mr. Carney

</td><td>

/s Mary Kincaid
Mary Kincaid
Assistant Federal Community Defender
FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979

Attorney for Ms. Hayes

</td></tr>
</table>

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2019, a copy of the foregoing Motion for Continuance was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

*s/ Mary M Kincaid*
Mary M Kincaid