UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:19-CR-00073 |
| v. | ) | |
| | ) | JUDGES VARLAN/GUYTON |
| | ) | |
| WANDA HAYES | ) | |
| PATRICK CARNEY | ) | |

### UNITED STATES' RESPONSE TO DEFENDANT'S JOINT MOTION TO SUPPRESS

The United States of America, by and through the United States Attorney for the Eastern District of Tennessee, responds to defendant's Motion to Suppress [Doc. 27] (hereinafter referred to as "Joint Motion") as follows:

### I. INTRODUCTION

Following a valid traffic stop, defendants argue Tennessee Highway Patrolman Trooper William Connors (hereinafter Trooper Connors) violated the defendants' Constitutional rights in four ways. First, the defendants argue the traffic stop was not supported by probable cause; second, the length of the traffic stop was unconstitutionally delayed; third, there was no reasonable suspicion to conduct the canine sniff around the vehicle; and lastly, Trooper Connors failed to provide *Miranda* warnings while incriminating statements were solicited from both defendants at the scene. The Joint Motion also argues the reliability of the canine has not been established and the canine alert is no longer meaningful due to the legalization of hemp.

The United States respectfully submits the Joint Motion be denied as the search and seizure of the vehicle was lawful. In this case, the defendants, Wanda Hayes ("Hayes") and

Patrick Carney ("Carney"), were arrested on January 23, 2019 for possession of 4.5 ounces of methamphetamine, digital scales, and $2,556 in U.S. Currency. The initial stop was a lawful stop due to a violation of T.C.A. § 55-8-152, i.e. exceeding the posted speed limit. The stop was not unduly delayed and Trooper Connors had reasonable suspicion that justified the duration of the stop and justified the deployment of his canine around the vehicle under the applicable totality of the circumstances analysis.

## II. FACTS

On the morning of January 23, 2019, at about 5:59 a.m., Trooper Connors stopped a Nissan Versa for traveling 70 miles per hour in a 65 miles per hour speed limit zone. The Versa was travelling Eastbound on Interstate 40 in Jefferson County, Tennessee. Trooper Connors' vehicle was equipped with an in-dash camera system that captured the video and audio of the traffic stop.

The Versa came to a stop on the shoulder of the interstate at about 6:00:00 a.m. Upon approaching the passenger side of the vehicle, Trooper Connors made contact with both defendants. Trooper Connors asked Carney, who was driving, for his license and registration. Trooper Connors asked Carney to exit his car and join him in his vehicle while he explained the traffic infraction and checked out his information. At 6:02:05 a.m., while running his information, Trooper Connors and Carney had a conversation to include questions regarding the defendants' itinerary. Carney stated that they were coming from Atlanta, Georgia. Trooper Connors asked Carney why they were in Atlanta and Carney told him the two were visiting Hayes' daughter. Carney told Trooper Connors that they had stayed with Hayes' daughter for two days in Atlanta. At 6:06:53 a.m., Carney hands Trooper Connors the registration to the

2

vehicle. While running his information, Trooper Connors noticed that Carney was not the registered owner of the vehicle and asked Carney if Hayes was the owner. Carney told Trooper Connors that Hayes was the owner. Trooper Connors then went to speak with Hayes and asked to see her license to confirm she was the registered owner of the vehicle as well as check the proof of insurance. While she was looking for her license, Trooper Connors asked Hayes similar itinerary questions. Hayes told Trooper Connors they were coming from Abingdon, Virginia. Trooper Connors asked her again and Hayes said they were driving around Tennessee but she did not know exactly where they had been previously. Hayes told Trooper Connors they had been in South Carolina and Georgia, but an ice storm hit so now they were in Tennessee. Trooper Connors asked Hayes about her daughter and Hayes said due to the ice storm, they never made it to Atlanta to see her daughter.

Trooper Connors took Hayes' license back to his vehicle while Hayes remained in the front passenger seat of her car. Trooper Connors and Carney sat back in the front seats of Trooper Connor's car. Trooper Connors asked Carney if there was anything illegal in the car and Carney said no. At 6:14:23 a.m., Trooper Connors called dispatch to check criminal history and for possible active warrants. At 6:16:22 a.m., sixteen minutes after the stop initiated, Trooper Connors deployed his K9 partner, Lakey, and started a sniff around the vehicle. Trooper Connors is a trained K9 officer and Lakey travels in the back-seat with Trooper Connors while they are on duty. At 6:16:53 a.m., Lakey positively alerted in the rear passenger-side area of the vehicle. Trooper Connors radios for backup and tells Carney that he will be searching the vehicle because his K9 positively alerted. At 6:19:52 a.m., the warrant check came back to Trooper Connors over his radio.

