<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TENNESSEE
 2                    AT KNOXVILLE, TENNESSEE

 3   _____ )
     UNITED STATES OF AMERICA,   )
 4                               )
             Government,         )
 5                               )
     vs.                         ) Case No. 3:19-cr-73
 6                               )
     WANDA HAYES and PATRICK     )
 7   CARNEY,                     )
                                 )
 8            Defendants.        )
     _____ )
 9
                    SUPPRESSION/MOTION HEARING
10            BEFORE THE HONORABLE H. BRUCE GUYTON

11                 Tuesday, November 19, 2019
                    9:34 a.m. to 12:25 p.m.
12
     APPEARANCES:
13
                 ON BEHALF OF THE GOVERNMENT:
14
                 ALAN SCOTT KIRK, ESQ.
15               U.S. DEPARTMENT OF JUSTICE
                 OFFICE OF U.S. ATTORNEY
16               800 Market Street
                 Suite 211
17               Knoxville, TN 37902

18               MS. ADDIE MARTIN, Extern
                 MR. JEFF BRINK, Extern
19

20

21

22
     REPORTED BY:
23
     Teresa S. Grandchamp, RMR, CRR
24   P.O. Box 1362
     Knoxville, Tennessee 37901
25   (865) 244-0454
</pre>

1   **APPEARANCES:** (Continued)

2              **ON BEHALF OF THE DEFENDANT CARNEY:**

3              JOSHUA D. HEDRICK, ESQ.
               WHITT, COOPER, HEDRICK & WOJCIK
4              607 Market Street
               Suite 1100
5              Knoxville, TN 37902

6              **ON BEHALF OF THE DEFENDANT HAYES:**

7              MARY MARGARET KINCAID, ESQ.
               FEDERAL DEFENDER SERVICES OF EASTERN
8              TENNESSEE, INC.
               800 South Gay Street
9              Suite 2400
               Knoxville, TN 37929

10                        *  *  *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    <u>WITNESS FOR THE GOVERNMENT:</u>                        <u>PAGE</u>

3    <u>TROOPER WILLIAM CONNORS</u>

4    Direct Examination                                      7
     By Ms. Martin
5
     Further Direct Examination
6    By Mr. Kirk                                            29

7    Cross-Examination                                      65
     By Mr. Hedrick
8
     Cross-Examination                                     119
9    By Ms. Kincaid

10   Redirect Examination                                  120
     By Mr. Kirk
11

12

13

14                            <u>EXHIBITS</u>

15   <u>STIPULATED EXHIBITS:</u>

16      <u>EXHIBIT</u>                              <u>ID:</u>     <u>IN EVID:</u>

17   Exhibit No. 1 (Dash cam video clips)    6         6
     Exhibit No. 2 (Dash cam video clips)    6         6
18   Exhibit No. 3 (Tennessee Highway        6         6
                    Patrol report)
19   Exhibit No. 4 (Laky Certificates)       6         6

20                   *  *  *  *  *  *  *  *

21

22

23

24

25

1          THE COURTROOM DEPUTY:  All rise.

2          The United States District Court for the

3  Eastern District of Tennessee is now open.  The

4  Honorable Bruce Guyton, United States Magistrate Judge,

5  presiding.

6          Please come to order and be seated.

7          Case No. 3:19-cr-73, United States of America

8  versus Wanda Hayes and Patrick Carney.

9          Here on behalf of Defendant Hayes is Molly

10  Kincaid.

11          Is counsel for Defendant Hayes present and

12  ready to proceed?

13          MS. KINCAID:  Present and ready, Your Honor.

14          THE COURTROOM DEPUTY:  Here on behalf of

15  Defendant Carney is Joshua Hedrick.

16          Is counsel for Defendant Carney present and

17  ready to proceed?

18          MR. HEDRICK:  Present and ready, Your Honor.

19          THE COURTROOM DEPUTY:  Here on behalf of the

12:32PM  20  government is Alan Kirk, Addie Martin and Jeff Brink.

21          Is counsel for the government present and ready

22  to proceed?

23          MR. KIRK:  Present and ready, Your Honor.

24          THE COURT:  Good morning, Counsel.  The matter

25  is before the Court for a motion to suppress and we'll

1    hear the evidence on that first.

2           The Court also is going to need to address the

3    trial schedule in this case.  We'll do that when we

4    finish taking testimony and so forth with regard to the

5    suppression motion, but I'll go ahead and ask the deputy

6    clerk to check on some new trial dates for Judge Varlan

7    if the parties are interested in moving their trial

8    date, which is December the 10th.  If you don't want to

9    move it, that's up to you, but I'm just saying that's an

09:34AM  10   issue we need to address.

11           All right.  The Court has reviewed the filings

12   in this matter.  I don't think there is any need for any

13   opening statements.

14           Government's first witness, please.

15           MR. KIRK:  Yes, Your Honor.

16           If I may -- if it please the Court -- just

17   address a couple of housekeeping matters real quick

18   regarding -- what the government has done is placed --

19   the government will intend to have four exhibits.  I

09:34AM  20   placed all four on a disk for the Court.

21           And if the Court would like to receive those,

22   both defense counsel have stipulated to these exhibits;

23   so we'd offer those to the Court at this time.  And as

24   they become relevant, we'll tender those to the Court

25   and bring them up to the witness.

1    MR. HEDRICK:  So stipulated.

2    MS. KINCAID:  Yes, Your Honor, that's correct.

3    THE COURT:  All right.  The Court will receive

4  the stipulated Exhibits 1 through 4 to this proceeding.

5    (Stipulated Exhibits 1 through 4 were

6    marked/received into evidence.)

7    MR. KIRK:  May I approach, Your Honor.

8    THE COURT:  Yes.

9    MR. KIRK:  And, Your Honor, just for the

09:35AM  10  record, Exhibit 1 and 2 are dash cam video clips from

11  the highway patrolman Trooper William Connors.

12    Exhibit 3 is his Tennessee Highway Patrol

13  report that's relevant to this case.

14    And Exhibit 4 are two certificates regarding

15  training and graduation of his canine partner, Laky.

16    Your Honor, also, if it please the Court,

17  Ms. Martin will handle the first half of the direct of

18  Trooper Connors and I will finish the direct of

19  Mr. Connors, and Mr. Brink, if necessary, will offer

09:35AM  20  argument at the end, if that will be all right with the

21  Court.

22    THE COURT:  Any objection to splitting the

23  questioning?

24    MS. KINCAID:  No, Your Honor.

25    MR. HEDRICK:  Sorry.  No, Your Honor.

1    THE COURT:  All right.  Proceed.

2    MR. KIRK:  And with that, we will call Trooper

3  Connors.

4    THE COURT:  All right.  Sir, if you'll just

5  come stand beside the witness chair and raise your right

6  hand to be sworn.

7    Madam Clerk, would you please swear the

8  witness.

9    THE COURTROOM DEPUTY:  Yes, Your Honor.

09:36AM  10    (The witness was thereupon duly sworn.)

11    THE COURTROOM DEPUTY:  Please be seated.

12    **TROOPER WILLIAM CONNORS**,

13  having been first duly sworn, was examined and testified

14  as follows:

15                    DIRECT EXAMINATION

16  BY MS. MARTIN:

17  Q.    Good morning.

18  A.    Good morning.

19  Q.    Can you please introduce yourself to the Court.

09:36AM  20  A.    Trooper William Connors.  I'm with the

21  Tennessee Highway Patrol.

22  Q.    And how long have you been with the Tennessee

23  Highway Patrol?

24  A.    I've been with them since February 1st of 2015.

25  Q.    And what is your title?

1  A.        I'm on the criminal interdiction team.  That's

2  my title right now, yes, ma'am.

3  Q.        And have you been on that since 2015?

4  A.        No, ma'am.  I started that in -- go back

5  here -- January of 2018.

6  Q.        Okay.  So at the time of this stop, you were on

7  that team?

8  A.        Correct; yes, ma'am.

9  Q.        And prior to that, were you in law enforcement?

09:37AM 10  A.        I was.  I was also in the military for eight

11  years in the Marine Corps.

12            After the -- after the Marine Corps, I was with

13  the Johnson City Police Department for -- from 2008 to

14  2015.

15            During that timeframe, I served on the criminal

16  investigation division, CID, as an interdiction officer

17  there, as well as we worked with gangs, dangerous drugs

18  and things of that nature for approximately three years

19  on that team before I went to the highway patrol.

09:37AM 20  Q.        Okay.  And at the highway patrol, what are your

21  main duties?

22  A.        Main duties is traffic safety, number one;

23  first and foremost.  Then down to our team, we look for

24  people that are smuggling, any type of criminal activity

25  across our interstates or through our state from point A

1    to point B.

2    Q.         Okay.  You said you were on the criminal

3    interdiction team?

4    A.         Yes, ma'am.

5    Q.         And are you specifically trained in that; do

6    you have to be?

7    A.         Yes, ma'am, I am.

8    Q.         Okay.  And can you explain the training; just a

9    summary of it.

09:38AM  10   A.         Yes, ma'am.  So starting back with the police

11   department in Johnson City, on their team, I went to

12   several classes and conferences ran by Desert Snow.

13   They're interdiction-based law enforcement officers that

14   teach interdiction caselaw.  They try to teach per what

15   circuit that you work in for the federal system; like

16   we're in the 6th.

17             Then with the highway patrol, I've been through

18   the National Interdiction Conference, which is a host of

19   classes and education for a whole week;

09:39AM  20   multiple -- multiple times with that.

21             The Drug Interdiction Assistance Program.  They

22   do classes as well.  And it's interdiction officers from

23   across the state, and I've trained in Georgia,

24   Tennessee, Indiana, Colorado.

25             I've worked with CBP as part of my interdiction

1    duties down in McAllen, Texas.  So we're kind of spread

2    out all over the United States doing our training

3    education.

4    Q.        And can you just tell the Court exactly what

5    interdiction is.

6    A.        It's basically finding, locating people that

7    are smuggling.  Doesn't matter whether it's drugs,

8    humans, guns, money; any type of higher-end criminal

9    activity that travels across our state, we try to find

09:39AM  10    it as it's traveling through our state.

11    Q.        Okay.  And are you up-to-date on all your

12    certifications?

13    A.        Yes, ma'am.

14    Q.        And what are those certifications?

15    A.        Those are what I've just said.

16    Q.        Okay.

17    A.        Each year we try to keep -- keep our officers

18    that are on the interdiction team through a bit of

19    training because it changes from year to year, day to

09:40AM  20    day, month to month.  So it's always evolving, always

21    changing.  So we try to stay up on current trends with

22    other states.

23            We meet up with seven or eight other states

24    once a year to go over trends and things like that, what

25    they're seeing, just to educate ourselves on what

1    they're seeing and educate them on what we're seeing on

2    the interstates.

3    Q.      Let's talk about Laky.  Who is Laky?

4    A.      Laky is my drug-detector canine.  He's a

5    Belgium Malinois, and he's approximately four years old.

6    Q.      Okay.  Has he been with you all those four

7    years?

8    A.      No, ma'am.  I've had him since he was

9    about -- they don't give their birthdays whenever

09:40AM 10   they're imported from overseas.  But I've had him for

11   about -- since about middle of 2017; beginning to middle

12   of 2017 is when I first got him.

13   Q.      And does Laky have to have certification?

14   A.      He does, yes, ma'am.

15   Q.      And is Laky up-to-date on his certifications?

16   A.      He is, yes, ma'am.

17   Q.      Okay.  How do canines get certified?

18   A.      Okay.  So we have to train two days, two days a

19   month, eight hours each day.  So 16 hours a month is

09:41AM 20   what we're required.

21   Q.      Every month?

22   A.      Every month.

23   Q.      Okay.

24   A.      And then we train on the four odors, marijuana,

25   meth, heroin, cocaine.  That's what he's trained to

1    alert to.

2          Then once a year we will certify with USPCA,

3    United States Police Canine Association, with their

4    master handlers, master trainers.  They come in from

5    various states, or if there is master trainers, other

6    local agencies that are certified trainers, they will

7    come in, and they grade us and certify us wherever that

8    might be.  Most of the time usually it's in Nashville

9    where our canine headquarters is.

09:41AM  10   Q.       And how long do those certifications last?

11   A.       Usually a day to two days, just depending on

12   how many people, how many officers come in to do it,

13   because we'll certify -- USPCA, multiple agencies

14   certify underneath that association.  So the last time I

15   believe it was -- I believe there was just one day, but

16   it was all-day certification.

17   Q.       And once you get the certifications, how long

18   do they stay in effect for?

19   A.       So they're in effect for a year.  Like, from

09:42AM  20   the date -- say we certified in July of this year.  It

21   would be good until December 31st the next year.

22   Q.       Okay.  So it could be up to a year-and-a-half?

23   A.       Could be, yes, ma'am.

24   Q.       Okay.

25   A.       But we try to certify every -- before the year

1   ends is the way our program is designed.

2   Q.        And do they give you any certificates once you

3   complete --

4   A.        They do, yes, ma'am.

5   Q.        And you provided the government with some of

6   these certifications --

7   A.        Yes, ma'am.

8   Q.        -- do you recall that?

9   A.        Yes, ma'am.

09:42AM  10        MS. MARTIN:  At this point, Your Honor, the

11   government would like to move Exhibit 4 into evidence.

12   The parties have already stipulated.

13        MR. HEDRICK:  Judge, it's been stipulated to

14   its admissibility.

15        THE COURT:  It will be received.  It's already

16   marked No. 4.

17        MS. MARTIN:  Thank you, Your Honor.

18   BY MS. MARTIN:

19   Q.        Officer Connors, can you see this on your

09:43AM  20   screen?

21   A.        Yes, ma'am.

22   Q.        Okay.  Can you walk me through what the United

23   States Police Canine Association is at the top here

24   (indicating)?

25   A.        That's the association.  So this is the

1    Certificate of Certification from the USPCA, which is

2    the United States Police Canine Association.  They do

3    narcotics dogs, bomb dogs, tracking dogs.  Laky is just

4    a narcotic-only dog.  So they certified me in just the

5    narcotics part.

6    Q.      And is that who you went to Nashville to do the

7    one- to two-day certification with?

8    A.      Yes, ma'am.

9    Q.      Okay.  And this certification, it looks like

10   it's from May 31st, 2018?

11   A.      Yes, ma'am.

12   Q.      And that's still in effect, this certification

13   is?

14   A.      Yes, ma'am.  We actually certify again tomorrow

15   with our dogs with the USPCA back in Nashville.

16   Q.      Okay.  So this one was in effect on

17   January 23rd, 2019?

18   A.      Yes, ma'am, it was.

19           MS. MARTIN:  Okay.  Can we scroll down.  I

20   think there is another --

21   BY MS. MARTIN:

22   Q.      Okay.  And it's -- can you tell me what this is

23   (indicating)?

24   A.      Yes, ma'am.  This is a -- the same association.

25   It's just another certificate of attendance where they

1  send out two certifications; one for the attendance for

2  me personally and then one for Laky for his actual

3  Certificate of Certification.

4  Q.        And do you have to keep these on record

5  somewhere?

6  A.        We do, yes, ma'am.

7  Q.        Where do you keep them?

8  A.        They stay on file with our canine division with

9  Devery Moses.  He's our administrator for the canine

09:44AM  10  program in Nashville at our headquarters.

11  Q.        And does Laky come with you every time you're

12  on duty?

13  A.        Yeah, unless there is a -- unless I'm coming to

14  court or something for an extended period of time, he'll

15  stay at home.  But if I'm out on the road working, he'll

16  be with me, yes, ma'am.

17  Q.        And, Trooper Connors, how many stops have you

18  done over the years?  Just an estimate.  I know you

19  probably don't have an exact number.

09:45AM  20  A.        10-, 20,000, 30,000.  I mean, I've been in law

21  enforcement for 11, 12 years; so a lot.

22  Q.        And do you know how many of those have been

23  challenged?

24  A.        I don't have an exact number, but not -- not

25  many of them, no, ma'am.

1  Q.        Okay.  And when you're doing those stops, do

2  you have video and audio?

3  A.        Yes, ma'am.

4  Q.        Okay.  Where is the video?

5  A.        So the camera, video camera, in our car is

6  mounted right in the center of our car, kind of to the

7  right of our rearview mirror.  And then there is audio

8  inside the car, and we also have audio mics that connect

9  to our person, if that makes sense.

09:45AM 10  Q.        Okay.  So when you get out of the car, you have

11  audio on you?

12  A.        Correct.

13  Q.        Okay.  And did you do a traffic stop involving

14  the defendants here, Ms. Hayes and Mr. Carney, on

15  January 23rd, 2019?

16  A.        Yes, ma'am.

17  Q.        And was that stop captured on video?

18  A.        It was, yes, ma'am.

19  Q.        Was it captured on audio?

09:46AM 20  A.        Yes, ma'am.