3

Due to safety precautions for troopers and because there were two suspects and only one trooper, Trooper Connors waited for backup to arrive before beginning the search. At 6:29:27 a.m., the search began after more troopers arrived on scene to assist. Upon search of the vehicle, Trooper Connors located 4.5 ounces of ice methamphetamine and digital scales inside a red duffle bag in the trunk. Additionally, Trooper Connors located $2,556.00 in United States currency on Hayes' person. Hayes and Carney were both *Mirandized* and arrested for felony possession of methamphetamine.

### III. LAW

A. <u>The stop was based upon probable cause that defendant Carney was operating his vehicle in violation of T.C.A. § 55-8-152.</u>

It is well-established that a law enforcement officer may stop and temporarily detain a motorist based upon probable cause to believe the individual has committed a traffic violation, which is consistent with the Fourth Amendment's prohibition against unreasonable seizures. *Whren v. United States*, 517 U.S. 806 (1996). A stop and roadside detention is lawful as long as the officer has probable cause to believe that the motorist has violated traffic laws. *United States v. Garrido*, 467 F.3d 971, 977-78 (6th Cir. 2006) (citing *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003)). This is true regardless of the subjective motives of the officer. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993); see also *United States v Johnson*, 242 F.3d 707, 709-10 (6th Cir. 2001) (upholding stop for a broken tail light in violation of Tennessee traffic laws regardless of the officer's subjective motivation; *United States v. Bailey*, 302 F.3d 652, 656-57 (6th Cir. 2002) (reiterating that an officer's actual motivation for stopping a defendant who was committing a traffic violation is irrelevant to the constitutionality of that stop).

Defendants rely on *State v. Smith*, 484 S.W.3d 393, 403 (Tenn. 2016) for the proposition that the traffic violation alleged by Trooper Connors is *de minimis* and does not meet the probable cause standard. In *Smith*, the defendant's vehicle momentarily crossed the fog line and the court found that this violation was so *de minimis* that it did not meet the probable cause standard. *Id*. Here, Trooper Connors observed Carney driving down the interstate and Trooper Connors paced the defendant as driving 70 mph in a 65 mph zone as well as verified the speed with his moving radar. As the defendants state in the Joint Motion, the language of the speed limit statute is clear and unambiguous, and driving over the speed limit is a violation of law. The question of the legality of a stop under the Fourth Amendment is whether, based on an "objective assessment of an officer's actions in light of the facts and circumstances then known to him . . . the officer has probable cause to believe that a traffic violation has occurred or was occurring." *United States v. Ferguson*, 8 F.3d 385, 388-91 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994). The Sixth Circuit has repeatedly confirmed this distinction, holding that probable cause "required only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Barrett*, 890 F.2d 855, 861 (6th Cir. 1989) (*citing Illinois v. Gates*, 462 U.S. 213, 244 n.12 (1983)). *See also United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) ("Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'") (*quoting United States v Bennett*, 905 F.2d 931 (6th Cir. 1990)).

Trooper Connors had probable cause to stop the defendants' vehicle. The relevant statute provides that "it is unlawful for any person to operate or drive a motor vehicle upon any highway or public road of this state in excess of sixty-five miles per hour (65 mph)" T.C.A. § 55-8-152(a). Trooper Connors paced the defendants' vehicle in his patrol vehicle for several moments as well

5

as utilized his in-car moving radar before concluding their vehicle was traveling 70 mph in a 65 mph zone. Therefore, Trooper Connors had the requisite probable cause to initiate a traffic stop.