21  Q.        So both of the audio and video devices were

22  working?

23  A.        Yes, ma'am.

24  Q.        And have you reviewed this video and audio --

25  A.        Yes, ma'am.

1    Q.        -- of this stop?

2              And does that fairly and accurately depict your

3    traffic stop of these defendants on January 23rd, 2019?

4    A.        Yes, ma'am.

5              MS. MARTIN:  Okay.  Your Honor, at this point

6    the government moves to admit Exhibit 1 into evidence,

7    which has also been stipulated to.

8              THE COURT:  Admitted.  Thank you, Counsel.

9              MS. MARTIN:  Thank you, Your Honor.

09:46AM 10   BY MS. MARTIN:

11   Q.        So can you kind of walk me through when these

12   audio and video devices turn on.

13   A.        So either I can turn it on manually by hitting

14   the record button or I can -- let's see -- manually hit

15   the button, or when I turn my lights on, it will

16   automatically turn on.  If I turn my lights on, it turns

17   on the camera, but the audio doesn't start -- it -- let

18   me take that back.

19             So when I turn on my lights, it goes back

09:47AM 20   30 seconds and starts from that point and starts

21   recording forward.

22   Q.        The video?

23   A.        The video.  So from the time that I turn it on,

24   it starts 30 seconds before that.  The video starts.

25   The audio doesn't start until I actually turn the lights

1    on, if that makes sense.  So there will be a 30-second

2    gap in-between until the audio turns on.

3    Q.      Okay.  And you said you yourself can manually

4    turn them on, too?

5    A.      Yes, ma'am.

6    Q.      Okay.  Do you remember if you manually turned

7    them on on January 23rd, 2019?

8    A.      I believe I manually turned it on.  I'm not a

9    hundred percent sure on that.

09:47AM  10  Q.      Why would you manually turn it on?

11   A.      If I'm watching a vehicle that has showed me

12   some factors that there may be some criminal activity

13   going on, I'll try to capture the violation on video

14   before the actual traffic stop begins.

15   Q.      Okay.  And are those indicators; is that what

16   you --

17   A.      Indicators or factors, yes, ma'am.

18   Q.      Okay.  And what are indicators or factors?

19   A.      So the things relevant to this stop that I saw,

09:48AM  20  so I sit at the 409 mile marker on I-40; that's where I

21   was sitting that day watching the eastbound side of

22   I-40.

23           It was dark.  I'm watching traffic come from

24   west to east.  There is a little grade of a hill as the

25   cars were coming towards me.  So the vehicle in question

1  comes across in the middle lane of I-40.  There is a

2  tractor-trailer behind it.

3          As soon as they come across the hill and they

4  see me, they move over to the right-hand lane and then

5  slow down beside the tractor-trailer.  So as they pass

6  by me, they're hidden from -- hidden from my view by the

7  tractor-trailer as they go past.

8  Q.      Okay.

9  A.      Most traffic -- most normal traffic won't do

09:49AM 10  that.  If they're traveling the speed limit, they may

11  let off the gas; they may tap their breaks, but they

12  won't switch lanes and then hide themselves behind

13  another vehicle.

14  Q.      Okay.  Why is that significant to you?

15  A.      Basically they're trying to hide themselves.

16          MR. HEDRICK:  Your Honor, I object to the

17  testimony that the traffic yielding to faster traffic on

18  his left is hiding himself.

19          THE COURT:  Sustained.

09:49AM 20          MR. HEDRICK:  Move to -- well, it's not --

21  BY MS. MARTIN:

22  Q.      Why does it -- why do you notice this car?

23  A.      It moved to the right-hand lane.  It was in the

24  middle lane.  It moved to the right-hand lane.

25          MS. MARTIN:  Okay.  And can we play the video?

1          THE COURT:  Yes.

2          (Video file played in open court.)

3    BY MS. MARTIN:

4    Q.        So, at this point, where are you?

5    A.        This is about the 409, the 410 mile marker and

6    the paved median.

7    Q.        Okay.  And what are we looking at here?  Do we

8    see the car pass?

9    A.        No, they had already gone past before I -- by

10   the time that I had pulled out.

11   Q.        Okay.  And why -- so you manually turned the

12   video on here?

13   A.        I did, yes.  Yes, it would have manually turned

14   on.  It was the 30 seconds back from this point.

15   Q.        Okay.  And why are you still sitting?

16   A.        I'm letting the car -- watching to see if

17   they're going to continue to slow down in that lane,

18   reduce speed, or if they're going to speed back up.  So

19   I watched them as they get further down the interstate

20   before I actually pull out on them.

21   Q.        And why do you do that?

22   A.        To see if they continue to slow down or if they

23   will speed back up.

24            A lot of times traffic will take back off as

25   soon as they're out of view of an officer.  If they're

1   not up to criminal activity, they will just take back

2   off to their speed that they were doing.

3          Sometimes people will maintain that speed for a

4   while.  Just to see what their reaction is to my

5   presence sitting there.

6   Q.     And is that pretty standard for you to do?

7   A.     Yes, ma'am.

8   Q.     Okay.  Now, the first indicator or factor that

9   you were talking about, them changing lanes and slowing

09:51AM 10  down, is that enough to pull them over?

11  A.     No, ma'am.

12         MS. MARTIN:  Okay.  If we could play the video.

13         (Video file played in open court.)

14  BY MS. MARTIN:

15  Q.     So now you're pulling out.  And how -- do you

16  know how far ahead the car is?

17  A.     They're about -- I mean, they're up there where

18  the brake lights are; several cars into that group of

19  traffic.

09:51AM 20         MS. MARTIN:  Okay.  And if we can pause that

21  for one second.

22  BY MS. MARTIN:

23  Q.     Tell me on this left side of this screen what

24  the -- all this means.

25  A.     Okay.  So you've got your top.  That's just

1    your different audios.

2    Q.        Uh-huh.

3    A.        The next is the volume for, like, in-car.  I

4    can turn it up or down.

5    Q.        Okay.

6    A.        The second part is:  I can switch to camera one

7    or camera two, which is -- camera one is facing forward;

8    camera two is facing rear.

9    Q.        Okay.

09:52AM  10  A.        If I turn my lights on, my sirens on or my

11   brakes, those boxes will turn red.

12   Q.        Okay.

13   A.        The PIPs, I'm not exactly sure what those do.

14   We've never used them or seen them turned on.

15            The GPS has your lat longs, where you're at.

16   It has your speed and your heading.

17   Q.        Okay.  So at this point your speed is 100 miles

18   per hour?

19   A.        Yes, ma'am.

09:52AM  20            MS. MARTIN:  Okay.  We can keep playing.

21            (Video file played in open court.)

22   BY MS. MARTIN:

23   Q.        And will you just let me know when you see the

24   car.

25   A.        Yes, ma'am.

 1      So they're going to be in the far right lane

 2  still.

 3  Q.      Okay.  Do we see them right now?

 4  A.      No, ma'am.  No, ma'am.

 5  Q.      Okay.

 6  A.      Okay.  They're going to be right here on the

 7  far right lane (indicating) --

 8  Q.      Okay.

 9  A.      -- on the back end of this tractor-trailer.

09:53AM  10      MS. MARTIN:  Okay.  Can we pause it for a

 11  second.

 12  BY MS. MARTIN:

 13  Q.      All right.  I'm going to -- is that it where I

 14  just did the arrow?

 15  A.      Yes, ma'am.

 16      MS. MARTIN:  Okay.  We can keep playing.

 17      (Video file played in open court.)

 18  BY MS. MARTIN:

 19  Q.      Okay.  So what are you doing right now?

09:53AM  20  A.      So right here, I'm pacing him, backing my speed

 21  off until I match theirs.

 22  Q.      Okay.

 23  A.      So once I match theirs at 70 miles an hour with

 24  my vehicle, my moving radar runs on front-facing, same

 25  way.  So the front antenna shoots out and gets the speed

1    of the people that are in the vehicle in front of me.

2    So then I'll move over behind them and confirm my pace

3    with their speed to the far right lane here.

4    Q.        Okay.  So you're going 70 miles per hour right

5    now?

6    A.        Yes, ma'am.

7    Q.        And with the pacing, you're keeping up with

8    their car --

9    A.        Yes, ma'am.

09:54AM 10    Q.        -- and not gaining on them?

11              THE COURT:  Counsel, let's let the witness

12    answer the questions; okay?

13              MS. MARTIN:  Yes, Your Honor.

14              THE COURT:  Let's hear the witness's testimony,

15    not yours.

16              Thank you.  Go ahead.

17    BY THE WITNESS:

18    A.        So I'm -- my vehicle, I'm matching their speed

19    with my speed, making sure they're not creating more

09:54AM 20    distance or more distance -- or I'm creating more

21    distance on them.

22              It's not a true, actual pace, if that makes

23    sense.  I'm just getting, in my mind, how fast they're

24    going with the pace right here.  That way I can estimate

25    their speed, which I estimated at 70 miles an hour.

1  That's why I confirm it with my -- with my in-car radar

2  once I move to the lane behind them.

3  BY MS. MARTIN:

4  Q.       Okay.  Tell me about your in-car radar.

5  A.       So I've got a front and rear antenna that

6  shoots out front and rear.  So if I'm sitting

7  stationary, I can get vehicles coming towards me, or I

8  can change it to front, moving away from me, and it will

9  get vehicles going away from me.

09:55AM  10       Same way with -- when I'm -- when I'm traveling

11  in traffic, if somebody is coming up behind me really

12  fast, I can use my rear same radar and it will catch

13  their speed as they're approaching me.  Same way goes

14  with the vehicle that's in front of me.  It will catch

15  their speed as they're in front of me moving.

16  Q.       And are you using that?

17  A.       Yes, ma'am.

18  Q.       Okay.  On your report, when you select how you

19  are determining the speed of this car --

09:55AM  20  A.       Yes, ma'am.

21  Q.       -- do you remember what you selected?

22  A.       Yes, ma'am.  So, pace, what I normally

23  typically do is if -- whatever method I use first,

24  that's what I'll put in the drop-down box.  You're

25  only -- you can only actually click on one.  You can't

1  pick multiple things, if that makes sense, on the

2  drop-down box.  So I usually use the first one that I

3  used, which was the pace method.  And then when I moved

4  over, that's when the radar came into the -- came into

5  contact with that vehicle.

6  Q.        Okay.  And how do you calibrate this radar?

7  A.        So it's certified every year by our radio

8  techs.  They're certified to do that once a year.  And

9  then at the beginning of each shift, we have tuning

09:56AM  10  forks that we use to calibrate the machine itself and

11  the antennas to make sure that they're working and

12  picking up proper speed.

13  Q.        And was it calibrated on this date?

14  A.        Yes, ma'am.

15        MS. MARTIN:  Okay.  We can keep playing.

16        (Video file played in open court.)

17        MS. MARTIN:  Okay.  We can pause it.

18  BY MS. MARTIN:

19  Q.        We just heard you say something.  What were

09:56AM  20  you -- were you talking to someone?

21  A.        I was just documenting for the camera on their

22  speed, 70 in a 65 zone.

23        MS. MARTIN:  Okay.  We can keep playing.

24        (Video file played in open court.)

25        MS. MARTIN:  Okay.  You can pause it.

1   BY MS. MARTIN:

2   Q.       So what's happening here?

3   A.       Number one, you can see as soon as I get behind

4   them, they immediately let off -- either their brake or

5   let off the gas, because as soon as I get behind them,

6   you can see that tractor-trailer start to create

7   distance from us.  That's when I initiate the traffic

8   stop.

9   Q.       Okay.

09:57AM 10          MR. HEDRICK:  Your Honor, I -- excuse me.  I'm

11   sorry.

12          I object to lack of foundation with respect to

13   his conclusion that this car let off the brake and not

14   that the tractor-trailer accelerated.

15          THE WITNESS:  Going off the -- going off the

16   radar speed.

17          THE COURT:  All right.  Excuse me.

18          THE WITNESS:  I'm sorry.

19          THE COURT:  I'll take that objection under

09:57AM 20   advisement.

21          MR. HEDRICK:  Thank you, Your Honor.

22          THE COURT:  In the middle of the testimony, I

23   can't rule on it.

24          MR. HEDRICK:  Thank you, Your Honor.

25          MS. MARTIN:  Okay.  We can keep playing.

1        (Video file played in open court.)

2        THE COURT:  Counsel, can you pause that.

3   BY MS. MARTIN:

4   Q.     Okay.  So what's happening here?

5   A.      This is the traffic stop.  This is where the

6   car makes the final stop on the roadside here, right

7   about the 412 mile marker.  I believe it's the 412 right

8   there.

9   Q.      Okay.  And what did you notice when you pulled

10  them over?

11  A.      If you'll notice, as it continues to play, the

12  driver leaves the right turn signal on, which is just

13  something, through my experience in law enforcement

14  training, most people, once they come pull over, they

15  usually turn it back off because they hear that clicking

16  noise of the turn signal and it's -- to me, it's

17  irritating to listen to it clicking, clicking, clicking,

18  click, click.  Most people hear that and they will turn

19  it back off.

20       A lot of times when people are extremely

21  nervous, they block out everything that's going on

22  around them and they don't even notice that the turn

23  signal is continually on.

24  Q.      Okay.

25  A.      Now, for safety-wise, someone that's just

1    pulled over, a lot of times they will leave it on to

2    signal people coming behind them that they're pulled

3    over and they're staying there which would be a

4    different type of situation.

5              MS. KINCAID:  Your Honor, I would object to

6    that answer as to speculation as to the cause of why

7    someone would leave their turn signal on.

8              THE COURT:  Sustained.

9              MS. MARTIN:  Your Honor, at this point,

09:59AM  10   Mr. Kirk is going to take over the rest of the

11   questioning.

12                    FURTHER DIRECT EXAMINATION

13   BY MR. KIRK:

14   Q.        Trooper Connors, let's go back in time in the

15   video just a little bit.

16             When you were observing the tractor-trailer in

17   the middle lane and the Nissan Versa in the right lane,

18   did you observe the brake lights on the tractor-trailer

19   illuminate?

10:00AM  20   A.        No, sir.

21   Q.        And do you recall if you observed the brake

22   lights on the Versa illuminate?

23   A.        I did not, no.

24   Q.        And did you ob- -- and you said previously you

25   observed distance.  Can you describe to me one more time

1    the distance being created between the tractor-trailer

2    in the middle lane and the Versa in the right lane.

3    A.        At -- when they topped the hill?

4    Q.        As you were following and pacing, you were

5    describing that just a minute ago.  I want to make sure

6    I understood your answer correctly.

7    A.        Yes.  So as soon as I follow behind them,

8    directly behind them in the right-hand lane, their

9    vehicle speed slows because my vehicle speed obviously

10:00AM  10   has to slow because they're slowing down, which you can

11   see, which is documented on the left side of the screen

12   there.

13   Q.        Okay.  Let's observe you approach the vehicle,

14   and as you -- before you hit play, let's listen to you

15   observe and approach the vehicle.  Do you recall which

16   side of the vehicle you approached?

17   A.        The passenger side.

18   Q.        Okay.  We'll observe this and then I'll have

19   some follow-up questions after that.

10:01AM  20           (Video file played in open court.)

21   BY MR. KIRK:

22   Q.        Okay.  Trooper Connors, describe what you

23   observed when you looked into the vehicle.

24   A.        So, as I'm approaching the vehicle, I can't see

25   in because there is a huge box almost to the top of the

1  ceiling in the backseat.  Then when I get to the

2  driver's side, Ms. Hayes is sitting in the passenger

3  seat and Mr. Carney is in the driver's seat.

4  Q.      Okay.  And what did you observe when you saw

5  the two of them?

6  A.      They were both awake.  He was looking for his

7  license through his wallet or whatever.

8  Q.      Okay.  Do you recall what Ms. Hayes was doing?

9  A.      I believe she was going through the glove

10:02AM 10  compartment.  But she was -- I don't remember exactly

11  what she was doing.  But I believe she was looking

12  through the -- for paperwork for the car.

13  Q.      Okay.  And we noticed you tapped on the window.

14  Did that --

15  A.      Correct.

16  Q.      -- window eventually roll down?

17  A.      It did.

18          MR. KIRK:  Okay.  All right.  Let's continue to

19  watch the video.

10:02AM 20          (Video file played in open court.)

21  BY MR. KIRK:

22  Q.      We're going to switch over to the in-car

23  camera, Exhibit 2, here in a moment, but a couple of

24  follow-up questions regarding what we just saw.

25  A.      Yes, ma'am -- yes, sir.

1    MR. KIRK:  Pause that.  If we can go back to

2  the beginning.  Thank you.

3  BY MR. KIRK:

4  Q.     Okay.  So I believe we saw Mr. Carney driving?

5  A.     Yes.

6  Q.     All right.  And what did you ask?  I

7  know -- let me ask you this:  Where is your microphone

8  normally when you're conducting your duties?