> B. <u>The traffic stop was reasonable in scope and duration and the canine sniff was based upon reasonable suspicion.</u>

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). To qualify under the Fourth Amendment as a "reasonable seizure," a traffic stop must be "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983). That standard requires "the detention [be] sufficiently limited in time and the investigative means used by the officers involve the least intrusive means reasonably available." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). This standard does not "impos[e] a categorical ban on suspicionless unrelated questioning that may minimally prolong a traffic stop." *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010); *accord Stepp*, 680 F.3d at 622 ("A traffic stop is not 'measurably' extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree."). The Supreme Court has noted, "An officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

In order to evaluate whether a stop is reasonable and has not been measurably extended, the Court conducts a "fact-bound, context-dependent inquiry" to assess "whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*– including any prolongation due to suspicionless unrelated questioning–was reasonable." *Everett*, 601 F.3d at 493-94 (*quoting United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008))

6

(emphasis in original). When conducting this inquiry, "the overarching consideration is the officer's diligence – i.e., his 'persevering' or 'devoted application to accomplish the undertaking' of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." *Id.* at 494 (quoting Webster's Third New International Dictionary Unabridged (1981) at 633); *accord United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("in assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). One factor used in determining an assessment of an officer's diligence is the subject matter of the extraneous questions; "questions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer do not bespeak a lack of diligence." *Stepp*, 680 F.3d at 633; *accord Everett*, 601 F.3d at 494-95.

Trooper Connors did not unreasonably prolong the traffic stop. A large portion of the detention of the defendants was to identify the initial purpose of the stop, the need for Trooper Connors to identify the occupants of the vehicle, and to determine Carney's ability to safely operate the vehicle. Within the first five minutes of the stop, Trooper Connors ran Carney's information through his in-car computer and began asking itinerary questions as well as receive the vehicle registration. When Trooper Connors checked vehicle registration, he discovered the passenger, Hayes, was the owner of the car. Due to this discovery, Trooper Connors asked Hayes questions to include itinerary questions which yielded different answers than those given by Carney. A total of sixteen minutes elapsed between the initial stop and when Trooper Connors deployed his K9 partner. *See, e.g., United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (finding detention reasonable where the entire investigation lasted less than one hour with

7

approximately thirty-five minutes spent waiting for a canine unit to arrive; *United States v. Knott*, 839 F.2d 285, 290-91 (6th Cir. 1988) (finding a thirty-minute detention was not inherently unreasonable).

Upon approaching the vehicle at 6:01 a.m., Trooper Connors asked for Carney's license and the vehicle's registration so he could conduct a records check. *See United States v. Bonilla*, 357 F. App'x 693, 696 (6th Cir. 2009) ("Requesting a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation do not exceed the scope of a traffic stop."). Trooper Connors asked Carney step out of the vehicle and walk back to the patrol vehicle where Trooper Connors asked reasonable questions, among them confirming information on his license, who the passenger in the vehicle was, and what their travel plans were. *See Stepp*, 680 F.3d at 662 (explaining that questions during traffic stop about where defendants "were going and where they were coming from" were proper).

Continuing to acquire preliminary information, Trooper Connors approached Hayes, seated in the front passenger seat and asked for her license and asked similar itinerary questions. When Hayes' responses contradicted Carney's prior responses, Trooper Connors suspicions of criminal activity continued to arise. *See Everett*, 601 F.3d at 494 (finding that "certain locomotion-related inquiries not strictly directed to the motorist's conduct at the time of the stop, such as the motorist's travel history and travel plans," do not suggest a lack of diligence because they "may help explain or put into context why the motorist was committing the suspicious behavior the officer observed") (internal quotation marks omitted).

At 6:14:14 a.m., Trooper Connors radioed his dispatch in order to check for possible warrants. The dispatch officer confirmed receipt of the request at 6:14:38 a.m. Immediately after the confirmation from his dispatch, Trooper Connors deployed his K9 partner at 6:16:00

8

a.m. After the free-air sniff was completed, the warrants check was completed and the information was relayed back to Trooper Connors at 6:19:52 a.m. Based upon the totality of the circumstances and upon the training and experience of Trooper Connors, the deployment of his K9 partner Lakey was based upon his reasonable suspicion of criminal activity. Contrary of the Joint Motion argument, Trooper Connors' continued investigative steps throughout the course of the traffic stop were lawful.

The Joint Motion relies upon *Rodriguez v. United States*, 135 S.Ct. 1609 (2015). However, *Rodriguez* is distinguishable from the present facts. In *Rodriguez*, a K9 officer completed his check of the driver's licenses of both Rodriguez and his passengers, issued a traffic citation, and then subsequently waited for another law enforcement officer before conducting a canine sniff. *Id.* Trooper Connors expeditiously checked Carney's and Hayes' licenses and registration, radioed to check warrants, and immediately deployed his K9 partner. There was no extension of the traffic stop in order to conduct a K9 sniff. Additionally, Trooper Connors' reasonable suspicion of criminal activity continued to rise based on the actions and statements of the defendants throughout the stop. As the Court noted in *Rodiriguez*, "[b]eyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1611.