9  A.     It's connected to a -- the clip of it clips

10:04AM 10  over top of this button (indicating) so it doesn't go

11  flying off.  But it's right here at my chest

12  (indicating).

13  Q.     When you say "right here," you're putting your

14  fingers right about the second button down on your tie

15  on your uniform?

16  A.     Yes.

17  Q.     And you're obviously on an interstate system.

18  Is that traffic noise that we're hearing?

19  A.     Yes, sir.

10:04AM 20  Q.     What did you ask for when you approached the

21  vehicle?

22  A.     For his license initially.  It was -- it was

23  broken and almost completely broken in half.  That's

24  what he was telling me when he handed it to me.  I asked

25  for his registration as well.

1    At that point Ms. Hayes had handed him, like, a

2 wad of paperwork.  So I asked for the registration, and

3 he just grabbed the whole -- all the paper and brought

4 it back with him.

5 Q.    And we saw you asked Mr. Carney to join you in

6 your vehicle.  Why did you do that?

7 A.    Correct.  That's where I do all my traffic

8 infractions from.  I have them come back, especially

9 because of how cold it was.  That way I don't have to

10:05AM  10 run back and forth.  If I have any other questions,

11 we're right there where I can take the traffic

12 enforcement action right there in my car.

13 Q.    Okay.  And you just mentioned it was cold.

14 This was January 23rd, 2019.

15 A.    Correct.

16 Q.    Do you recall -- can you describe the weather

17 conditions.

18 A.    The wind was blowing.  I don't remember how

19 cold it was.  It was -- I mean, it would cut right

10:05AM  20 through you, it was that cold.

21 Q.    All right.  What about Ms. Hayes?  As you're

22 approaching or coming back to your vehicle with

23 Mr. Carney, what do you normally do when you have

24 another passenger; in this case, Ms. Hayes?

25 A.    I just had her stay in the vehicle with that --

1   at this particular time, yes.

2   Q.        Okay.  All right.  What are some of the duties

3   that you're going to perform when you initiate a traffic

4   stop?  So you're coming back to your vehicle.  What are

5   some of the things that you're going to do?

6   A.        So I'll have to check their license,

7   registration, the insurance.  I'll also put it into our

8   warning -- we're able to do warnings on the computer and

9   then print them off from our car.  So I'll input all

10:06AM  10   that information.  And I'll either have either

11   dispatch -- I will either call, use the radio or do it

12   myself -- have dispatch run the information through NCIC

13   to verify everything.

14   Q.        Okay.  Let me ask a follow-up question:  Is

15   there a difference between a warning and a citation?

16   A.        There is, yes.

17   Q.        And if you could explain the difference.

18   A.        A warning doesn't go on your record.  It

19   doesn't go against you in any way.  It's just a piece of

10:06AM  20   paper that explains the reason for the stop.  It has all

21   the information, date, time, location, reason for the

22   stop.

23         A citation, exact same thing, except you'll

24   have a court date and potentially fines, fees through

25   the court system for the traffic violation.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1  Q.      And you talked a little bit about this before,

2  but all that is done on your in-car computer?

3  A.      Yes, sir.

4  Q.      Can you explain how that system works.

5  A.      Yeah.  So it's a tablet/computer, but it just

6  hooks in.  It sits almost exactly how this computer

7  screen is sitting to my right with the keyboard.

8          So once I get in there, there is two different

9  systems; the Titan system, which runs the citations or

10:07AM 10  the warnings, and then there is the MPS which runs --

11  where I'll input their information to have it run

12  through NCIC or for warrants checks, things of that

13  nature.

14  Q.      Do you usually utilize both systems on traffic

15  stops?

16  A.      Yes, sir.

17  Q.      And did you do so on January 23rd, 2019?

18  A.      Yes, sir.

19  Q.      All right.  Do you have the capability of

10:07AM 20  printing from your vehicle?

21  A.      I can, yes.

22  Q.      So if you wanted to print a warning or

23  citation, you have that capability?

24  A.      It's on the -- yes, as long as it's a citable

25  offense, yes.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1  Q.        And does your system communicate outside your

2  car?

3  A.        It does, yes, sir.

4  Q.        And how does that work?

5  A.        So if I write an actual citation, like, for

6  speeding, depending on the county, because certain

7  counties aren't up-to-date -- this particular county

8  that I work in is up-to-date.  But I could put it in,

9  click submit, and once it goes in, it will -- their

10 server will pull from our server and input all the

11 citations that were written that day to that particular

12 courthouse via internet.

13        And if I -- there is a box in there that you

14 can click, arrestable offense or non-arrestable offense.

15 If you click arrestable offense, it basically freezes

16 that in time and it won't send that because you have to

17 hand-deliver that if you want that to go on record.

18        If it's a non-arrestable offense, which would

19 be for speeding, simple possession, something of that

20 nature -- or -- I'm sorry -- simple possession

21 is -- you'd have to hand-deliver that one, but for

22 speeding -- excuse me -- or a traffic offense, it would

23 send it directly to the courthouse.

24 Q.        Okay.  Understood.

25        Let's observe about 60 seconds or so and I'll

 1    have some follow-up questions.

 2                (Video file played in open court.)

 3                MR. KIRK:  Can you just pause it for a minute.

 4    BY MR. KIRK:

 5    Q.         I want to note for the Court and the record,

 6    there is a current time down here in the bottom left of

 7    the video, and that says 6:01 and 19 seconds.  Is that

 8    the time of day?

 9    A.         It is, yes, sir.

10:09AM 10  Q.         Okay.

11                (Video file played in open court.)

12    BY MR. KIRK:

13    Q.         Okay.  All right.  You just said, "I'm not

14    going to write you a citation for it."

15    A.         Correct.

16    Q.         Why is that?

17    A.         I just planned on writing him a warning for the

18    traffic violation.  That's usually what I do on most

19    traffic stops.  That's what the intent was, to fill out

10:10AM 20  that warning citation once I made sure that his license,

21    warrant checks, vehicle checks, and insurance checks

22    came back everything clear.

23    Q.         So those -- that list you just gave us,

24    warrants checks, registration, license, is that what

25    you're about to start performing as we observe the

1  video?

2  A.        Correct, yes, sir.

3  Q.        Okay.  Let's watch.

4            (Video file played in open court.)

5  BY MR. KIRK:

6  Q.        So you're asking what I would call itinerary

7  questions.  Why do you do that?

8  A.        It's one thing that I've learned through

9  interdiction classes, education, other veteran officers,

10:11AM 10  just through in my experience as well and doing it, I'll

11  ask basically itinerary questions to see if it matches

12  with, say, the passenger, or if they're unable to

13  answer, their reaction within those questions, how they

14  answer it, what they're doing while they are answering

15  those questions.

16  Q.        Are you also observing Mr. Carney --

17  A.        Yes, sir.

18  Q.        -- throughout this interaction?

19            And why do you do that?

10:12AM 20  A.        I look for either micro expressions or things

21  that they will do, such as touching their face, rubbing

22  their hair, doing grooming techniques, basically to try

23  to calm themselves down because of their level of stress

24  or fear, trying to kind of bring themselves back down to

25  a normal level.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1   Q.        And are these things you've learned through

2   your training as an interdiction officer?

3   A.        Yes, sir.

4   Q.        And have you had experiences in other traffic

5   stops as well that are similar?

6   A.        Yes, sir.

7   Q.        Okay.  Let's --

8             (Video file played in open court.)

9             MR. KIRK:  Can you pause just for a second.

10:14AM  10  BY MR. KIRK:

11  Q.        So I see that you're -- I guess that's your

12  right hand we're looking at.  You're typing.  Are you

13  performing these checks at the same time while you're

14  conversing with Mr. Carney?

15  A.        Yes, sir.

16  Q.        Okay.

17            (Video file played in open court.)

18  BY MR. KIRK:

19  Q.        You testified previously about you

10:15AM  20  observed -- looked for indicators.  Up to this point at

21  6:05 and 13 seconds, had you noticed any indicators that

22  raised your reasonable suspicion?

23  A.        Yeah.  Again, the grooming techniques, the

24  delay on answering what time they left from.  And then

25  when I asked him about if they did anything fun because

1  they went down to see grandkids and he says no, that

2  stuck out to me.  I don't know if I would call that a

3  factor, but grandparents going down a long distance to

4  see their grandkids and they don't do anything fun just

5  stuck out to me as odd.

6  Q.      But not necessarily an indicator?

7  A.         Correct.

8  Q.      But just odd?

9  A.         Correct.

10:16AM  10         MR. KIRK:  Okay.  Let's continue to play,

11  please.

12         (Video file played in open court.)

13  BY MR. KIRK:

14  Q.      Okay.  Through this questioning and answering

15  with Mr. Carney that we just observed --

16  A.         Yes, sir.

17  Q.      -- any indicators there?

18  A.         Not really when I asked him about the

19  narcotics.  He laughs on the money, which indicates that

10:18AM  20  he -- to me, that he knows that there is somewhat of a

21  large amount of U.S. currency.  But when I say 10,000 or

22  more, he kind of brings it back down.

23         MS. KINCAID:  Objection, speculation.

24         MR. HEDRICK:  Join.

25         MR. KIRK:  I'll rephrase that question, Your

1  Honor.

2          MS. KINCAID:  It was more of an objection to

3  the answer.

4          THE COURT:  Well, I think that the trooper can

5  testify as to his personal reaction --

6          MR. KIRK:  Yes, Your Honor.

7          THE COURT:  -- to what was said.  And it will

8  be, I suppose, up to the Court to determine what weight,

9  if any, to give that.

10:18AM  10          MR. KIRK:  Yes, Your Honor.

11          THE COURT:  Thank you.

12  BY MR. KIRK:

13  Q.      When you were asking about -- you went through

14  the list of narcotics.  Did any of those answers stand

15  out or were they an indicator?

16  A.      No, he said no to marijuana, cocaine, heroin.

17  Meth -- he said no to all of them.  Meth, it was a

18  slight change in his voice that I picked up on when he

19  said that, but nothing that really stuck out to me at

10:19AM  20  that point.

21  Q.      Okay.  Understood.

22          (Video file played in open court.)

23  BY MR. KIRK:

24  Q.      Was that the registration he just handed you?

25  A.      Yes, sir.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1        (Video file played in open court.)

2        MR. KIRK:  Pause for just a second.

3   BY MR. KIRK:

4   Q.        I believe he just identified what you described

5   as the big box in the backseat.  What was that?

6   A.        It was like a chicken coop from a co-op or

7   tractor supply or something like that.  It was a big

8   huge box.

9   Q.        And then you asked about luggage.  Why did you

10  ask about luggage?

11  A.        To see if they were -- kind of prove or

12  disprove that they stayed overnight somewhere, if they

13  planning to stay overnight somewhere.  It would also

14  indicate whose bag was what and if he would tell me.

15        You'll also see him when he mentions luggage,

16  he takes a huge breath when he answers.  After he's done

17  answering, kind of relieved that he got it out.

18        MR. HEDRICK:  Judge, I object.  I object to the

19  continued -- the officer's continued attempts to ascribe

20  motivations to what he's seeing.

21        I would ask that the Court instruct the witness

22  to stop doing that so we can get through this a little

23  quicker, please.

24        THE COURT:  Well, to the extent he's

25  speculating as to why the defendant's doing certain

1   things, I sustain that objection. However, the trooper

2   is able to testify as to what his personal reaction is

3   to the statements made. And in some situations that's

4   going to be very close to the same thing.

5        MR. KIRK: All right. Let's go on.

6        (Video file played in open court.)

7        MR. KIRK: If you would pause that. I'm going

8   to switch back to Exhibit 1, which is the front-facing

9   dash camera. And if we could pick back up at the

10:22AM 10   three-minute and 40-second mark is, I believe, where we

11   left off.

12       MS. MARTIN: Three what?

13       MR. KIRK: Three minutes 40 -- right there

14   (indicating); right where you are. And can you just

15   pause.

16       We've picked back up right at the exact same

17   time as you all are exiting the vehicle. So this is

18   back to your front-facing camera with Exhibit 1.

19       Continue to play. I'm sorry. The tracks are

10:23AM 20   just a little off. If you could just fast forward a

21   little bit. No, no, no, no. Should be about right

22   there (indicating). Yeah.

23       (Video file played in open court.)

24       MR. KIRK: Keep going forward a little bit

25   more, please.

1          (Video file played in open court.)

2          MR. HEDRICK:  It's 6:08:05 --

3          MR. KIRK:  Thank you.

4          MR. HEDRICK:  -- on the video.

5          (Video file played in open court.)

6          THE COURT:  I'm sorry.  Could you replay that?

7          MR. KIRK:  Can you back it up just a few

8    seconds, please, for the Court.  Right there

9    (indicating).  All right.  Press play, please.

10:24AM  10          (Video file played in open court.)

11   BY MR. KIRK:

12   Q.     Did you hear what you just said, Trooper

13   Connors?

14   A.     Yes, sir.

15   Q.     And what did you say?  I know we have some

16   traffic noise, but what did you say there?

17   A.     Let me check the registration and then I'll get

18   them out of there in a few minutes.

19   Q.     Okay.  All right.

10:24AM  20          (Video file played in open court.)

21   BY MR. KIRK:

22   Q.     So at this point you were interacting with

23   Ms. Hayes?

24   A.     Correct.

25   Q.     And you had previously told Mr. Carney you

1  wanted to check the registration, and why is that?

2  A.       The color was different on the registration

3  that he gave me than what the actual car was.

4          We do have a lot of stolen vehicles.  They

5  will, like, switch plates on cars; same car, same

6  make/model, just a different license plate stole from

7  it; same type of car.  So we're just making sure that

8  everything matches and that she is the registered owner

9  and that they're supposed to be in that car.

10:25AM  10  Q.       Okay.  And you had just asked her, "Where are

11  you all coming from today?"  Why is that?

12  A.       Just basic itinerary questions again to see if

13  it's any different from what he was telling me, and then

14  she tells me that they're coming from Abingdon

15  (phonetic).

16  Q.       All right.

17          (Video file played in open court.)

18          MR. KIRK:  Pause that for a minute.

19  BY MR. KIRK:

10:25AM  20  Q.       Now, it's kind of hard to hear Ms. Hayes in

21  this audio.  Do you recall what she said there?

22  A.       I asked them if they stayed -- if she stayed in

23  Tennessee, and -- something to that effect, and she just

24  said, "We're just riding around Tennessee."

25  Q.       Okay.  All right.

1          (Video file played in open court.)

2    BY THE WITNESS:

3    A.       Or riding around.

4          (Video file played in open court.)

5    BY MR. KIRK:

6    Q.       Okay.  What did Ms. -- what did Ms. Hayes say

7    just then?

8    A.       She said that she was headed down to Georgia to

9    see her daughter but she didn't make it.  They didn't

10:26AM 10   make it.

11   Q.       That's different than what Mr. Carney told you?

12   A.       Completely different.

13   Q.       And what is -- as a trooper, what are you

14   noticing about this answer?

15   A.       Somebody is lying to me about their itinerary.

16   Why they're lying would be the reason behind lying about

17   their itinerary.

18   Q.       Would this be an indicator?

19   A.       Yes.

10:27AM 20        (Video file played in open court.)

21        MR. KIRK:  If you could stop there.

22   BY MR. KIRK:

23   Q.       What was Ms. Hayes' answer right there?

24   A.       She said she made it into Georgia, but there

25   was an ice storm, so they came back.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1  Q.        Okay.   And I'm hearing you somewhat repeat what

2  she is saying.   Why are you doing that?

3  A.        Because she is talking real softly, and I like

4  to repeat that so to make sure it picks up on my audio.

5  Q.        All right.

6           (Video file played in open court.)

7  BY MR. KIRK:

8  Q.        From your vantage point there, you could

9  observe Ms. Hayes in the passenger seat?

10 A.        Yes, sir.

11 Q.        And what were you observing her do?

12 A.        She was trying to get her license out of

13 her -- it was in one of those wallet-type things that

14 you've got to slide out.   A lot of times they will get

15 stuck in that plastic.   She was fumbling with it the

16 whole time.   She just now gets it out of her wallet

17 right there.

18 Q.        Okay.

19          (Video file played in open court.)

20 BY MR. KIRK:

21 Q.        Do you recall what she said to you right then?

22 A.        Then she mentions something about a knife store

23 in -- coming from a knife store.   I don't recall the

24 exact extent of what she said in ref- -- they were

25 coming to or going to a knife store.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1  Q.      What were your observations of Ms. Hayes'

2  demeanor?

3  A.      She was extremely, overly nervous.  Just kind

4  of trying to -- you could tell she is trying to make up

5  answers as fast as she could.  She was thinking about

6  how she was going to answer my question.  She was all

7  over the place with her itinerary.  The best way to

8  describe it was just overly, over- -- overly nervous.