Alternatively, if the Court finds that the trooper extended the traffic stop beyond the time reasonable to write a traffic citation, the trooper developed reasonable and articulable suspicions during the stop itself, i.e. the disparity in itineraries, Carney's demeanor and inconsistent answers, and Hayes' demeanor and inconsistent statements. Reasonable suspicion requires

9

specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see also United States v. Sokolaw*, 490 U.S. 1, 7 (1989). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000).

> C. Trooper Connors was not required to issue a *Miranda* warning to the defendants as the traffic stop and questions were not custodial in nature.

The Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v Arizona*, 384 U.S. 436, 478-79 (1966). Trooper Connors questioned the defendants to determine whether criminal activity was afoot. However, based on a totality of the circumstances, the defendants were not in custody and *Miranda* warnings were not required. The location of the questioning took place on Interstate 40, the defendants were not handcuffed or placed in the back of a police car, defendant Hayes remained within her own car throughout the stop to include the canine sniff around the car, and the questions were cordial and conversational in nature. Although the defendants were not free to drive away from the scene, they were not detained to the degree that is characteristic of a formal arrest. *See United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Trooper Connors temporarily detained the defendants, however, the detention was not custodial in nature. Trooper Connors was in a marked Tennessee Highway Patrol vehicle and he

10

activated his emergency lights to initiate the traffic stop. Trooper Connors was wearing his uniform, which is clearly a law enforcement officer's uniform, to include personal equipment and a firearm. However, the United States Supreme Court has noted the difference in a routine traffic stop and those situations associated with a police interrogation room (*See Berkemer v McCarty*, 468 U.S. 420, 437-39 (1984)). In *Berkemer*, the Court said "we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id* at 437. The Court cited two factors. First, detention of motorists for a traffic violation is presumptively temporary and brief. *Id.* Second, the circumstances of a traffic stop are not of a nature that a "motorist feels completely at the mercy of the police." *Id.* at 438. The defendants were not entitled to receive *Miranda* warnings and the absence of such warnings does not require suppression of the defendants' statements.

> D. Trooper Connors and his K9 partner, Lakey, are reliable and therefore the K9 alert to the odor of narcotics was valid.

Trooper Connors and his K9 partner, Lakey, have been trained and certified since December of 2017. Since then, Trooper Connors and Lakey have re-certified annually. The Government intends to present evidence and testimony at the evidentiary hearing on this matter, as well as procedures utilized to conduct a K9 sniff of a vehicle.

The Joint Motion argues because of recent changes in Tennessee state law regarding hemp, a positive alert from a canine is not reliable. This argument does not hold water. Trooper Connors' K9 partner is trained to detect the odor of a variety of narcotics, one of those odors is methamphetamine, which was found in the defendants' vehicle. Hemp has been highly regulated within the State of Tennessee, with an industrial pilot program regarding the cultivation of hemp

11

starting in 2014 and still ongoing as of the date of this reply brief.[1] Carney and Hayes both have drivers' licenses from the State of Virginia and there is no evidence to suggest either is working within industrial hemp farming.

Trooper Connors' K9 partner does not train with hemp. Lakey is trained and certified on the odor of cocaine, heroin, marijuana, and methamphetamine. Marijuana is a Schedule I controlled substance under the Controlled Substances Act and the possession of marijuana is a prosecutable offense. Lakey alerted three times to the odor of narcotics emanating from the defendants' car. As Lakey sniffed the right rear passenger area of the defendants' vehicle, Lakey alerted three distinct times.

## IV. CONCLUSION

For the reasons stated herein, the defendants' Joint Motion should be denied. Respectfully submitted this 4th day of November, 2019.

                                        J. DOUGLAS OVERBEY
                                        UNITED STATES ATTORNEY

By:    s/ *Alan S. Kirk*
        Alan S. Kirk
        Assistant United States Attorney
        800 Market Street, Suite 211
        Knoxville, TN 37902
        (865) 545-4167
        alan.kirk@usdoj.gov
        AL Bar#:5539N45K

---

[1] *See https://extension.tennessee.edu/Cheatham/SiteAssets/Pages/default/Hemp%20W777.pdf*