9          (Video file played in open court.)

10 BY MR. KIRK:

11 Q.      Okay.  You asked similar questions regarding

12 narcotics in the vehicle that you had asked Mr. Carney.

13 A.      Correct.

14 Q.      What did you observe and hear Ms. Hayes'

15 answers to be?

16 A.      She said no to all of them.  But also when she

17 answers, she just put her head down and answered no with

18 her head down the entire time.

19 Q.      And is that an indicator?

20 A.      It is.  She was not -- she was making eye

21 contact with me when I was talking to her, and as soon

22 as I started asking her those questions, she looked down

23 and starts answering those questions.

24         (Video file played in open court.)

25

1   BY MR. KIRK:

2   Q.        Now, you just asked, "You did go see your

3   daughter?"  Did I hear that correctly?

4   A.        Correct.  I did a clarifying question, and then

5   I asked her and stated it, "So you did go see your

6   daughter?"  Because she was jumping around on her

7   itinerary.  And she said, "No, I did not go see my

8   daughter."

9   Q.        And what was the answer?

10  A.        No.

11            (Video file played in open court.)

12            MR. KIRK:  Pause right there.

13  BY MR. KIRK:

14  Q.        I think our audio and video is a little bit

15  off-sync, but you had asked -- you had a couple of

16  follow-up itinerary questions again to Ms. Hayes.  Why

17  were you asking those questions again?

18  A.        Just clarifying questions based off of the

19  questions I had asked him earlier, clarifying questions

20  with her to see if they matched up or were completely

21  different, which in this case they were completely

22  different.

23            I asked her if they had stayed in a hotel while

24  they were out or stayed anywhere, in a car, a hotel, and

25  she never -- she couldn't answer that question.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1   Q.        And did Ms. Hayes provide you with any other

2   paperwork?  I know you said she got her license out.

3   Insurance or any other paperwork?

4   A.        No, they were never able to provide the

5   insurance for the vehicle.

6   Q.        And then what do you do after you're done

7   talking with Ms. Hayes?

8   A.        So I go back to my vehicle to finish the

9   warning citation, and at this point, I'm going to run

10  them both warrants because in the area of southwest

11  Virginia, northeast Tennessee, Sullivan County,

12  Kingsport, Bristol, and then southwest Virginia border

13  is a huge hub for crystal methamphetamine right now.

14  Knowing that because that's where I used to live at this

15  time.  Also, working with the federal agencies doing

16  things of that nature, it tied directly to crystal

17  methamphetamine in the area.  I knew that was a

18  prevalent area for them to be going to.  Especially when

19  they're coming from a source city, which is Atlanta,

20  Georgia.

21            So I go back in with the itinerary

22  discrepancies, the different changes in their behaviors,

23  went ahead and ran warrants to make sure that they

24  weren't wanted out of Virginia or out of Sullivan County

25  for anything.

1  Q.       Okay.  And at this point in time that we're

2  observing where I paused at 6:12 and 24 seconds, what

3  suspicions -- what suspicion do you have?  What's the

4  height of your suspicion?

5  A.       I'm suspicious that they're up to criminal

6  activity.  There is some type of criminal activity going

7  on.  In my opinion, at that time they were transporting

8  some type of illegal substance from Atlanta, Georgia,

9  which is a source city, back to where they live in

10 southwest Virginia.

11         MR. KIRK:  And if we could let this player

12 remain, and if we can switch back to Exhibit 2, please,

13 and let's pick up at 6:12-and-a-half, please.

14         (Video file played in open court.)

15         MR. KIRK:  Little bit further back.

16         (Video file played in open court.)

17 BY MR. KIRK:

18 Q.       So this is back at -- on the time there, it

19 says 6:12 and 53 seconds.  This is after you've spoken

20 with Ms. Hayes at the side of the Versa.

21 A.       Correct.

22 Q.       And now we're going to observe you and

23 Mr. Carney getting back into your vehicle.

24 A.       Correct.

25         MR. KIRK:  Okay.  Let's just let this play.

1      (Video file played in open court.)

2  BY MR. KIRK:

3  Q.      Okay.  Why were you asking these questions

4  again of Mr. Carney?

5  A.      Again, clarifying questions to make sure that

6  he's going to give me the same answer again that he did

7  previously.  Also to see if any other -- anything else

8  would potentially come out that he would admit to

9  potentially in their itinerary.

10:36AM  10  Q.      Okay.  And did anything from these responses

11  stick out to you?

12  A.      Previously he said that he had never been down

13  to her daughter's house, and then right here he just

14  says, "Yeah, I have; I've been down there before."  So

15  right there he's lying to me again from the previous

16  answer.

17  Q.      Okay.

18      (Video file played in open court.)

19      MR. KIRK:  Pause for a second.

10:37AM  20  BY MR. KIRK:

21  Q.      What is a 29 check?

22  A.      A warrant check.

23  Q.      Okay.  At this point at 6:14 and 16 seconds,

24  had you completed the checking the registration and

25  license, the previous checks you were doing?

A.        The -- yes, correct.  I checked the -- made

sure that the license is valid, registration is valid.

I'm still finishing up on the warning citations.  There

is about four or five parts you have to put in there.

Q.        When you say finish up, that's what you talked

about earlier, where you're putting information onto

your computer sitting there in your car?

A.        Correct, into the Titan system.

Q.        And now you're starting -- you said the 29 is a

warrants check?

A.        Yes.

Q.        And who is that that you're talking to?

A.        So that's my dispatch.  They're based out of

the Knoxville/Strawberry Plains area.  So I'll contact

them directly and give them the license number and they

can check through their system, through the National

Crime Information Center.

          They also can call -- they have got the numbers

there to call the local counties and check to make sure

there is not any warrants on file because a lot of the

local counties won't put their warrants into NCIC, so

they have to check them locally, separately from NCIC.

Q.        And typically how long does a warrant check in

your experience typically take?

A.        With two people, they can be anywhere from one

1  minute, two minutes, three minutes.  It really depends

2  on what they have going on at dispatch because at that

3  time of night, there is usually only one or two

4  dispatchers and they're covering the Fall Branch

5  district and the Knoxville district.  So if they're

6  checking other counties for people, they're doing that

7  first before they get back to me.

8  Q.        Okay.

9            (Video file played in open court.)

10:39AM  10  BY MR. KIRK:

11  Q.        Is this the driver's license numbers?

12  A.        Correct.

13            (Video file played in open court.)

14            MR. KIRK:  Switch back to Exhibit 1.  That was

15  6:14.

16            (Video file played in open court.)

17            MR. KIRK:  A little bit further.

18            (Video file played in open court.)

19            MR. KIRK:  This might be a little bit of an

10:40AM  20  overlap, but we'll pick it up from here.

21            (Video file played in open court.)

22  BY MR. KIRK:

23  Q.        At what point -- did you run your canine

24  partner Laky at this traffic stop?

25  A.        Yes, sir.

1  Q.      At what point during the traffic stop did you

2  come to the decision to run Laky?

3  A.      Basically after I had talked to Ms. Hayes, I

4  knew there was some type of criminal activity going on

5  within that vehicle.  That's the point that I was either

6  going to ask for consent or just go ahead and run the

7  dog.

8          With the way Mr. Carney was acting in the car

9  when I asked certain questions, I didn't even ask him

10 for consent for the car.  I just went ahead and ran the

11 dog to see if he would pick up on any narcotic odor

12 coming from the car.

13 Q.      And where is Laky?

14 A.      He sits directly behind me in the kennel in the

15 car.

16 Q.      Okay.  So he's been sitting in your car this

17 entire time?

18 A.      Correct, yes, sir.

19          MR. KIRK:  Okay.  All right.

20          (Video file played in open court.)

21 BY MR. KIRK:

22 Q.      And has --

23          MR. KIRK:  I'm sorry.  One more question.  I'm

24 sorry.  Thank you.

25

10:41AM (line 10)

1  BY MR. KIRK:

2  Q.        And has the warrants check been completed at

3  this point, 6:14 and 29 seconds?

4  A.        No, they have not radioed back to me yet.

5  Q.        Okay.

6          (Video file played in open court.)

7  BY MR. KIRK:

8  Q.        We hear you say "Good boy."  It seemed to take

9  a little bit of time to get Laky out.  Why is that?

10:43AM  10  What were you doing?

11  A.        Putting my jacket on because it was extremely

12  cold.  I think I put my toboggan on.  And, of course, I

13  have to get his lead and hook him up and get him out.

14  And I usually go right beside my car and let him use the

15  bathroom real quick before I take him up to the car.

16  Q.        Okay.  And I'll -- we'll play it here in a

17  second, but we'll observe you run the canine, and then

18  after it, I'll pause and ask you some questions.

19  A.        Yes, sir.

10:43AM  20          (Video file played in open court.)

21          MR. KIRK:  I'll pause here in a second, but

22  we'll observe you run the -- Your Honor, I'm -- quick

23  apology.  The video and audio is a little bit off-sync,

24  and if it would please the Court, if we could ask for

25  just a brief recess to see if I could get this back

1    synced up for the Court.

2         THE COURT:  All right.  We'll take a few

3    minutes.  Please tell the courtroom deputy when you're

4    ready to proceed again.

5         MR. KIRK:  Yes, Your Honor.  My apologies to

6    the Court.

7         THE COURTROOM DEPUTY:  All rise.  This

8    honorable court stands in recess.

9         (A brief recess was taken.)

10:57AM  10     THE COURTROOM DEPUTY:  This Court is again in

11   session.  Please come to order and be seated.

12        THE COURT:  Counsel.

13        MR. KIRK:  Yes, Your Honor.  I appreciate the

14   break.  The audio and video will still be a little bit

15   off as our government laptop is struggling to keep up.

16   BY MR. KIRK:

17   Q.     But we will pick it up from here, Trooper

18   Connors.  Let's observe the canine going around the

19   vehicle.

10:57AM  20     (Video file played in open court.)

21   BY MR. KIRK:

22   Q.     All right.  Trooper Connors, our video is

23   lagging a little bit.

24   A.     Yes.

25   Q.     So if you could talk us through the process of

1  running Laky around the Versa.

2  A.        So when I go to do a free-air sniff around a

3  vehicle, most of the time I'd start at the front on the

4  interstate just because the traffic passing is blowing

5  all that air directly ahead.  So I'll start at the very

6  front and I'll run either counterclockwise one way, and

7  as soon as I run it all the way around the vehicle, I'll

8  reverse that and run the opposite way.

9          Just due to the way cars are made, different

11:00AM 10  makes and models, there is different areas where air is

11  going to get out and leak out of that vehicle.  With

12  traffic going by and not going by, it's going to swirl

13  that air in different ways.  So the reason why we run

14  them two different directions is just in case he misses

15  it.  If it is there on the first go-round, on the way

16  back around, it gives him a chance to possibly get an

17  odor going the opposite way.

18  Q.        For every vehicle that you do a canine

19  sniff-around, do you do that every time, the clockwise

11:00AM 20  and then counterclockwise?

21  A.        Correct.

22  Q.        And Laky went around the vehicle once, we did

23  see.  Did we see an alert that first go-round?  At that

24  time it was clockwise.

25  A.        Correct.  No.  Not the first time, no.

1  Q.        And then tell us about the second time back

2  around, the counterclockwise.

3  A.        So on the second time, he actually bypasses me,

4  he goes in front of me and works -- at that time I can

5  tell he has an odor because you'll see him lift his head

6  up and he'll run around the car, and he'll actually go

7  up the side of the car, and that's when he goes to a

8  final alert in sit.

9          Once he sat, I re- -- where he alerted to, I

11:01AM 10  re-presented it to him, just to check again, to run

11  back, and he went back in that same odor, which is the

12  back rear tire, passenger side, and then worked that

13  same side up again.

14  Q.        Okay.  You said when he sits, that's the alert?

15  A.        Correct, yes, sir.

16  Q.        And how many times did he alert at that

17  particular location, to the best of your memory?

18  A.        I believe it was two or three -- two or three

19  times he sat right in that area.  The video lagged right

11:01AM 20  there.  I can't remember if it was two or three.

21  Q.        And why do you -- when you say -- you know,

22  when you're saying "check" -- we could hear that in the

23  audio -- why are you saying that?

24  A.        I'm just presenting an area that I want him to

25  check again.  When he ran past me, obviously I knew

1    there was an odor.  When I went around the car, went up

2    and then alerted, I was actually walking towards him.

3    Which that can sometimes cause them to sit and be a

4    false alert.  So I didn't want that to be an issue.

5           So that's when I had re-presented that area

6    that he alerted to and backed away from him.  That way I

7    wasn't causing him to go into a final sit.  And as I was

8    walking away, he sat back on his own.

9           I think I checked it a third time to make sure.

10   I can't -- I don't want to be -- I don't want to say

11   something wrong, but I think it was three times, but --

12   Q.       Okay.

13   A.       -- we'd have to go back and look at the video.

14   Q.       Where was Mr. Carney while you were running

15   Laky around the vehicle?

16   A.       He's standing at my front passenger tire just

17   off in the median right there (indicating) is where I

18   usually have people stand.

19   Q.       Okay.  And where was Ms. Hayes during the

20   canine sniff?

21   A.       She is still in the front passenger seat.

22   Q.       Had the warrants check returned that we heard

23   you earlier call in, the 29 check, as you called it, had

24   the results of that come back to you on the radio at

25   this point?

1    A.       No, sir, not yet.

2    Q.       Do you recall when that came back?

3    A.       I believe it was another minute or two before

4    it comes back.  I don't know the exact time frame

5    when --

6    Q.       It was after the canine sniff?

7    A.       It was after the canine, yes.

8    Q.       After Laky alerts, do you -- what do you do

9    after that?  Do you radio anybody else or do you tell

11:03AM 10   your dispatch anything?

11   A.       Correct.  So if there is more than one occupant

12   in the car, we're supposed to call for a secondary unit

13   to search the vehicle.  That way we're not searching the

14   vehicle by ourself.  Unless we don't have a dog cage, we

15   can put them in the backseat of a car.  But I'm only

16   able to secure one person.  So I actually called for

17   Trooper Woods to come to my location for the vehicle

18   search.

19   Q.       Okay.  And did Trooper Woods, did he show up to

11:03AM 20   your location at some point?

21   A.       He did, yes.

22   Q.       Okay.  And as Laky alerted, did you decide

23   you're going to search the vehicle?

24   A.       Yes, sir.

25   Q.       Did you inform Mr. Carney that you were going

1  to search the vehicle?

2  A.        I did, yes, sir.

3  Q.        And did you explain to him the basis of why you

4  were going to search the vehicle?

5  A.        I did.  He became very defensive as soon as I

6  told him the reason that I was going to hold him and

7  search the vehicle at that point due to the Fourth

8  Amendment vehicle exception.  He tried to argue it was a

9  different amendment.  Not that that really matters, but

11:04AM  10  that he was very defensive about me searching that

11  vehicle.  He did not want me to search that vehicle.

12  Q.        And prior to searching the vehicle, was

13  Ms. Hayes asked to step out of the vehicle?

14  A.        Once Trooper Woods got there, I did have her

15  exit the vehicle, just for our safety, but I left her

16  inside the warm car as long as I could up to that point.

17  Q.        Okay.  Where did -- after they were pulled out

18  of the vehicle, prior to the search of the vehicle,

19  where was -- where was Ms. -- Ms. Hayes -- excuse me --

11:05AM  20  and Mr. Carney, where were they told to go?

21  A.        They stayed off to the side of the roadway for

22  a short time, and then with the probable cause search,

23  we went ahead and put them in the back of the car to

24  stay warm.

25            I did offer initially if she wanted to sit in

1    the car.  They didn't want to.  And then we had them sit

2    in a few minutes later to keep them -- it's safer inside

3    of a car than standing up there if someone rode into the

4    side of her car.

5    Q.        When you say offered to let her sit in the car,

6    which car are you referring to?

7    A.        Any one of the cruisers.

8    Q.        Not the Versa; is that correct?

9    A.        Correct.

11:05AM  10    Q.        Okay.  Prior to the search of the vehicle, at

11    this point was Ms. Hayes under arrest?

12    A.        No.

13    Q.        And was Mr. Carney under arrest?

14    A.        No, sir.

15    Q.        Okay.  Did you personally conduct the search of

16    the vehicle?

17    A.        I did, yes, sir.

18    Q.        And did any other trooper help you?

19    A.        Trooper Kevin Stroope assisted in it as well.

11:05AM  20    Trooper Woods actually stood by with the subjects back

21    there and was kind of standing to the side of the car.

22    Q.        Okay.  And what was found in the vehicle?

23    A.        There was five baggies of crystal

24    methamphetamine located in a red suitcase or bag in the

25    trunk of the vehicle.

FURTHER DIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1   Q.     Okay. And have you observed and seen in your

2 experience as a highway patrolman crystal ice

3 methamphetamine?

4   A.     I have, yes.

5   Q.     And you're familiar with what it looks like?

6   A.     Yes, sir, I am.

7   Q.     And what it feels like?

8   A.     Yes, sir.

9   Q.     And did what you found in the car this day, was

11:06AM 10 it consistent with that --

11   A.     Yes, sir.

12   Q.     -- with ice methamphetamine?

13   A.     Yes, sir, it did.

14   Q.     Did you find anything else?

15   A.     There was about $2500 in cash that Ms. Hayes

16 had on her person in the -- in the front seat of the car

17 with her.

18   Q.     After the ice methamphetamine was found, were

19 they -- was Ms. Hayes and Mr. Carney placed under

11:06AM 20 arrest?

21   A.     They were, yes.

22   Q.     And were they advised of their Miranda rights?

23   A.     They were, yes.

24   Q.     Is that standard procedure?

25   A.     It is, yes.

1    Q.       Did you do that advisement or did another

2    trooper?

3    A.       I believe I did, but I don't want to tell you

4    something wrong.

5            MR. KIRK:  Just one moment, Your Honor.

6            No further questions, Your Honor.

7            THE COURT:  Thank you, Counsel.

8            Mr. Hedrick.

9            MR. HEDRICK:  Thank you, Your Honor.

10           If I may, Your Honor.

11           THE COURT:  Yes.

12           MR. HEDRICK:  Thank you.

13                    CROSS-EXAMINATION

14   BY MR. HEDRICK:

15   Q.       Trooper Connors, Josh Hedrick.  Good morning,

16   sir.

17   A.       Good morning.

18   Q.       All right.  I'd like to start with your start.

19   You've been with the highway patrol, you say, since

20   2015?

21   A.       Correct, yes, sir.

22   Q.       But you've only worked with Laky -- tell me if

23   I'm saying that name wrong -- since 2017.

24   A.       Correct.

25   Q.       How many -- I know you don't have an exact

1   number, but how many stops -- you told us about 10- to

2   20,000 stops.  How many stops do you think you've made

3   since you've been assigned with Laky?

4   A.        So I've had him since -- one, two -- almost two

5   full years with him.  So, gosh, I mean, I don't even

6   know where to get close to.  A few thousand.

7   Q.        Okay.  Maybe 2-, 3,000?

8   A.        Possibly.

9   Q.        Okay.

11:08AM  10   A.        With him in the car --

11   Q.        Right.

12   A.        -- if that's what you're referencing.

13   Q.        Right.  I'm trying to narrow the 10- to 20,000

14   down to how many you've done with the dog.

15   A.        Got you.

16   Q.        So you say that's probably about right?

17   A.        Guesstimating, yes, sir.

18   Q.        Sure.  All right.  Now, when you originally saw

19   this vehicle, you were in a -- I guess a drive through

11:09AM  20   the median; right?

21   A.        Yes.

22   Q.        Where you can pass from one side of the

23   interstate to the other?

24   A.        Yes, sir.

25   Q.        Located between mile marker 409.4 and 409.6?

1    A.        I believe so, yes.

2    Q.        More or less --

3    A.        Yes, sir.

4    Q.        -- right?

5              And you were running interdiction; right?

6    A.        Yes, sir.

7    Q.        What's the difference between interdiction and

8    traffic?

9    A.        Working traffic and interdiction?

11:09AM  10   Q.        Yes, sir.

11   A.        Interdiction, my duties is to find people that

12   are smuggling, any type of criminal activity, higher-end

13   criminal activity, where somebody who is, say, per se, a

14   traffic unit is out there doing the same thing that I'm

15   doing, enforcing traffic laws.  It's just that I'm

16   looking for criminal activity along with that.

17   Q.        Okay.  You're more focused on drug issues?

18   A.        Any criminal act.  We're an all crimes approach

19   interdiction team.

11:10AM  20   Q.        Which is why you usually write warning tickets?

21   A.        Most of the time, yes, sir.

22   Q.        Now, when you saw this Nissan, you came up

23   behind him.  You saw him pass by and you pulled up and

24   came up behind him --

25   A.        Correct.

1    Q.        -- right?

2              When you came up behind him, you got behind him

3    as he was behind and to the right of a tractor-trailer;

4    is that correct?

5    A.        Correct, yes, sir.

6    Q.        And you were closing on him; right?

7    A.        When I was coming up, correct.

8    Q.        And your speed was increasing as you approached

9    him at the point in which you say that the Nissan began

11:10AM  10   to slow down.

11   A.        At which point are we talking about?  I'm

12   sorry.

13   Q.        I'll get you on the video.

14             Okay.  So this is Exhibit 1; would you agree?

15   A.        Yes, sir.

16   Q.        And we are about to watch you approach --

17   you've got your lights on.  Give me just a second.

18             All right.  Now, what we're looking at right

19   here, sir, is Exhibit 1, and it's about 146 on the

11:11AM  20   recording, and this is a period in the video where you

21   are approaching the Nissan; am I right?

22   A.        Correct, yes, sir.

23   Q.        And you're about to -- if I recall correctly,

24   you're about to pull in behind the Nissan --

25   A.        Correct, yes, sir.

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1  Q.        -- right?

2           And at which point you testified that the

3  Nissan slowed; correct?

4  A.        Yes, sir.

5  Q.        And then you initiated your emergency equipment

6  and pulled him over?

7  A.        Correct.

8  Q.        Okay.  Now, we're going to play that video just

9  a little bit.

11:12AM 10           (Video file played in open court.)

11  BY MR. HEDRICK:

12  Q.        And we see that your speed -- your speed

13  appears to have changed from 71 to 72 and then back down

14  to 71 and 68 --

15  A.        Correct, yes, sir.

16  Q.        -- correct?

17           And at 68 when you put your lights on --

18  A.        Correct.

19  Q.        -- right?

11:12AM 20           And at that point he pulls over right at about

21  exit 412?

22  A.        Correct.

23  Q.        Now, when you get off the highway at exit 412,

24  there aren't really any gas stations or anything

25  immediately at the exit as there are with others.

1    A.        There is two off the 412.

2    Q.        Well, you have to go up the ramp and across the

3    bridge; right?

4    A.        It's right off the exit.

5    Q.        Yes or no?

6    A.        Yes, there is gas stations right off the exit.

7    Q.        But you have to go up the exit ramp; right?

8    A.        Correct.

9    Q.        And you have to turn left and go over the --

11:12AM   10   over the interstate --

11   A.        Correct, yes.

12   Q.        -- before you get there?

13   A.        Yes.

14   Q.        Okay.  So up the ramp and over the bridge to

15   get to the gas stations?

16   A.        Yes, sir.

17   Q.        All right.  Now, you stopped him -- the purpose

18   of the stop was for speeding; right?

19   A.        Yes, sir.

11:13AM   20   Q.        And when you stopped him for speeding, you

21   ended up ultimately writing a citation; right?

22   A.        No, sir.

23   Q.        Pardon?

24   A.        No, sir.

25   Q.        No.  Oh, not a warning?

1    A.        When you say "citation," citation meaning that

2    it was sent into the courts.

3    Q.        Uh-huh.

4    A.        Okay.  The citation that you're referring to is

5    a -- it's a citation, but it's not turned into the

6    courts; it is for documentation for our records only as

7    a department.

8    Q.        Why do you keep those records?

9    A.        We have to -- any time we make an arrest, we

10   have to have a citation, whether it be single citations.

11   So the handwritten single citations have -- each one has

12   a number, a red number that tracks those, and then we

13   have the citations that we print off which also have

14   tracking numbers on them.

15   Q.        Right.  But the question was why.

16   A.        For documentation of the traffic stop.

17   Q.        Okay.  Why do you document the traffic stop?

18   A.        Because that's what we do; we document the

19   traffic stops.

20   Q.        Is there not any purpose?  Do you ever use --

21   do you ever use that documentation for anything?

22   A.        Yes, sir.

23   Q.        Okay.  So that would be the purpose.  So tell

24   us what the purpose is.

25   A.        Okay.  So we can track how many traffic stops

11:13AM (line 10)

11:14AM (line 20)

1    we make --

2    Q.        Right.

3    A.        -- things of that nature; speed, following too

4    closely, intent.  Any type of violations that we stop

5    people for, just documentation.

6    Q.        May I suggest to you that the reason that you

7    make these documents is so that there is a record of

8    what happens?

9    A.        Correct.

11:14AM 10   Q.        Have you considered that as it might be the

11   reason why do you this?

12   A.        Documenting, like I said earlier.

13   Q.        You think that may be true?

14   A.        Yes, sir.

15   Q.        And because it's important to have a good

16   useful documentation; right?

17   A.        Correct.

18   Q.        And if it's not useful or it's not accurate,

19   there is no point in having it; would you agree with

11:15AM 20   that?

21   A.        Correct.

22   Q.        Now, in this situation, this citation

23   that -- whatever it was you want to call it, you filled

24   something out.  Well, what should we call it if it's not

25   a citation?

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1  A.       You can call it -- you call it a citation.

2  It's just not one that's turned into the court.

3  Q.       Okay.  I'll keep calling it a citation.

4  A.       Documenting piece of paper.

5  Q.       Okay.  So you filled out a documenting piece of

6  paper in which you -- now, of course, in this case, you

7  said Ms. Hayes was driving the car, but that was, I

8  assume, an error?

9  A.       It was, yes, sir.

11:15AM  10  Q.       Okay.  And you said that the speed was verified

11  by pacing; right?

12  A.       Yes.

13  Q.       I didn't hear.

14  A.       Yes.

15  Q.       Okay.  Now, today in court you're telling us

16  that you had a radar read; correct?

17  A.       Yes, sir.

18  Q.       That radar read doesn't appear on any of the

19  documentation you created in this case, does it?

11:15AM  20  A.       No, sir.

21  Q.       It doesn't appear on anything you called in to

22  dispatch, does it?

23  A.       No, sir.

24  Q.       I assume it doesn't appear on any -- do you

25  keep notes when you're in the field?

1  A.        I have, like, a little handwritten journal of

2  traffic stops, number of stops, reason for the stops;

3  things of that nature.

4  Q.        Okay.  It doesn't appear in there either, does

5  it?

6  A.        No, sir.

7  Q.        Now, so you pull -- get to the car, and now,

8  these times -- this exhibit does not have times on it,

9  as far as I can tell.

11:16AM  10  A.        Which one?  What are you referencing?

11  Q.        The time -- the clock time; right?  So there is

12  a time on the screen, but there is a time of day.

13  A.        The screen we're looking at right here

14  (indicating)?

15  Q.        Yes, sir.

16  A.        I don't see a time right here on this one, no,

17  sir.

18  Q.        But the actual -- like, so there is, in fact, a

19  recording of your --

11:16AM  20        MR. HEDRICK:  With the Court's permission, I'm

21  going to show the witness a recording, Judge.

22  BY THE WITNESS:

23  A.        Where it shows 6:00 a.m.?

24  BY MR. HEDRICK:

25  Q.        Yeah.  It's your cruiser video.  Oops, that's

1 the wrong thing.

2        So what we're looking at right now, sort of a

3 larger format -- sorry.  Sorry.  I didn't expect it to

4 start playing.

5        It's sort of a larger format of what we were

6 looking at before --

7 A.      Correct.

8 Q.      -- would that be fair?  This just is not

9 cropped.

11:17AM 10        And you can see where it says current time.

11 A.      Correct.

12 Q.      That's the time of day --

13 A.      Correct.

14 Q.      -- right?

15        And based on that time of day, you

16 can -- that's accurate, I guess, is what I'm getting at;

17 right?

18 A.      Yes, sir.

19 Q.      All right.  So you pull him over and you walk

11:17AM 20 up to the car at about 6:00 a.m., 6:00 and 20 seconds, I

21 think; would you agree with that?

22 A.      Yes, sir.

23 Q.      Now, at this point -- let's go over what you

24 know about this car; okay?

25        When you walk up to the car, you got a Nissan

1  Versa; right?

2  A.        Yes, sir.

3  Q.        You've paced it at 70 miles an hour; right?

4  A.        Yes, sir.

5  Q.        But it's not a true pace; right?

6  A.        Correct.

7  Q.        Because a true pace is -- actually, it takes a

8  little longer.

9  A.        Two-tenths of a mile.

11:18AM 10  Q.        You didn't have a full two-tenths, did you?

11  A.        No, sir.

12  Q.        You know that when you first saw it, it

13  was -- you crested the hill in the center lane; right?

14  A.        Correct, yes, sir.

15  Q.        With a tractor-trailer behind it; right?

16  A.        Yes, sir.

17  Q.        And then moved from the center lane to the

18  right lane; right?

19  A.        Yes, sir.

11:18AM 20  Q.        At which point the tractor-trailer passed it;

21  right?

22  A.        Yes, sir.

23  Q.        Now, on the interstate, what's the rule about

24  slower traffic?  Slower traffic keep --

25  A.        To the right.

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1  Q.      To the right.

2          Now, you and I are the only people in the world

3  that know that, apparently, but -- so if you are going

4  slower than someone behind you, what are you supposed to

5  do?

6  A.      Move to the right.

7  Q.      Move to the right.

8          And what happens when you move to the right?

9  A.      Traffic can pass you.

11:19AM 10  Q.      Faster traffic passes you, right.

11          So you know that the car crested the hill,

12  moved to the right, was passed by faster traffic; right?

13  A.      Yes.

14  Q.      And that it was from Virginia?

15  A.      Yes, sir.

16  Q.      And those are the things we know about this car

17  so far; right?

18  A.      Correct.

19  Q.      So you suspect it of speeding?

11:19AM 20  A.      Yes, sir.

21  Q.      Now, when you initiate your emergency

22  equipment, turn your blue lights on, and that car pulls

23  over to the side of the road, it stops, parks, you get

24  out of your car; right?

25  A.      Yes, sir.

1    Q.      What would you have done if he had thrown it in

2    drive and taken off down the highway?

3    A.      Initiated a pursuit.

4    Q.      Why?

5    A.      He would be breaking the law.

6    Q.      Okay.  So I assume that that's the point you

7    would not have let him go?  You wouldn't have just said,

8    Oh, well, all right.

9    A.      If he ran from me?

11:20AM  10    Q.      Uh-huh.

11    A.      No, sir.

12    Q.      Well, you say "ran."  I mean, if he had just

13    driven off; right?

14    A.      That's the same.

15    Q.      Not going to let that happen?

16    A.      It's still the same thing.

17    Q.      Yeah.

18            So you walk up to the car; right?  And you get

19    to -- you walk up to the car.  You get to the car, and

11:20AM  20    you say to him you need his license and his

21    registration; right?

22    A.      Yes, sir.

23    Q.      And he's able to provide you with his license;

24    am I right?

25    A.      Yes, sir.

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1   Q.        When you get his license, at that point it's

2   illegal for him to drive away, isn't it?

3   A.        Yes, sir, he's detained on a traffic stop.

4   Q.        Okay.  Because he cannot -- you can't drive

5   away without your license; right?

6   A.        He's lawfully stopped, so, no.

7   Q.        Okay.  Well, the question I asked you was:  You

8   can't drive without your license.

9   A.        Yes.

11:21AM 10   Q.        Okay.  And you see a passenger; right?

11   A.        Correct.

12   Q.        And you don't ask for her license, do you?

13   A.        Not initially, no.

14   Q.        You could have?

15   A.        Yes, sir.

16   Q.        And you could have taken his license, stepped

17   to the rear of his vehicle or even back in your vehicle

18   and called for a records check?

19   A.        Could have.

11:21AM 20   Q.        Okay.

21   A.        That's not how I operate my traffic stops.

22   Q.        Because you're in the interdiction unit?

23   A.        I do -- we do the traffic stops the way that

24   we're told to, the way that we're trained to do them.

25   Q.        Oh, so this -- this wasn't -- this was because

1  you were instructed to do it this way?

2  A.      We're trained, yes, sir, to bring them back and

3  put them in the front seat of our cars, yes, sir.

4  Q.      Who is "we"?

5  A.      The interdiction team.

6  Q.      Okay.  So the interdiction team operates

7  differently than traffic enforcement with respect to

8  separating passengers?

9  A.      It all depends on them as officers.  Just on

11:22AM 10  our teams, we do.  Some regular road troopers do the

11  same thing.

12  Q.      Okay.  And these two individuals were separated

13  because that's what you're trained and told to do?

14  A.      Trained and told to do, yes, sir.

15  Q.      Okay.  So it's not these people.  You didn't

16  separate them because of these people; you separated

17  them because that's what you're told to do?

18  A.      That's how I do my job, yes, sir.

19  Q.      So you asked him to get out of his car and into

11:22AM 20  yours; right?

21  A.      Yes, sir.

22  Q.      Now, at this point, you've moved him from his

23  vehicle into your vehicle; right?

24  A.      Correct.

25  Q.      You still have his driver's license; right?

1    A.         Yes, sir.

2    Q.         Now, you put him in the front seat of your car

3    because you can't really put him in the back, can you?

4    There is a dog back there.

5    A.         No, there is a side -- there is a seat.  I

6    could put him back there.

7    Q.         And you tell him that you've got him for 70 in

8    a 65, but you're not going to write him a citation for

9    that.  That's at 6:01:42.  Do you agree with that?

11:23AM  10    A.         I also -- if I may clarify that I asked him to

11   step back to the car and he willingly came back there.

12   So, yes, I do.

13   Q.         So I don't know how that answers my question.

14   A.         Yes to your question.

15   Q.         Okay.  6:01:42?

16   A.         Yes, sir.

17   Q.         Now, at that point, it's been a minute

18   20 seconds; right?

19   A.         Yes, sir.

11:23AM  20    Q.         And at that point, you do not call in for a

21   records check, do you?

22   A.         Not yet, no, sir.

23   Q.         Okay.  Instead, you ask him to verify his name;

24   right?

25   A.         Yes, sir.

1    Q.       And you ask him for his passenger's name;

2    right?

3    A.       Yes.

4    Q.       Where he's coming from; right?

5    A.       Correct, all while I'm working on the

6    information, yes, sir.

7    Q.       Well, but, see, that's -- the question is:  You

8    could have been talking -- you could have already called

9    dispatch; right?

11:23AM  10   A.       I could have done it a hundred different ways,

11   but that's the way that I do it.  I come back and enter

12   their name into the computer as I'm going --

13   Q.       It's not a personal attack; so I'm not

14   attacking you personally.

15   A.       I'm just answering -- I'm just answering your

16   question.

17   Q.       Focus on the question.

18   A.       I am focused on the question.

19   Q.       You could have called dispatch?

11:24AM  20   A.       Yes, sir.

21   Q.       Okay.  And dispatch could have been running

22   this records check while you're doing the registration

23   check?

24   A.       Which would, in turn, have made the other

25   process even longer on the other side of it, yes.

1    Q.        Why is that?

2    A.        It's the same thing.  You're just reversing

3    when I'm doing it.  It's still going to take the same

4    amount of time.

5    Q.        Does the records check take longer if you call

6    it in sooner?

7    A.        It's the same amount of the time.  Both

8    instances you're talking about --

9    Q.        Right.

10    A.        -- inputting the information and calling it in

11    at the same amount of time.  No matter where you put it,

12    it's going to be the same amount of time.  It doesn't

13    matter here on the road.

14    Q.        Okay.  So what are you checking on your

15    computer; the registration?

16    A.        So, in our system, you input the information so

17    that it can go to dispatch or that I can run it.  So I

18    can look for the validity of the license --

19    Q.        Uh-huh.

20    A.        -- make sure it's valid; make sure it doesn't

21    have any outstanding tickets; make sure it's not

22    suspended/revoked for DUI or something of that nature;

23    making sure that the registration matches the vehicle.

24    Q.        No, at that point in time.

25    A.        That's what I'm doing.

1  Q.       All of that all at once?

2  A.       Yes, sir.  Well, you have to input each

3  separately, and you wait until it runs and comes back.

4  Q.       Okay.  Can you call a tag in to see if a car is

5  stolen?

6  A.       If you ask for an NCIC check on it, yes.

7  Q.       How do you ask?

8  A.       For dispatch.

9  Q.       Okay.  So you could have radioed dispatch,

11:25AM 10  given them the tag number and seen if this car was

11  stolen?

12  A.       I did radio into them.

13  Q.       No, I mean, at that -- in the very beginning.

14  A.       I did.

15  Q.       Well, when -- I thought you said there was some

16  confusion over the color and the registration.

17  A.       The color was black; on the registration, it

18  showed blue that he handed me.

19  Q.       Okay.  So what did dispatch say about it?

11:25AM 20  A.       They didn't tell me what color.  They're not

21  looking at the car.  They don't know what car I'm

22  looking at.  So it means nothing to them.  But they see

23  blue on their side.  They don't know what color car I'm

24  looking at over here.

25  Q.       That wasn't my question.

1  A.        What's your question?

2  Q.        Oh, right.  What did dispatch say about the

3  registration?

4  A.        They didn't say anything about it.

5  Q.        Oh.  Well, that's not very helpful.

6  A.        Just answering your question.

7  Q.        Was there -- they didn't know if it was stolen

8  or not?

9  A.        So I called in the traffic stop --

11:26AM  10  Q.        Uh-huh.

11  A.        -- through my radio, gave them the tag

12  information and the car color and the make and model of

13  the car where the stop is going to be.

14  Q.        Okay.  Did you --

15  A.        They input --

16  Q.        And when you did that, when you called in the

17  car with the tag, did you ask them to check to see if

18  the registration matched the car?

19  A.        No, sir.

11:26AM  20  Q.        Okay.  That's what I'm getting at.  But you

21  could have?

22  A.        I wasn't -- to answer your question, I

23  wasn't -- I didn't see that it said blue on the

24  registration at that point; so I wasn't suspicious that

25  it could be stolen at that point.

1   Q.        But you could have?

2   A.        Could have, but normally would not have.

3   Q.        Okay.  So -- all right.  So we're in the car.

4   You ask him his name, his passenger name, where he's

5   coming from, when he left Atlanta; right?  Now, none of

6   those questions have anything to do with speeding, do

7   they?

8   A.        No, sir.

9   Q.        Now, you asked him how long he's known Wanda.

11:27AM  10   Now it's six minutes -- 6:03:40; right?

11   A.        Yes, sir.

12   Q.        You ask him why he went to Atlanta; right?

13   A.        Yes, sir.

14   Q.        Now, at that point it's been four minutes; am I

15   right?

16   A.        Yes, sir.

17   Q.        You still have his license; right?

18   A.        Yes, sir.

19   Q.        None of these questions have anything to do

11:27AM  20   with speeding?

21   A.        Correct.

22   Q.        None of these questions have a place on the

23   warning form, do they?

24   A.        No, sir.

25   Q.        And none of these questions relate to the

1    registration of the vehicle, do they?

2    A.        There was one or two questions within there,

3    yes, there was, but not all of them, no.

4    Q.        Okay.  His -- his name doesn't -- well, where

5    he's coming from doesn't relate to the registration,

6    does it?

7    A.        No, sir.

8    Q.        What time he left Atlanta doesn't relate to the

9    registration, does it?

11:27AM 10    A.        No, sir.

11   Q.        The purpose of his trip doesn't relate to the

12   registration, does it?

13   A.        It could be, depending on the source city and

14   where they're going back to, the registration, where

15   it's registered out of.

16   Q.        How does that help you answer questions about

17   the registration?

18   A.        It just helps me in my interdiction.

19   Q.        Whether it's properly registered.

11:28AM 20    A.        No, sir, it doesn't.

21   Q.        Okay.  Now, the reality is that you're going to

22   ask him these questions to see if his answers are the

23   same as his passenger; right?

24   A.        Eventually, yes.

25   Q.        And they don't have anything at all to do with

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1    the speeding.  We're trying to find out if he's going to

2    give the same answer as his passenger; right?

3    A.        Ultimately, yes, sir.

4    Q.        Because if he gives a different answer than his

5    passenger, that leads you to believe that there is

6    criminal activity afoot?

7    A.        Not just in-between his passenger and him; it

8    could -- a lot of times we stop occupants that are just

9    solo occupants of the vehicle but we'll have passengers

11:28AM 10 to talk to.  So it could just be the simple answers and

11    micro expressions and their reactions to certain

12    questions and answers while I'm talking to them inside

13    the car while I'm filling out the information, inputting

14    the stuff into the system.

15    Q.        I'm not sure you want to say no to that

16    question.  Let me try again because I feel like maybe

17    I've confused you.

18              If the two people in the car give different

19    answers, that makes you suspicious of criminal activity?

11:29AM 20 A.        Depending on the questions and the answers,

21    yes.

22    Q.        So not always?

23    A.        Correct.

24    Q.        Okay.

25              THE COURT:  Counsel --

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1  BY MR. HEDRICK:

2  Q.        And you asked him about money, drugs and guns;

3  right?

4            THE COURT:  Counsel --

5            MR. HEDRICK:  Sir.

6            THE COURT:  -- we have a very brief matter that

7  we have to take up at 11:30, and it's really brief, but

8  it's critical that it get done today on a representation

9  issue.

11:29AM 10            MR. HEDRICK:  I'm very sorry.

11            THE COURT:  The lawyers are all gathered

12  outside.

13            If I could get the marshals to just switch our

14  defendants in the courtroom, this has to be done, and

15  then we'll get back to you.  I'm sorry to interrupt your

16  cross.

17            MR. HEDRICK:  No, that's quite all right,

18  Judge.

19            THE COURT:  I hate to interrupt any lawyer's

11:30AM 20  examination, but --

21            MR. HEDRICK:  No, I understand, Judge.  Shall I

22  leave this or shall I disconnect it?

23            THE COURT:  You can leave whatever you want to

24  leave.  I don't think they're going to need any space on

25  any table for what we're getting ready to do.

1          MR. HEDRICK:  Yes, sir.

2          THE COURT:  Thank you.  Sorry.  I apologize to

3    both parties.

4          MR. HEDRICK:  None needed, Judge.

5          THE COURT:  All right.  Madam Clerk.

6          THE COURTROOM DEPUTY:  All rise.  This

7    honorable court stands in recess.

8          (A brief recess was taken.)

9          THE COURTROOM DEPUTY:  This court is again in

11:47AM  10   session.  Please come to order and be seated.

11         THE COURT:  Counsel, here is our schedule:  The

12   issue before the Court at this time, it's a quarter

13   until 12:00.  The Court's able to go to 12:15.  Then the

14   Court is going to have to stop and this matter cannot be

15   continue through this afternoon because of other matters

16   that the Court has to do.

17         I don't want to rush anybody.  The Court is

18   available to reconvene on this tomorrow and finish

19   tomorrow.  So, please -- and we'll have to finish this,

11:48AM  20   and I don't want to rush anybody through the officer's

21   testimony.  And I'm sorry, you might have to come back

22   tomorrow.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  But then we also need to take up

25   the trial date and the other schedule, and I'm just

1    telling you now so you can be thinking about what you

2    might want to do.

3          You all may have conflicts for tomorrow

4    morning.  If you do, we'll look at something else.  But

5    having said that, let me get -- we'll let you get back,

6    Mr. Hedrick, and -- but I don't want to rush anyone.  I

7    want everyone to have as full and complete an

8    opportunity as they have for questions; both sides.

9          MR. HEDRICK:  Yes, Your Honor.  I'm sorry.

11:48AM 10    Maybe I misunderstood the Court.  Did you want

11    to -- were you asking us to give an opinion about our

12    availability tomorrow or do you want to just get right

13    back into the hearing?

14          THE COURT:  Well, it's your choice.  If we can

15    agree on that now, that's fine.  Like I said, looking at

16    this, I don't see it all ending in 30 minutes.

17          MR. HEDRICK:  I think that's probably true,

18    Judge, unfortunately.

19          MR. KIRK:  The government is available

11:49AM 20    tomorrow, Your Honor, and at any time tomorrow.

21          MR. HEDRICK:  I can be available -- I'm

22    available tomorrow.  I'm available at the Court's

23    pleasure.  I'm available tomorrow.  It would be nice if

24    we could start, like, at maybe 10:00.  I only say that

25    because I have a couple state court matters that I'd

1  like to have an opportunity to go reschedule before we

2  get started tomorrow.

3          THE COURT:  We can start at 10:00.

4          Ms. Kincaid.

5          MS. KINCAID:  I am available all morning, Your

6  Honor.  I would like to ask:  My client lives in

7  Virginia; so I would maybe want to waive her appearance,

8  depending on whether she could come back or not.

9          THE COURT:  That would be fine.  It's not going

11:49AM  10  to be a violation of her release if she is not here

11  since you've represented that.

12          MS. KINCAID:  Thank you, Your Honor.

13          MR. KIRK:  And, Your Honor, I apologize for my

14  brash answer.  I probably should have conferred with

15  Trooper Connors.  He and his canine partner, Laky, are

16  set to annually recertify tomorrow.

17          THE COURT:  That's correct, he did say that.

18          And I'm going to give everybody -- everybody's

19  going to get plenty of time to do whatever they want to

11:50AM  20  do, and if it's a conflict that can't be resolved with

21  the witness, then, of course, we'll accommodate that as

22  well.

23          MR. KIRK:  Right.  Yes, Your Honor.

24          MR. HEDRICK:  I forgot about that, Judge, in

25  answering the Court's question.

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1    THE COURT:  Yes.  Okay.  All right.  Well,

2  let's just go for -- let's give ourselves another 25 or

3  30 minutes and then we'll see where we are.

4    Mr. Hedrick.

5    MR. HEDRICK:  Thank you, Your Honor.

6  BY MR. HEDRICK:

7  Q.    Trooper, we were -- let me just get back to

8  where we -- get reoriented to where we were, sir.

9    You had -- we have Mr. Carney in your car and

11:50AM 10  you're speaking to him about where he's coming from, why

11  he went to Atlanta, and what he did down in Georgia;

12  okay?

13  A.    Yes, sir.

14  Q.    Okay?  And that's -- we're right about 6:05:10

15  in your video; okay?

16  A.    Yes, sir.

17  Q.    And that's the point at which you verify his

18  address and date of birth; that is, you ask him what's

19  your birthday; what is your address, and I assume that

11:51AM 20  you're comparing that to the license that you have.

21  A.    Correct.

22  Q.    Okay.  And then after that at 6:06 and

23  20 seconds, you ask him about money and drugs and guns

24  in the car --

25  A.    Yes.

1    Q.          -- correct?

2               Has your car got any money in it, large sums of

3    money, guns or drugs; right?

4    A.          Yes, sir.

5    Q.          And at that point he's been stopped for about

6    six minutes; would that be fair?

7    A.          Yes, sir.

8    Q.          And we still have not called dispatch to check

9    records or the registration; right?

11:51AM 10  A.          Correct.

11   Q.          Okay.  Now, then you tell him that we need to

12   get out of the car and wait at the front of my cruiser;

13   right?

14   A.          Correct.

15   Q.          And that's at 6:08:05; right?

16   A.          Yes, sir.

17   Q.          Now, he gets out of the car at your

18   instruction; right?

19   A.          Yes, sir.

11:51AM 20  Q.          So, so far, we have taken him from his car into

21   your car, talked with him for a while in your car, and

22   then taken him back out of your car to wait on the side

23   of the road while you speak with the passenger --

24   A.          Yes, sir.

25   Q.          -- right?

1              Now, you still have his driver's license;
2    right?
3    A.     Yes, sir.
4    Q.     It's right about sunrise; would that be fair?
5    A.     Close to it, yes, sir.
6    Q.     Okay.  It's still pretty dark out; right?
7    A.     Yes, sir.
8    Q.     It's very cold outside; right?
9    A.     Yes.
11:52AM  10  Q.     With the wind that will cut right through
11   you --
12   A.     Yes, sir.
13   Q.     -- right?
14             Now, he can't walk off down the interstate, can
15   he?
16   A.     No, sir.
17   Q.     You wouldn't permit that?
18   A.     No, sir.
19   Q.     Primarily because it's just not safe --
11:52AM  20  A.     Correct.
21   Q.     -- right?
22   A.     And it's illegal.
23   Q.     Right, it is illegal, but it's also just a bad
24   idea; right?  You would tell him, Hey, man, don't do
25   that?

1  A.        Yes.

2  Q.        So you don't put him back in his car?  You have

3  him wait on the side of the road while you talk to the

4  passenger; right?

5  A.        Yes, sir.

6  Q.        And the reason for that is so that you can talk

7  to the passenger without the two of them talking to each

8  other; right?

9  A.        Yes, sir.

11:53AM 10  Q.        Because you took him out of his car to talk to

11  him separately to find out what his answers would be to

12  your questions about his itinerary --

13  A.        Yes, sir.

14  Q.        -- right?

15            And you did that because you're trained and

16  instructed to get that information to see if it

17  indicates criminal activity is underway --

18  A.        Yes, sir.

19  Q.        -- right?

11:53AM 20            And having asked those questions with the

21  intent of getting information about criminal activity,

22  you then return to the other passenger; right?

23  A.        Go back up to the car, yes, sir.

24  Q.        And you're going to ask the passenger similar

25  questions or the same questions?

1    A.       Yes, sir.

2    Q.       And the point of that is to get her to say

3    something either confirming or contradicting what he

4    said?

5    A.       Yes, sir, to compare their stories.

6    Q.       And if she says something that contradicts what

7    he said, then that indicates to you there is criminal

8    activity going on?

9    A.       Yes, sir.  As well as checking the license and

10   the registration as well.

11   Q.       Well, we'll come to that.

12            So you go to the car and you take Ms. Hayes'

13   license; right?

14   A.       Yes, sir.

15   Q.       Now, that's the first thing you do, essentially

16   the first thing you do when you get to the car is ask

17   her, "May I have your license."  Right?

18   A.       Yes, sir.

19   Q.       And at that point it's been eight minutes.  We

20   still can't -- we still haven't called dispatch; am I

21   right?

22   A.       Correct.

23   Q.       Now, you're not going to let Ms. Hayes walk off

24   down the highway, are you?

25   A.       No, sir.

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1  Q.      And you're not going to let Ms. Hayes drive off

2  down the highway, are you?

3  A.      No, sir.

4  Q.      All right.  Well, she doesn't even

5  know -- where are the keys at this point; do we know?

6  A.      The car is still running.

7  Q.      Oh, okay.  All right.  But you're not going to

8  let her drive away, are you?

9  A.      Not at that time, no, sir.

11:54AM 10  Q.      Okay.  Or at any of these times?

11  A.      Not under the traffic stop, no, sir.

12  Q.      And so you ask her, "Where are you coming

13  from?"  Right?

14  A.      Yes, sir.

15  Q.      And we begin this series of questions to

16  compare with -- to compare with what it is Mr. Carney

17  told you; right?

18  A.      While she is trying to get her license out,

19  yes, sir.

11:55AM 20  Q.      So you told -- we're talking about going to the

21  car to answer this question about registration; right?

22  A.      Correct, yes, sir.

23  Q.      But you're not answering -- you're not asking

24  questions about the registration; you're asking

25  questions about where she went, how long she was in

1    Atlanta, and who she visited in Atlanta?

2    A.        Verifying her -- like I said to Mr. Carney in

3    the car before I got back out there, I was going to

4    compare and make sure that she is the owner of the car,

5    checking up on the registration, and that's what I was

6    waiting on her to get.  She was fumbling for her

7    license.  I was asking her those questions while she was

8    fumbling for her license in the car.  It took her quite

9    some time to get the license out which is shown on the

11:55AM 10   video.

11   Q.        The question I asked you, sir, was:  Those

12   questions that you asked her don't have anything to do

13   with the registration.

14   A.        Correct, yes, sir.

15   Q.        Okay.  And then you flat out -- I mean, you

16   told her, Don't lie to me.

17   A.        Yes, sir.

18   Q.        I've got a dog.

19   A.        Yes, sir.

11:55AM 20   Q.        I'm going to sniff -- the dog is going to sniff

21   the car.

22   A.        I never said that.

23   Q.        If you lie to me, it will be bad.  Right?

24   A.        I never said that the dog was going to sniff

25   the car.

CROSS-EXAMINATION BY DEFENDANT CARNEY - TROOPER WILLIAM CONNORS

1    Q.        Well, to that -- that's -- you may not have

2    used those words, but that's what you were telling her.

3    You've got a drug-detecting dog.  Don't lie to me.  If

4    you tell me the truth, it will be better for you.

5    Right?

6    A.        Right.

7    Q.        And that's because you wanted an honest answer

8    out of her --

9    A.        Yes, sir.

11:56AM 10    Q.        -- right?

11              If there were drugs in the car, you wanted her

12    to say there were drugs in the car --

13    A.        Yes, sir.

14    Q.        -- right?

15              And you're asking these questions with the

16    intent of finding out if there is drugs in the car?

17    A.        To compare the stories, yes, sir.

18    Q.        Right?

19    A.        Yes, sir.

11:56AM 20    Q.        Well, careful.  That's not the question I asked

21    you.  You said compare the stories.

22    A.        Correct.

23    Q.        I didn't ask you about comparing the stories.

24              You're asking these questions to find out if

25    there is drugs in the car.

1  A.      I'm asking those questions to compare the

2  story.  I'm answering your question.  Comparing the

3  story from his to hers.

4          The ultimate goal --

5  Q.      Well, I need you to --

6  A.      -- is to see if there is criminal activity in

7  the car.

8  Q.      Okay.

9  A.      So don't put words in my mouth.  That's not

10 what I said.

11 Q.      You're asking -- you're asking these questions

12 to get statements indicating criminal activity exists --

13 A.      Correct.

14 Q.      -- if that's true?

15 A.      If there is criminal activity, yes, sir.

16 Q.      And so then after talking to her, then you tell

17 Mr. Carney to get back in the car.

18 A.      Yes, sir.

19 Q.      Now, at that point, we still have not called

20 for a warrants check and we still have not called for

21 the registration through dispatch, to check the

22 registration through dispatch; right?

23 A.      The registration was sent in as soon as I

24 called the traffic stop in.  So it goes into dispatch.

25 Q.      No, no, no, no, no.  I asked if it's valid.

1   A.      It checks it automatically.  If it was stolen,

2   they would tell me.  Does that make sense?

3   Q.      No.  No, not in light of your initial answers.

4           I had asked you in the very beginning when you

5   called this into dispatch, what was the response about

6   the validity of the tag, and you said there wasn't one.

7   A.      They didn't respond back with anything to me,

8   correct.

9   Q.      Okay.  So you never called in to dispatch about

11:57AM 10  the tag?

11  A.      Yes, I did.

12  Q.      Okay.  Had you called in at that point?

13  A.      When there -- when my blue lights are on or as

14  we're pulling over, I --

15  Q.      No, when you're putting Mr. Carney back in the

16  car at 6:12:44.

17          You've talked to Wan- -- you've talked to

18  Ms. Hayes; right?

19  A.      Correct.

11:58AM 20  Q.      After talking to Ms. Hayes, it's 6:12:44 --

21  A.      Right.

22  Q.      -- you say to Mr. Carney, Let's get back in my

23  car.

24  A.      Yes, sir.

25  Q.      You put him back in your car.

1  A.        Yes, sir.

2  Q.        At that point, had you called the tag in for

3  verification?

4  A.        Yes, when I make the initial stop, I called in

5  the tag.  That's when dispatch puts it in, the tag into

6  the system.

7  Q.        Okay.  All right.  So then you didn't need to

8  talk to these people at all about their registration;

9  you had dispatch checking the registration since the

11:58AM 10  start of the stop?  "Start of the stop."  That's

11  terrible.  Since the initiation of the traffic stop?

12  A.        No, sir.

13  Q.        Okay.  Now we're going around again.

14            Look, you -- you said that when you initiate

15  the stop with the blue lights --

16  A.        Yes.

17  Q.        -- you called the tag into dispatch.

18  A.        Yes, sir.

19  Q.        Dispatch is checking to see if the tag is valid

11:59AM 20  and matches the car; right?

21  A.        Yes, when they input the information into

22  NCIC --

23  Q.        Right.

24  A.        -- they will create a case number for the

25  traffic stop and put it in that way.

1  Q.       So when you're asking these people questions,

2  it doesn't have anything to do with the registration;

3  you've got dispatch working on that?

4  A.       Again, if the tag was stolen off of another car

5  and that tag hasn't been registered -- or been shown as

6  stolen in the system, it's not going to come back.

7  Dispatch is not going to know that.

8  Q.       That's not true, though, isn't it, because

9  dispatch can tell you what it's tagged to?  Dispatch

11:59AM 10  could come back and say, yeah, that's a Chevrolet

11  pickup, and you can say, Chevy?  No, it's not.  Hold on

12  a second.  Right?

13  A.       In my line of work with stolen vehicles, a lot

14  of thieves or criminals will take tags, steal tags off

15  of cars that are the exact make and model, put them on

16  another car that's actually stolen, and if the people

17  don't realize that their tag is gone or if it gives them

18  enough time to get from point A to point B with a good

19  tag that's not in NCIS as stolen, nobody is going to

12:00PM 20  know the difference.

21  Q.       So what's the answer to my question?

22  A.       If you'll restate the question, please.

23  Q.       Okay.  All right.  If dispatch radios back that

24  the tag goes to a car other than a Nissan Versa, that

25  answers the question for you, doesn't it?

1  A.       What question is that?

2  Q.       Oh, Lord.  Okay.  Look, about whether the

3  registration is valid.

4           MR. KIRK:  Your Honor, I'm going to object

5  to --

6           MR. HEDRICK:  I'm sorry.

7           MR. KIRK:  -- asked and answered numerous

8  times.

9           THE COURT:  Overruled.  I'm still not clear.

10          Go ahead, Mr. Hedrick.

11 BY MR. HEDRICK:

12 Q.       Okay.  You're trying to figure out if the

13 registration is valid; right?

14 A.       Is valid and goes to that car.

15 Q.       Right.

16 A.       The registration is attached to the tag.

17 Q.       This may be faster if you let me just ask --

18 A.       I'm making sure that I'm tracking what you're

19 saying so we can get to the same story.

20 Q.       Now, when you call in the registration, the

21 tag, when you call in the tag, if dispatch comes back

22 and says that tag goes to, say, for example, a Chevrolet

23 pickup, then you know that's the wrong tag.

24 A.       Then I would know that, correct.

25 Q.       Right.

1  A.        Yeah.

2  Q.        So it's not just whether it's stolen or not.

3  That was my question.  That's all I wanted to know was

4  not just whether it's stolen or not.

5  A.        They will tell -- I'm confused on what you're

6  asking right now.  I'm sorry.

7  Q.        That's okay.

8            You're interested in more than whether it's

9  stolen in dispatch.

12:01PM 10  A.        No, if it's a stolen car, it's a criminal

11 activity.

12 Q.        That's all you're interested -- I'm asking if

13 your -- when it comes to the tag if you're interested in

14 more than whether dispatch has it listed as stolen.  You

15 want to know more than if it just says stolen in NCIS.

16 A.        Right.  I'm going to take it further into the

17 investigation.

18 Q.        Now, I'm saying you were -- then you do.

19 A.        Yes, yes.

12:01PM 20  Q.        All right.  Now, when you put Mr. Carney back

21 in the car, it's 6:13:01.  At that point you know that

22 Ms. Hayes has said something different about the

23 itinerary than he has --

24 A.        Correct.

25 Q.        -- right?

1     You have had -- gotten two different stories;

2  right?

3  A.     Yes, sir.

4  Q.     And you believe that only one of them can be

5  true; right?

6  A.     Yes, sir.

7  Q.     Which means someone is lying to you?

8  A.     Correct.

9  Q.     And whoever is lying to you is probably

12:02PM 10  committing a crime?

11  A.     Not necessarily the person lying, no.  But it

12  could be.  It just proves to me there is criminal

13  activity.

14  Q.     So there is a crime somewhere?

15  A.     Correct.

16  Q.     And you want to know about that crime because

17  that's your job?

18  A.     Correct.

19  Q.     When you put him in the car, you've got his

12:02PM 20  license; right?

21  A.     Yes, sir.

22  Q.     He's in the car because you told him to get in

23  the car?

24  A.     Yes, sir.

25  Q.     He's in your car?

1    A.        Yes, sir.

2    Q.        And you're asking him questions to see if he's

3    the one who is lying; right?

4    A.        Correct.

5    Q.        And you in -- among your training, I have no

6    doubt that you've been trained in interview techniques.

7    A.        Yes, sir.

8    Q.        And one of those techniques is confronting

9    someone with inconsistencies in their story --

12:03PM  10    A.        Yes, sir.

11    Q.        -- right?

12              And that's what you do here in this case

13    because you tell him, She is saying you didn't visit the

14    grandkids; right?

15    A.        Yes.

16    Q.        You confront him with the inconsistency; right?

17    A.        Yes.

18    Q.        Because you are trained to do that as an

19    interview technique; right?

12:03PM  20    A.        Yes, sir.

21    Q.        At this point no one has been advised of their

22    Miranda rights; am I right?

23    A.        No, sir.

24    Q.        All right.  And you run the records -- you ask

25    for dispatch, for the records check, at 6:14:20; right?

1  A.       Yes, sir.

2  Q.       Do you recall what happens immediately prior to

3  that?

4  A.       No, sir.

5  Q.       Immediately prior to you asking for the records

6  check --

7           MR. HEDRICK:  Bear with me, Your Honor.  I

8  apologize.  I meant to do this while we were on our

9  break and I just didn't.

12:04PM  10           All right.  I'll turn this back on for just a

11  moment.

12           (Video file played in open court.)

13  BY MR. HEDRICK:

14  Q.       Okay.  Mr. Carney says for the first time, "I

15  don't want to answer these questions anymore."  Right?

16  A.       No, he said, "Do I have to answer these

17  questions?"

18  Q.       "Do I have to answer these questions?"  And

19  that's when you call for the records check.

12:05PM  20  A.       Yes.

21  Q.       Once he has shut down.

22  A.       No, sir, he didn't shut down.  He said, "Do I

23  have to answer these questions?"  And I said, "No, you

24  don't have to."

25  Q.       And what did he say after that?

1  A.        I don't recall what he said right after that.

2  Q.        Uh-huh.  So once he says, "Do I have to answer

3  these question anymore," now we call for the records

4  check and we end up with our dog sniff.

5            So let's turn now, if we can, to the dog.  How

6  many times has -- Laky?

7  A.        Yes, sir.

8  Q.        Laky.  How many times has Laky been certified

9  with you?

12:06PM  10  A.        Twice.

11  Q.        What were his -- is it a male?

12  A.        It is, yes, sir.

13  Q.        What were his grades?

14  A.        Grades?

15  Q.        Yes, sir.

16  A.        I don't have his grades.

17  Q.        You'll agree with me that one of the -- you'll

18  agree with me that one of the points that the USPCA

19  makes very clear is that they don't believe in pass/fail

12:07PM  20  testing; right?

21  A.        Yes, sir.

22  Q.        So there must have been a grade; we just don't

23  know what it is?

24  A.        I'm sure we can get it from the USPCA.

25  Q.        Okay.  What's his error rate?

1    A.        I don't have an error rate for him.

2    Q.        Why not?

3    A.        There is caselaw on that.  We'll go back to the

4    dog because the only time that you can judge a dog if

5    he -- what you would say is in error would be in

6    training.

7    Q.        Why is that?

8    A.        Because where you have a handler who is

9    watching you work cars, he knows where the odor is,

12:07PM  10    where the odor is not, and if your dog would alert to a

11    car or an area that's not where the odor is, then that

12    would be an error.

13    Q.        Okay.  So what's his error rate in training?

14    A.        You'd have to look in the training records that

15    I believe you'll have.  I don't have it with me.

16    Q.        Okay.  That's not something that you know?

17    A.        No, sir.

18    Q.        Okay.  Is that not something that you would be

19    interested to know, concerned to know?

12:08PM  20    A.        No, because he's extremely good at what he

21    does.

22    Q.        Okay.  Would you be confident if I said, These

23    are your new firearms; you're going to carry them

24    instead of the old ones; they're pretty good; we have no

25    idea how often they jam?

1   A.        Is that a question?

2   Q.        It is.

3   A.        What was the question?

4   Q.        Would you be -- I don't know if I can do the

5   whole thing again.  Watch me.

6             Would you be comfortable if I said, These are

7   your new duty firearms; you're going to carry these

8   instead of the ones you had before; they're pretty good,

9   but, frankly, we haven't the faintest idea how often

12:08PM 10  they jam.  Would you be okay with that?

11  A.        No, sir.

12  Q.        Why not?

13  A.        You don't know if they're going to work or not.

14  Q.        Okay.  That makes sense.

15            So the reason that you don't keep an error rate

16  in the field is because sometimes the dog alerts to the

17  presence of narcotics that were there but aren't there

18  anymore; is that right?

19  A.        Correct.

12:09PM 20  Q.        So the dog may be telling you that something

21  used to smell like drugs.

22  A.        Or that it's hidden too well for us to find.

23  Q.        Well, okay.

24  A.        There is caselaw in reference to that.

25  Q.        So if your -- if your dog is detecting places

1  where drugs used to be but aren't now --

2  A.        He's detecting the odor of illegal narcotics.

3  That odor is still in there.

4  Q.        Right.  Like, imagine a rental car.  Let's say

5  that if I rent a car; right, and I transport a whole

6  bunch of meth in it; right?

7  A.        Yes, sir.

8  Q.        And I return the car.  And Mr. Carney rents the

9  car.  You pull it over.  The odor is there and the dog

10 alerts.  You search the car.  You find nothing because

11 it's my odor, not his.  Is that -- did he pass or fail

12 that?

13 A.        That's a pass because he alerted to the

14 presence of the odor.

15 Q.        Okay.

16 A.        That's what he's trying to find.

17 Q.        Right.

18           Let's assume that he has -- wait just a second.

19 I'm sorry.  I've lost my place in my notes.

20           How does he differentiate between the drugs?

21 A.        How does he differ- -- you're talking about

22 alert-wise?

23 Q.        Right.

24 A.        He doesn't.

25 Q.        Okay.  He's trained on marijuana, cocaine,

1  heroin, and -- help me.  Meth.  Oh, geez, this is a meth

2  case.  That's stupid.  Cocaine, marijuana, heroin, and

3  meth; am I right?

4  A.       Yes, sir.

5  Q.       Now, if you find drugs and confiscate them,

6  where do you send those drugs?

7  A.       The TBI lab.

8  Q.       Why?

9  A.       For testing to confirm.

12:11PM  10  Q.       Okay.  Why have the TBI lab do it?  Why don't

11  you all do the testing?

12  A.       Because a lot of officers have been hurt with

13  the new fentanyl stuff coming out.  So we're not allowed

14  to touch or open bags.  We have to send it off.

15  Q.       Okay.  Does it have anything to do with the

16  machines and stuff they have over there?

17  A.       I'm sure.  I'm not a chemist or a lab tester.

18  Q.       I was -- that was the answer I was expecting

19  you to give is you're not a chemist is why you don't do

12:11PM  20  the testing.

21  A.       Yes, sir.

22  Q.       So the TBI lab, I guess, is the people that are

23  trained and entrusted with analyzing the drugs, and the

24  TBI lab is the people that are entrusted with knowing

25  when they found a particular substance and when they

1  haven't; right?

2  A.        Yes, sir.

3  Q.        Are you aware that the TBI assistant director

4  of forensic services division says that a dog trained to

5  just test for marijuana is now useless because Tennessee

6  has legalized commercial hemp and the dog can't tell the

7  difference?  The gentleman I'm talking about, if it

8  helps, is Mike Little.

9  A.        No, sir.  I can't remember if we actually sent

12:12PM  10  this off to the TBI lab or the DEA lab.  Either way, I

11  don't think it really matters.

12  Q.        Did you say you were aware or you're not aware?

13  A.        Was not aware, no, sir.

14  Q.        Well, let's talk very briefly.

15        MR. HEDRICK:  I may make my mark, Judge.

16  BY MR. HEDRICK:

17  Q.        Let's talk very briefly about what you -- about

18  what you found in the car; okay?

19        So after the alert and you begin the search,

12:13PM  20  and I think that you told us that you and some other

21  troopers were involved in the search; am I right?

22  A.        Yes, sir.

23  Q.        And in the search you found a red bag or a

24  suitcase?

25  A.        Yes, sir.

1    Q.        Where was that located?

2    A.        The trunk.

3    Q.        Inside the trunk.

              Inside that bag, was the methamphetamine loose

5    or was it packaged again?

6    A.        Packaged in five different bags.

7    Q.        Five plastic bags?

8    A.        Yes, sir.

9    Q.        Like Ziploc® bags or sandwich bags?  Help me

12:13PM  10  understand the bags.

11   A.        Just plastic, like, torn bags, like, tied up?

12   Q.        Corner bags?

13   A.        Corner bags.

14   Q.        Like a sandwich bag?

15   A.        Something to that nature, yes, sir.

16   Q.        Okay.  Were those bags inside another bag other

17   than the red bag?

18   A.        A plastic container.

19   Q.        I couldn't hear.

12:13PM  20  A.        A plastic container.

21   Q.        Okay.  Like a Ziploc®?

22   A.        No, like one that locks on to -- not locks, but

23   snaps on top; like an airtight.

24   Q.        Like a Tupperware?

25   A.        Yes.

1  Q.       So you've got plastic bags inside the

2  Tupperware, and the Tupperware -- is the Tupperware in

3  another bag or just inside that red suitcase?

4  A.       I believe it's just inside the red suitcase.

5  Q.       Okay.  And I'm only doing this to make sure

6  that we don't have a misunderstanding.  You open up the

7  red suitcase.  There is the Tupperware, a plastic

8  Tupperware.  Open up the Tupperware, and there are the

9  individual baggies in, like, sandwich bags --

12:14PM  10  A.       Correct.

11  Q.       -- or something similar to a sandwich bag?

12  A.       Yes, sir.

13  Q.       Okay.  Was the bag itself, was it zipped?  The

14  suitcase, was it zipped up?  Did it have a zipper or

15  some other type of closer?

16  A.       I believe it was zipped up, yes, sir.

17  Q.       So a zipper would be the right kind of closer?

18  A.       Yes, sir.

19  Q.       Okay.  Was it underneath anything?  Were there

12:14PM  20  things on top of it or anything around it?

21  A.       I don't recall exactly.  I just know it was

22  right there.

23  Q.       Okay.

24  A.       One of the first bags when you opened the

25  trunk.

1    Q.        I see.  Okay.

2              MR. HEDRICK:  May I have just a moment, Your

3    Honor.

4              THE COURT:  Yes.

5    BY MR. HEDRICK:

6    Q.        One last question:  Just so there's -- I don't

7    have a confusion, the Tupperware containing the

8    methamphetamine, was it inside the suitcase down under

9    other things in the suitcase or was it loose and on top?

12:16PM  10  Does that make sense?

11   A.        I think it was actually on, like, one of the

12   side zipper places, I believe.

13   Q.        Okay.  Are we talking about, like, a duffle

14   bag?

15   A.        Yes.

16   Q.        Well, okay.  So, like, a large main compartment

17   and a -- zipper compartments on the sides?

18   A.        Yes, sir.

19   Q.        It was in a zipper compartment on the side?

12:16PM  20  A.        Yes, sir.

21   Q.        Do you know if there was -- do you recall if

22   there was other things in that compartment?

23   A.        A set of digital scales.

24   Q.        Okay.  Anything else?

25   A.        I don't recall.

1    Q.        Okay.  Would I be right in thinking that this

2    pretty much took up the whole volume of that

3    compartment?

4    A.        I really don't remember.

5    Q.        Pretty much filled up the compartment?

6    A.        I really don't remember.

7    Q.        Okay.

8    A.        We've got the pictures, I believe, somewhere or

9    on the video.

12:17PM  10            MR. HEDRICK:  That's all I have.  Thank you,

11   Your Honor.

12            THE COURT:  Ms. Kincaid, do you have any

13   questions for this witness?

14            MS. KINCAID:  Just one, Your Honor.

15                      CROSS-EXAMINATION

16   BY MS. KINCAID:

17   Q.        Trooper Connors, when you opened up that bag --

18   it was a duffle bag; correct?

19   A.        Yes, ma'am.

12:17PM  20   Q.        It was a red Marlboro bag?

21   A.        I don't know about the Marlboro.  It was a red

22   bag, duffle bag, yes, ma'am.

23   Q.        Do you recall any of the other items in the

24   bag, in the main part of the bag?

25   A.        There was some clothing, I believe.  I believe

1  we got pictures of everything that was inside the bag, I

2  think.  I won't tell you I'm --

3  Q.      I don't believe we've seen pictures of the

4  contents of the bag.

5  A.      Okay.

6  Q.      So I'm wondering what --

7  A.      There was clothing.  I don't want to tell you

8  wrong.

9  Q.      Can you say whether they were male or female

10  clothing?

11  A.      I'm wanting to say both, but I'm not a hundred

12  percent sure.  I don't want to tell you wrong.

13          MS. KINCAID:  That's all the questions I have.

14          THE COURT:  Anything else for this witness,

15  Counsel?

16          MR. KIRK:  Yes, Your Honor.

17                    REDIRECT EXAMINATION

18  BY MR. KIRK:

19  Q.      Trooper Connors, you've stated earlier that

20  after you initiated the traffic stop, you were asked

21  whether they were free to leave, and you said, no, they

22  were detained.  Were they detained for the purposes of

23  the traffic stop for the speeding and so you could check

24  the license, registration, and insurance?

25  A.      Yes, sir.

1   Q.        Because is that part of your job?

2   A.        Yes, sir.

3   Q.        And when you asked -- when you were asking

4   questions and you had different answers to itineraries,

5   what was going on in your head at that time?

6   A.        That there was criminal activity afoot involved

7   with these two individuals traveling up the interstate.

8   Exactly to what, I didn't know, but I assumed, coming

9   from the source city, Atlanta, back to southwest

12:18PM 10  Virginia that it was narcotics.

11  Q.        And I've pointed it out earlier on our direct

12  examination; maybe I didn't do a good job of it.  But we

13  saw where you were keying in information on your laptop.

14  Is that where you were also conducting checks of

15  driver's licenses, registration as well?

16  A.        Yes, sir.

17  Q.        Does your computer communicate in realtime; as

18  you put information, it tells you information back?

19  A.        Sometimes it takes about five, 10 seconds while

12:19PM 20  it runs, and then you'll hear it beep and come back, if

21  it comes back sometimes.

22  Q.        You said a moment ago when Mr. Hedrick was

23  asking about Laky, you said Laky was extremely good at

24  what he does.

25  A.        Yes, sir.

REDIRECT EXAMINATION - TROOPER WILLIAM CONNORS

1  Q.        What do you base that on?

2  A.        My training and experience with him.  I've been

3  with him for two years.

4            When we talk about an error rate, we don't

5  really keep the error rates because of the -- there is

6  caselaw in reference to that.  I'll have to -- I believe

7  it's Harris versus Florida, I think.

8            But due to the could-be odors, the movement of

9  odors with air, you can't a hundred percent say that a

10 dog is wrong if you search something and don't find

11 something.

12           Even in training, I don't recall any times that

13 he alerted off-source of an odor.  But I don't know.

14 Sorry.

15 Q.        I'm sorry.  What does that mean, off-source of

16 an odor?

17 A.        Off-source could be if a wind is blowing and

18 you got a hide in one car, the car next to it could be

19 pushing that odor up and over and the dog could be

20 smelling that odor bouncing off that car if they're

21 really close or depending on where the wind flow is.  So

22 you really have to be careful when you call it an error

23 to make sure the dog's not in odor.

24           But that's why we watch -- watch their

25 behaviors, their nose, their nose opening and closing.

1   Their ears, they get real excited when they get to odor.

2   And that's what we are trained to detect and look for

3   once they start getting into that odor.

4   Q.       If you're able, can you ballpark maybe how many

5   vehicles -- not in a training environment; I mean, in

6   the actual field -- how many vehicles you've run Laky

7   around?

8   A.       Probably several hundred.

9   Q.       And then based on your experience with him in

12:21PM 10  the training environment and then those several hundred,

11  it's your opinion that he's a reliable canine?

12  A.       Yes, sir, he is.

13           MR. KIRK:  I believe that's all the questions I

14  have, Your Honor.

15           THE COURT:  All right.  Anything else?

16           Mr. Hedrick?  Ms. Kincaid?

17           MR. HEDRICK:  No, Your Honor.

18           THE COURT:  Okay.  Thank you for your

19  testimony, sir.  You may step down.

12:21PM 20           All right.  Let's talk about schedule.

21           Well, we don't have any other witnesses; right?

22           MR. KIRK:  No, Your Honor.

23           THE COURT:  Do you want to come back to argue

24  this or do you want to -- does anybody want to file a

25  memorandum post hearing?  I always ask.

1    MS. KINCAID:  We will file a post-hearing

2    memorandum for sure.  We can also do an oral argument if

3    the Court would like and --

4         THE COURT:  We don't need both.

5         MS. KINCAID:  Okay.  We prefer to do written.

6         THE COURT:  I don't think.  Actually, if any --

7    but, I mean, having said that, if anyone wants to have

8    an oral argument, I will schedule it.

9         MR. KIRK:  I think --

12:22PM 10   THE COURT:  How much time do you need for your

11   memorandum, Ms. Kincaid?

12        MS. KINCAID:  Well, Your Honor, given that next

13   week is a holiday, I was thinking about this, and we

14   will give the court reporter time to create a

15   transcript.  So I was going to ask for about three weeks

16   if that doesn't --

17        THE COURT:  All right.  What date are you

18   asking for?

19        MS. KINCAID:  December 10th.

12:22PM 20   THE COURT:  All right.  Any objection?

21        MR. HEDRICK:  Or the end of that week.

22        MS. KINCAID:  Is that good?

23        MR. HEDRICK:  Or the end of that week.

24        MS. KINCAID:  Or the end of that week.  The

25   13th --

1          THE COURT:  The 13th?

2          MS. KINCAID:  -- I guess, we should ask for.

3          THE COURT:  Okay.  Any objection?

4          MR. KIRK:  No objection to that, Your Honor.

5          THE COURT:  Okay.  The parties may file

6    whatever -- you don't have to file a post-hearing

7    memorandum, but the Court is allowing until

8    December 13th.

9          If we have oral argument, though, it would have

10   to be after that date, obviously, but we could schedule

11   that for the week of the 16th if anyone wants to

12   schedule that.

13         MR. KIRK:  Your Honor, the government would be

14   fine with just post-hearing briefings and --

15         THE COURT:  All right.

16         MR. KIRK:  -- does not require oral argument.

17         THE COURT:  All right.  Then that's what we'll

18   do.

19         MR. HEDRICK:  That's fine with us, Judge.

20         THE COURT:  Okay.  Thank you.  That's what

21   we'll do.

22         All right.  Let's talk about the schedule in

23   this case.

24         MR. KIRK:  Your Honor, if I may, in response to

25   the post-hearing brief, that will encapsulate Christmas

| | |
|---|---|
| 1 | and New Year's for the government. If I could -- |
| 2 | THE COURT: Well, I was actually hoping |
| 3 | everyone would file theirs on the 13th. |
| 4 | MR. KIRK: Oh, yes, Your Honor. Can do. |
| 5 | Sorry. |
| 6 | THE COURT: Thank you. Sorry I wasn't clear on |
| 7 | that. Everyone will file on or before the 13th if you |
| 8 | choose to. Again, let me stress that the Court is not |
| 9 | requiring, only allowing time for it. |
| 12:23PM 10 | Now, I thought I wrote down something about a |
| 11 | trial date. Do you have that? |
| 12 | Oh, you've got that. We have trial dates from |
| 13 | Judge Varlan. April 7 -- |
| 14 | MS. KINCAID: Yes, Your Honor. |
| 15 | THE COURT: -- April 14, April 21, April 28. |
| 16 | MS. KINCAID: Any of those are fine with me, |
| 17 | Your Honor. |
| 18 | MR. KIRK: Mr. Hedrick and I are scheduled for |
| 19 | a trial on the 14th. So April 7th would be -- |
| 12:24PM 20 | MR. HEDRICK: Preferable. |
| 21 | THE COURT: All right. April 7; is that -- are |
| 22 | we all in agreement? |
| 23 | MS. KINCAID: Yes, Your Honor. |
| 24 | MR. HEDRICK: That's fine. |
| 25 | MR. KIRK: Thank you. |

1          THE COURT:  The Court will set a new pretrial

2    conference, the date in this case.  I'd like to set that

3    on March 23, if possible.  At 11 o'clock, if possible.

4          MR. KIRK:  That works for the government, Your

5    Honor.

6          MR. HEDRICK:  Fine with me, Your Honor.

7          THE COURT:  Is the government requesting a plea

8    cutoff as well?

9          MR. KIRK:  Yes, Your Honor.

12:25PM 10          THE COURT:  All right.  Any other dates or

11    deadlines we need to put on this?

12          MR. HEDRICK:  Excuse me, Your Honor.  Did you

13    say 11:00 for the pretrial conference?

14          THE COURT:  Yes, March 23 at 11:00.

15          MR. HEDRICK:  Thank you.

16          THE COURT:  We'll put that in the order, of

17    course.

18          All right.  Anything else?  No.

19          MR. HEDRICK:  No, that's fine.

12:25PM 20          THE COURT:  Is there any other matter of

21    scheduling or anything else that the Court needs to

22    address while everyone is here?

23          MR. KIRK:  No, Your Honor.

24          MR. HEDRICK:  No, Your Honor.  Thank you.

25          MS. KINCAID:  No, Your Honor.

1            THE COURT:  All right.  Thank you for your good

2   work today on this case.  I appreciate it.

3            Madam Clerk.

4            THE COURTROOM DEPUTY:  All rise.  This

5   honorable court stands adjourned.

6            (Which were all the proceedings had and

7             herein transcribed.)

8                      * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C-E-R-T-I-F-I-C-A-T-E

2     STATE OF TENNESSEE

3     COUNTY OF KNOX

4            I, Teresa S. Grandchamp, RMR, CRR, do hereby

5     certify that I reported in machine shorthand the above

6     proceedings, that the said witness(es) was/were duly

7     sworn; that the foregoing pages were transcribed under

8     my personal supervision and constitute a true and

9     accurate record of the proceedings.

10           I further certify that I am not an attorney or

11    counsel of any of the parties, nor an employee or

12    relative of any attorney or counsel connected with the

13    action, nor financially interested in the action.

14           Transcript completed and signed on Tuesday,

15    November 26, 2019.

16

17

18    _____

19           TERESA S. GRANDCHAMP, RMR, CRR
             Official Court Reporter

20

21

22

23

24

25