IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:19-CR-73-TAV-HBG |
| WANDA HAYES, and | ) | |
| PATRICK CARNEY, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on November 19, 2019, for an evidentiary hearing on the Defendants' Joint Motion to Suppress [Doc. 27], filed on October 21, 2019. Assistant United States Attorney Alan Scott Kirk and Interns Addie Martin and Jeff Brink appeared on behalf of the Government. Assistant Federal Defender Mary Margaret Kincaid represented Defendant Wanda Hayes. Attorney Joshua D. Hedrick represented Defendant Patrick Carney. Both Defendants were also present. At the conclusion of the hearing, Ms. Kincaid requested the opportunity to file a post-hearing brief. The Defendants timely filed a joint post-hearing brief [Doc. 33] on December 13, 2019. The Government timely filed a post-hearing brief [Doc. 34] on that same day. The Court then took the matter under advisement.

Based upon the testimony and exhibits presented at the hearing, the arguments of the parties, and the relevant case law, the Court finds that the officer lacked probable cause or reasonable suspicion to stop the car in which the Defendants were traveling. Accordingly, the

undersigned recommends that all evidence seized from the vehicle and any statements by the Defendants be suppressed. Alternatively, even if the traffic stop was supported by probable cause, the Court finds that the scope and duration of the stop violated the Fourth Amendment and that the officer failed to provide the *Miranda* warnings when conducting a custodial interrogation of the Defendants. Finally, the undersigned finds that the drug detection dog was properly trained and reliable. However, despite the reliability of the drug detection dog and even if the traffic stop is deemed proper, the Court still finds that all the evidence seized from the car, along with Defendants unwarned statements, must be suppressed.

## I.       POSTIONS OF THE PARTIES

This case arises out of the January 23, 2019 stop of Defendant Hayes's Nissan Versa, which was driven by Defendant Carney. Tennessee Highway Patrol Trooper William Connors stopped the Defendants as they were traveling eastbound on Interstate 40. Based upon evidence seized from the car on that day, Defendants Hayes and Carney are charged [Doc. 1] with a single count of conspiring to distribute and to possess with intent to distribute fifty (50) grams or more of methamphetamine on January 23, 2019.

The Defendants ask [Docs. 27 & 33] the Court to suppress all evidence and statements gained from the January 23, 2019 traffic stop, arguing that the trooper's actions violated their rights under the Fourth and Fifth Amendments to the United States Constitution. They contend that the traffic stop was unconstitutional, because Trooper Connors's estimation that their car was traveling five miles per hour over the speed limit is unreliable. Second, they assert that Trooper Connors prolonged the stop beyond its lawful purpose and lacked reasonable suspicion to question them or to perform a dog sniff. Third, they assert that any statements they gave must be suppressed,

2

because Trooper Connors interrogated them while in custody without advising them of the *Miranda* warnings. Finally, they maintain that the drug dog was not reliable.

The Government responds [Docs. 28 & 34] that the stop and search of the Defendants' car was lawful. It contends that Trooper Connors properly stopped the Defendants' car for going 70 miles per hour in a 65-mile-per-hour zone, which he verified by pacing and with radar. The Government argues that the stop was reasonable in scope and duration and that Trooper Connors led his canine in a dog sniff based upon reasonable suspicion. It asserts that the Defendants were not entitled to the *Miranda* warnings because the trooper's roadside questioning did not amount to custodial interrogation. Finally, the Government contends that the K-9 team involved in this case is trained and reliable.

## II.     SUMMARY OF TESTIMONY

The Government presented the testimony of Trooper William Connors of the Tennessee Highway Patrol ("THP"). Trooper Connors testified that he has worked for the THP since February 2015 and has served on the criminal interdiction team since January 2018 [Tr. at 7].[1] Prior to his employment with the THP, Trooper Connors was in the Marine Corps for eight years and worked for the Johnson City Police Department for seven years [Tr. at 8]. The THP is tasked with traffic safety and stopping criminal activity, including drug trafficking, on Tennessee highways [Tr. at 8]. Trooper Connors has worked with his drug-detection dog, Laky, since early or mid-2017 [Tr. at 11]. Laky is certified to detect marijuana, methamphetamine, heroin, and cocaine and was so certified in January 2019 [Tr. at 11, 13-14, Exh.4].

---

[1] The transcript [Doc. 32] of the November 19, 2019 evidentiary hearing was filed on November 26, 2019.

Trooper Connors has conducted between 10,000 and 30,000 traffic stops during his career in law enforcement [Tr. at 15]. He has a video recorder in his patrol car and an audio recorder in his car and on his person [Tr. at 16]. The camera in his patrol car automatically activates when Trooper Connors turns on his blue lights and captures the recorded video from thirty seconds prior to him turning on his lights and audio from the time that his lights are activated [Tr. at 17]. He can also manually activate the video camera [Tr. at 17-18].

On January 23, 2019, Trooper Connors was in the median near mile marker 409, watching the eastbound side of Interstate 40 ("I-40") [Tr. at 18]. Around 6:00 a.m., Trooper Connors saw a car come over the hill in the middle lane, followed by a tractor-trailer [Tr. at 18-19, 37]. As soon as the car crested the hill and was in view of Trooper Connor's patrol car, it moved into the right lane and slowed down, so that the tractor-trailer blocked Trooper Connor's view of the car [Tr. at 19]. Trooper Connors testified that typically vehicles traveling at or below the speed limit do not switch lanes as they pass him [Tr. at 19]. He watched the car to see if it continued to slow down or if it sped up again [Tr. at 20].

Trooper Connors manually activated his in-car camera, pulled onto the interstate, and accelerated to 100 miles per hour to catch up with the car [Tr. at 20-23]. Once he caught up to the car, Trooper Connors testified that he reduced his speed until he matched the speed of the car and moved into the right lane behind the car to pace it [Tr. at 23-24]. He said at that point, he was traveling at 70 miles per hour and estimated that the car was also traveling at 70 miles per hour [Tr. at 23-24]. Trooper Connors testified that he also confirmed the car's speed with his radar, once he moved into the lane behind the car [Tr. at 25]. He stated that he documented on the recording that the car was traveling 70 miles per hour in a 65-mile-per-hour zone [Tr. at 26]. He said that as soon as he pulled behind the car, it began to reduce speed and fall behind the tractor-

4

trailer [Tr. at 27].  As the car slowed, he did not notice either the car or the tractor-trailer activate its brake lights [Tr. at 29].  Trooper Connors then initiated a traffic stop [Tr. at 27].

Trooper Connors stated that he documented the stop on a report, which he creates electronically [Tr. at 25].  He acknowledged that on the report he said he determined the speed of the car via pacing [Tr. at 25].  However, he explained that he selects from choices in a drop-down box the first method he used to determine speed, and the report only allows him to select one method [Tr. at 25].  Trooper Connors said his radar is certified annually, and he calibrates it with a tuning fork at the beginning of each shift [Tr. at 26].  He testified that he calibrated the radar on January 23, 2019 [Tr. at 26].

The car came to a stop at mile marker 412 [Tr. at 28].  While pulling onto the shoulder of the road behind the car, which was a black Nissan Versa, Trooper Connors radioed the car's license plate number to the dispatcher [Exh. 1, video clip 1].  Trooper Connors testified that after coming to a stop, the driver of the car left the turn signal blinking [Tr. at 28].  Trooper Connors thought this was unusual, because in his experience, most people deactivate the turn signal once they are stopped [Tr. at 28].  As he approached the passenger's side of the car, Trooper Connors could not see into the car, because a large box blocked the view through the rear window [Tr. at 30-31].  When he looked through the passenger's side window, Trooper Connors saw Defendant Carney in the driver's seat looking in his wallet and Defendant Hayes in the passenger's seat looking through the glove compartment [Tr. at 31].  Trooper Connors tapped on the window, and one of the Defendants rolled it down [Tr. at 31].  Trooper Connors asked for a driver's license and registration [Tr. at 32].  Defendant Carney handed him a driver's license, which was broken almost completely in half [Tr. at 32].  Trooper Connors asked Carney to join him in his patrol car [Tr. at

33].  Hayes handed Carney a stack of paperwork from the glove compartment, which Carney brought with him to the patrol car [Tr. at 33].  Hayes remained in the Versa [Tr. at 33].

While in the patrol car with Carney, Trooper Connors told Carney that he was not going to write a citation for the traffic violation [Tr. at 37].  Trooper Connors testified that his intent at that time was to issue Carney a warning, once he completed his check of Carney's license, vehicle, and insurance information, and checked for any outstanding warrants [Tr. at 37].

Trooper Connor said he conducts all his traffic infraction processing in his patrol car, so that he does not have to walk back and forth to the subject vehicle [Tr. at 33].  He also noted that it was cold and windy on the morning of January 23, 2019 [Tr. at 33].  Trooper Connors testified that after initiating a traffic stop, his duties are to check the license, registration, and insurance of the driver and to create and issue either a citation or a warning from his in-car computer [Tr. at 34].  Trooper Connors said he can check information on NCIC himself or he can radio the dispatcher to have the dispatcher run the information through NCIC to verify it [Tr. at 34].  Trooper Connors is also able to check for outstanding warrants on his in-car computer [Tr. at 35].  Trooper Connors stated that he can enter all the information on his in-car computer and print the citation or warning in his car [Tr. at 34].  He said that a citation and a warning contain most of the same information, except that a warning does not go on the driver's record, whereas a citation contains a court date and carries potential fines or fees for the traffic violation [Tr. at 34].  Both a citation and a warning contain the date, time, location, and reason for the traffic stop [Tr. at 34].

Trooper Connors stated that while checking on the Defendant's information, he asked Carney questions about his itinerary.  He said based upon his training and experience, he asks itinerary questions, in order to compare the subject's answers with that of a passenger or to learn

6

whether the subject is not able to give an answer [Tr. at 38]. He said he also observes the subject's reactions while he or she answers, watching for "micro expressions" or calming behaviors, such as touching the face, rubbing the hair, or performing "grooming techniques," that could indicate the subject is stressed or afraid [Tr. at 38].

When Trooper Connors asked Carney where he and Hayes were coming from, Carney said they had been to Atlanta to stay with Hayes's daughter for a couple of days and that they had left at 3:00 or 3:30 a.m. that day, in order to avoid heavy traffic [Exh. 2]. Trooper Connors said that while speaking with Carney in his patrol car, he noticed Carney was exhibiting "grooming techniques" and that Carney paused before giving the time he left that morning [Tr. at 39]. Trooper Connors also said Carney's response that he and Hayes did not do anything fun while in Atlanta struck Connors as odd, because Carney had told him they went to Atlanta to see Hayes's grandchildren [Tr. at 39-40, Exh. 2]. Trooper Connors said that Carney laughed when the trooper asked whether there were large amounts of United States currency in the car, which indicated to Trooper Connors that Carney knew there was a large amount of currency in the car [Tr. at 40]. Trooper Connors stated that he asked Carney whether there was any marijuana, cocaine, heroin, or methamphetamine in the car and that Carney answered no to each, but his voice changed slightly when answering as to methamphetamine [Tr. at 41]. Carney told him that the large box on the backseat of the car was a chicken coop [Tr. on 42]. Trooper Connors stated that Carney took a deep breath after he answered that they had luggage in the car, which caused the trooper to believe Carney was relieved to get that information out [Tr. at 42].

Carney gave Trooper Connors the registration, which listed the color of the car as blue [Tr. at 44-45, Exh. 2]. Trooper Connors said the actual color of the car was black, so he talked with Hayes about the car's registration, in order to confirm that the car was not stolen [Tr. at 45, Exh.

7

2].  He had Carney get out and wait by the side of the patrol car, while he talked with Hayes [Tr. at 44].  Trooper Connors said he asked Hayes from where the couple was coming, and she answered Abingdon [Tr. at 45].  Trooper Connors said he asked Hayes if the couple had stayed in Tennessee, and she replied that they were "just riding around" [Tr. at 45-46].  He said Hayes told him that they were going to Georgia to see her daughter, but that they did not make it [Tr. at 46].  Trooper Connors said this was a different answer than Carney gave him, which caused him to think one of them was lying about their itinerary [Tr. at 46].  He said that differing answers about itinerary are an "indicator" [Tr. at 46].  After further questioning, Hayes told Trooper Connors that the couple had made it to Georgia, but there was an ice storm, so they came back [Tr. at 46].

Trooper Connors characterized Hayes as being "overly nervous," "all over the place with her itinerary," and as "mak[ing] up answers as fast as she could" [Tr. at 48].  He said that while he was talking to Hayes, she was fumbling with her wallet, trying to slide her driver's license out of the plastic pocket [Tr. at 47].  Trooper Connors said Hayes said the couple was either coming from or going to a knife store [Tr. at 47].  Trooper Connors testified that Hayes also denied that any of the four types of narcotics were in the car [Tr. at 48].  However, he said that although Hayes had maintained eye contact with him during the questioning, she looked down while answering his questions about whether there was marijuana, cocaine, heroin, or methamphetamine in the car [Tr. at 48].  Trooper Connors characterized this break in eye contact as another indicator [Tr. at 48].  He said he went back over some of the itinerary questions to confirm her answers, but Hayes confirmed that she did not see her daughter [Tr. at 49].  Also, she could not answer whether the couple had stayed in a hotel or their car [Tr. at 32].  Trooper Connors said neither Carney, nor Hayes were able to provide proof of insurance [Tr. at 50].

8

After talking with Hayes, Trooper Connors returned to his patrol car to complete the warning citation and to check for outstanding warrants on the couple in both southwest Virginia and northeast Tennessee [Tr. at 50]. He characterized the area on the Tennessee-Virginia border as a "huge hub for crystal methamphetamine" and said that Atlanta, Georgia, the city from which the couple purported to be coming, is a "source city" for this drug [Tr. at 50]. Trooper Connors said that based on the discrepancies in their itineraries and the changes in behavior during questioning, he decided to make sure that the couple did not have outstanding warrants in Virginia or Sullivan County, Tennessee [Tr.at 50]. He said that at the time he returned to his car with Carney, he was suspicious that Carney and Hayes were transporting an illegal substance from Atlanta, Georgia, to their home in southwest Virginia.

Once Trooper Connors and Carney reentered the patrol car, the trooper questioned Carney again about the couple's itinerary to see whether Carney would give the same answers as he did previously and whether he would give more information regarding their itinerary [Tr. at 52]. Carney said that he had been to Hayes's daughter's home before, which Trooper Connors said was different from what Carney said earlier [Tr. at 52]. At approximately thirteen minutes after stopping the Versa, Trooper Connors said he had finished checking the license and registration but was still finishing the warning citation [Tr. at 53]. At this point, he contacted the dispatcher and asked the dispatcher to check for outstanding warrants in Virginia and Sullivan County [Tr. at 53]. He said it can take between one and three minutes to conduct a warrant check for two people at that time of morning, when only two dispatchers are on duty [Tr. at 53-54].

Trooper Connors testified that after he finished talking with Hayes, he knew there was criminal activity going on inside the Versa, so he was either going to ask for consent to search or just lead his drug dog around the car [Tr. at 55]. He said given the way that Mr. Carney acted after

they returned to the car, he decided lead Laky around the car, without first requesting consent [Tr. at 55]. Trooper Connors said he was still waiting for the dispatcher to radio back on the warrant check, when he put on his coat and toboggan, leashed Laky, and got him out of the patrol car [Tr. at 56].

Trooper Connors said when leading Laky in a free-air sniff, he typically starts at the front of a vehicle and leads Laky around the vehicle once clockwise and again counterclockwise [Tr. at 58]. He said he does this because traffic passing beside the subject vehicle can cause the air around the vehicle to swirl in different ways [Tr. at 58]. Trooper Connors said Laky did not alert going around the Versa clockwise, but on the counterclockwise pass, Laky ran by him and sat to alert by the rear, passenger-side tire [Tr. at 59]. Trooper Connors said he re-presented that area to Laky and Laky returned to that same spot [Tr. at 59]. He said Laky sat in that same area two or three times [Tr. at 59]. Trooper Connors stated that he was walking toward Laky the first time Laky alerted on the Versa [Tr. at 60]. He said that his walking toward Laky can sometimes cause him to sit, so he re-presented the area and backed away to make sure it was not a false alert [Tr. at 60]. He said that during the dog sniff, Carney was standing on the shoulder of the road, near the front passenger tire of the patrol car and Hayes remained in the Versa [Tr. at 60]. Trooper Connors said the dispatcher radioed with the information from the warrant check a minute or two after the dog sniff. [Tr. at 61].

Trooper Connors said after Laky's alert, he decided he would search the Versa [Tr. at 61]. He informed Carney that he was going to search the car, and Carney became very defensive and did not want him to search it [Tr, at 62]. Trooper Connors radioed for Trooper Woods to come to the area, so they could search the Versa [Tr. at 61]. Once Trooper Woods arrived, Hayes was asked to get out of the car [Tr. at 62]. Carney and Hayes stood by the shoulder part of the time

during the search of the Versa and were placed in a patrol car, where it was warmer, during part of the time [Tr. at 62-63]. Trooper Connors said they were not under arrest during this time [Tr. at 63]. Trooper Woods stood beside Carney and Hayes, while Trooper Connors and Trooper Kevin Stroope searched the Versa [Tr. at 63]. The troopers found five baggies of a substance that was consistent with crystal methamphetamine in a red suitcase in the trunk of the car [Tr. at 63-64]. They also found around $2,500 in the front seat near where Hayes was sitting [Tr. at 64]. After finding these items, the troopers told Carney and Hayes they were under arrest and advised them of the *Miranda* warnings [Tr. at 64].

On cross-examination, Trooper Connors testified that he had worked with Laky since 2017 [Tr. at 65]. He said that he had conducted a few thousand traffic stops with Laky in the car [Tr. at 66]. He explained that he is focused on criminal interdiction, while enforcing traffic laws [Tr. at 67]. He agreed that because of this focus, he usually writes warning citations [Tr. at 67].

Trooper Connors said that the Versa passed him, while he was in the median [Tr. at 66-67]. He then pulled onto the interstate, caught up to the Versa, and got behind the Versa, when it was behind and to the right of the tractor-trailer [Tr. at 67-68]. Trooper Connors agreed that he was going 68 miles per hour when he activated his blue lights to pull the Versa over [Tr. at 69]. He agreed that the Versa stopped at exit 412 [Tr. at 69]. Trooper Connors said he stopped the Defendants for speeding, but he did not ultimately write them a citation [Tr. at 70-71]. Instead, he wrote a warning citation to document what occurred in the traffic stop [Tr. at 71-72]. Trooper Connors agreed that the statement that Hayes was the driver was an error on the warning citation [Tr. at 73]. He said the warning citation states that he verified the speed of the vehicle by pacing [Tr. at 73]. He agreed that his use of radar was not on any documentation created on the day of the stop, including his personal notes, or on his radio transmissions to the dispatcher [Tr. at 73-

11

74]. Trooper Connors also agreed that he did not use a "true pace" with the Versa, because he did not pace the Versa for a full two-tenths of a mile [Tr. at 76].

Trooper Connors testified that at the time he stopped the Versa, he knew that it had crested the hill, moved into the right lane, and was passed by traffic moving faster than it [Tr. at 77]. He also knew the Versa had a Virginia license plate and he believed it was speeding [Tr. at 77]. Trooper Connors said at that point, he would not have allowed the Versa to speed away [Tr. at 78]. The Versa stopped after he turned on his emergency lights, and he walked up to the Versa at around 6:00 a.m. and twenty seconds [Tr. at 75, 77-78]. Trooper Connors asked the driver for his driver's license and his registration [Tr. at 78]. The driver provided his driver's license [Tr. at 78]. Trooper Connors agreed at that point, the driver was detained at a traffic stop, and it would have been illegal for him to drive away [Tr. at 79]. Trooper Connors did not ask for the passenger's driver's license at that time [Tr. at 79]. Trooper Connors agreed that he could have asked for driver's licenses from both occupants, returned to his patrol car, and radioed for the records check, but he said that this was not what he was trained to do [Tr. at 79]. He said the interdiction team is trained to bring the driver to the patrol car and put them in the front seat [Tr. at 80].

Trooper Connors agreed that Carney entered his patrol car, and at 6:01:42, he told Carney that he was not going to write him a citation [Tr. at 81]. Trooper Connors said that he did not radio for a records check at that time but, instead, questioned Carney about his name, his passenger's name, from where he was coming, and what time he left Atlanta [Tr. at 81-82, 86]. He agreed that these questions were not related to speeding [Tr. at 86]. Trooper Connors said that as he talked to Carney, he was entering information on his in-car computer, so that he could check the validity of the driver's license and make sure the registration matched the vehicle he stopped [Tr. at 82-83]. Trooper Connors said he entered the driver's license and the registration separately and waited for

12

the check of each after it was entered [Tr. at 84].  He stated that he radioed the dispatcher with the Versa's license plate at the beginning of the stop [Tr. at 84].  He said the Versa was black, but when Carney handed him the registration, he saw that the registration said the car was blue [Tr. at 84].

Trooper Connors said at 6:03:40, he asked Carney how long he had known his passenger and why he went to Atlanta [Tr. at 86].  He agreed that neither of these questions were related to speeding or sought information required for the warning citation [Tr. at 86].  He said that his questions about the purpose of the trip helped in interdiction, not with his determination of whether the car was properly registered [Tr. at 87].  Trooper Connors agreed that ultimately his reason for asking Carney questions about his itinerary was to see whether Carney and his passenger gave the same answers and to observe Carney's reactions to the questions [Tr. at 87-88].  He agreed that if two people traveling in the same car give different answers to his questions on itinerary, it often, but not always, makes him suspicious that criminal activity is afoot [Tr. at 88].  At 6:05:10, Trooper Connors verified Carney's address and date of birth [Tr. at 93].  At six minutes into the traffic stop, he asked Carney whether he had any large amounts of money or any drugs or guns in the car [Tr. at 93-94].  Trooper Connors agreed that at that time, he still had not radioed the dispatcher to ask for a records check or to check on the registration [Tr. at 94].  At 6:08:05, he asked Carney to get out of the patrol car and wait on the side of the road, while he spoke with the passenger [Tr. at 94].  Trooper Connors still had Carney's driver's license at this point [Tr. at 95].  He agreed that he did not allow Carney to return to the Versa, because he wanted to question Hayes without Carney talking to her [Tr. at 96].

Trooper Connors testified that he walked to the Versa and questioned Hayes, asking her the same or similar questions as Carney, in order to see whether their answers matched or

13

contradicted each other [Tr. at 96-97]. He said he also intended to check her driver's license and the car's registration [Tr. at 97]. At eight minutes into the traffic stop, Trooper Connors asks Hayes for her driver's license [Tr. at 97]. He still had not radioed the dispatcher for a records check at this point [Tr. at 97]. Trooper Connors agreed that Hayes could not leave or drive away at this point, explaining he was still conducting a traffic stop [Tr. at 98]. While Hayes was trying to remove her driver's license from her wallet, Trooper Connors asked her the itinerary questions that he had asked Carney [Tr. at 98-99]. He agreed that these questions were not related to the car's registration and that he told Hayes not to lie to him [Tr. at 99]. Trooper Connors agreed that he asked these questions to learn whether the car contained evidence of criminal activity [Tr. at 101].

Trooper Connors said that when he radioed the license plate number at the beginning of the stop, the dispatcher automatically checked it and would have told him, if the car had been reported stolen [Tr. at 102-03]. He said he was trying to determine whether the car's registration was valid and went with that particular vehicle [Tr. at 105]. At 6:12:44, Trooper Connors told Carney to get back in his patrol car [Tr. at 102]. Trooper Connors said the fact that Hayes's and Carney's answers to his questions were different caused him to believe one of them was lying and their deception "prove[d] to [him] that there [wa]s criminal activity" [Tr. at 107]. Trooper Connors agreed that he then questioned Carney in his patrol car to determine whether Carney was the one lying [Tr. at 108]. He agreed that he confronted Carney with the inconsistencies in their answers, telling him that Hayes said they did not visit the grandchildren [Tr. at 108]. Trooper Connors agreed that at this point, he had not given the *Miranda* warnings [Tr. at 108]. At 6:14:20, Trooper Connors radioed the dispatcher to request the records check [Tr. at 109]. He said that immediately before he radioed the dispatcher, Carney asked if he had to answer these questions [Tr. at 109].

14

Trooper Connors told Carney that he did not have to answer and radioed for the records check [Tr. at 109-110].

Trooper Connors testified that Laky has been certified by the USPCA twice with him as the handler [Tr. at 110]. He said he did not have an "error rate" for Laky, because errors can only be determined in training [Tr. at 111]. Trooper Connors said Laky is "extremely good at what he does" [Tr. at 111]. He agreed the reason he does not calculate an error rate for Laky in the field is because a dog can alert to the odor of narcotics that were there but are no longer present [Tr. at 112]. He said the dog may alert to drugs that are hidden too well for him to find [Tr. at 112]. He stated that Laky does not differentiate between the four types of drugs—marijuana, cocaine, heroin, and methamphetamine—that he is trained to detect [Tr. at 113-14]. Trooper Connors stated that he no longer tests drugs in the field or touches open bags of controlled substances, because officers have been hurt by contact with fentanyl [Tr. at 114]. He agreed that chemists in the Tennessee Bureau of Investigation ("TBI") laboratory are trained to test controlled substances, although he did not know if the TBI or the Drug Enforcement Administration ("DEA") tested the drugs in this case [Tr. at 115]. Trooper Connors said he was not aware that Assistant Director Mike Lyttle of the TBI Forensic Services Division said that a dog trained to detect the odor of marijuana is now "useless," because the dog cannot differentiate between marijuana and commercial hemp, which is now legal in Tennessee.

Trooper Connors stated that during the search of the Versa, he found a red duffle bag in the trunk [Tr. at 115-16, 118]. In that bag, he found methamphetamine packaged in five "corner bags," which are a torn portion of a plastic sandwich bag that is tied [Tr. at 116, 118]. The corner bags were inside of a Tupperware container [Tr. at 116]. The Tupperware container was in a closed zippered compartment on the side of the red bag [Tr. at 117-18]. The red duffle bag was

15

one of the first bags visible when he opened the trunk [Tr. at 117-18]. Trooper Connors said he also found a set of digital scales in the zippered compartment of the red duffle bag [Tr. at 118]. He believed the main compartment of the red duffle bag contained male and female clothing [Tr. at 120].

On redirect examination, Trooper Connors testified that he detained Carney and Hayes for speeding, in order to allow him to check their license, registration, and insurance as a part of the traffic stop [Tr. at 120]. He said when Carney and Hayes gave inconsistent answers about their itinerary, he believed criminal activity was afoot, which he assumed involved narcotics, because they were traveling on the interstate from Atlanta, which is a source city [Tr. at 121]. He said when he was typing information into his in-car computer, he was conducting checks of their driver's licenses and registration [Tr. at 121]. He said it takes five to ten seconds for the computer to conduct the check and return the information [Tr. at 121]. Trooper Connors said based on his training and experience with Laky, he believes Laky is extremely good at what he does [Tr. at 121-22]. He did not recall Laky ever alerting to an "off-source odor," which is odor drifting through the air from another source, in training [Tr. at 122]. Outside of training, Laky has performed a free-air sniff on several hundred vehicles [Tr. at 123]. Based on his experience with Laky in training and in the field, Trooper Connors believes that Laky is a reliable canine [Tr. at 123].

## III.    FINDINGS OF FACT

Based upon the testimony of Trooper Connors and the exhibits in this case, the Court makes the following factual findings:

On the early morning of January 23, 2019, Trooper William Connors of the Tennessee Highway Patrol was on duty and parked in the median of I-40 near mile marker 409, watching the

16

three eastbound lanes. Trooper Connors saw a black Nissan Versa crest the hill in the middle lane, followed by a tractor-trailer. At the point at which Trooper Connors's patrol car would have been in view, the Versa moved into the right lane and was passed by the tractor-trailer, so that the tractor-trailer was between it and the patrol car. Trooper Connors activated his in-car camera, entered the left lane of I-40 eastbound, accelerated to over 100 miles per hour, and passed four other vehicles, before the Versa came into view.

Trooper Connors caught up to the Versa approximately one minute after entering the road and while he was traveling at 77 miles per hour. Seven seconds later, Trooper Connors slowed to 70 miles per hour and traveled at that speed for six seconds in the left lane, while the Versa was in the right lane and no other vehicles were between them. At that point, Trooper Connors stated aloud "70 in a 65 zone on this black vehicle" in order to document his estimate of the Versa's speed on his in-car camera. As Trooper Connors, crossed from the left to the middle lane and from the middle lane to the right lane, the distance between his patrol car and the Versa narrowed, both horizontally and vertically. One minute and forty-three seconds after pulling onto I-40, Trooper Connors was traveling directly behind the Versa in the right lane. When he first pulled behind the Versa, Trooper Connors was going 71 miles per hour and continuing to gain on the Versa. Five seconds later, Trooper Connors activated his blue lights to stop the Versa. At that point, Trooper Connors was traveling at 67 miles per hour.

At approximately 6:00 a.m., the Versa stopped on the shoulder of I-40 at mile marker 412. The driver left the right turn signal activated, even after the car stopped. As he pulled to a stop behind the Versa, Trooper Connors radioed the car's license plate to the dispatcher. Trooper Connors walked to the passenger's side of the Versa and saw Defendant Carney in the driver's seat looking through his wallet and Defendant Hayes in the passenger's seat looking through the

glove compartment. Trooper Connors tapped on the passenger side window, which one of the Defendants rolled down, and asked for a driver's license and registration. Carney handed Trooper Connors his driver's license. Then, Trooper Connors asked Carney to bring the registration and join him at the back of the Versa. When Carney joined him behind the Versa, Trooper Connors asked if he had any weapons on him. Carney said, "No," extending his arms out to his sides. Trooper Connors then told Carney to join him in his patrol car. Approximately one minute and forty seconds after stopping the Versa, when Trooper Connors and Carney were both seated in the front of the patrol car, Trooper Connors told Carney that he stopped him for going 70 miles per hour in a 65 zone but that he was not going to write a citation for the traffic violation.

Trooper Connors confirmed Carney's name on the driver's license, asked who was in the car with him, and asked how he knew her. Carney identified his passenger as Wanda Hayes and said that she was his girlfriend. Trooper Connors asked where the couple was coming from, to which Carney responded Hayes's daughter's house. Trooper Connors asked where the daughter's house was located, and Carney replied, "Atlanta." Trooper Connors asked where in Atlanta Hayes's daughter lived, and Carney said he was not sure, because it was the first time he had been there. Trooper Connors asked where the couple stayed, while there, and Carney responded that they stayed with Hayes's daughter. As Trooper Connors asked this series of questions, Carney looked through some paperwork, while Trooper Connors keyed information into his in-car computer.

At two minutes and fifty seconds into the stop, Trooper Connors asked if Carney was on probation or parole, which Carney denied, and whether he had ever been arrested. Carney said he had been arrested. Trooper Connors explained that when he performed a check of Carney's history, it would show Carney's arrests. Carney said he was arrested when he was younger.

18

Trooper Connors asked what time the couple left Atlanta. Carney responded that they left around 3:00 or 3:30 a.m. Trooper Connors asked why they left so early, and Carney replied they were avoiding the traffic. Trooper Connors asked how long Carney had known Hayes, and Carney said, "A couple of years." Trooper Connors asked whether Carney and Hayes lived together or separately, to which Carney responded that they lived separately. Trooper Connors confirmed that Carney said that they were at Hayes's daughter's house and asked how long they were there. Carney said they were there a couple of days. Trooper Connors continued to enter information into his in-car computer and again confirmed that Carney was not currently on probation or parole.

Approximately four minutes after stopping the Versa, Trooper Connors asked why Carney and his passenger had gone to visit Hayes's daughter, and Carney replied that Hayes wanted to see her daughter and granddaughter. Trooper Connors asked if Hayes was on probation or parole, to which Carney said, "No." Trooper Connors asked, "Does she live in an apartment or house down there?" to which Carney responded that both Hayes and her daughter have a house in Atlanta. Trooper Connors asked if the house was within the Atlanta city limits, but Carney did not know. Trooper Connors asked if the couple did anything fun while in Atlanta, to which Carney responded, "No, not really. Just hung out." Trooper Connors asked if Hayes was originally from Georgia, and Carney said she was from the Piney Rock area of Virginia.

At five minutes and thirty seconds after stopping the Versa, Trooper Connors confirmed Carney's address and birthday. Trooper Connors then informed Carney that there was a lot of criminal activity on the interstate and asked if there were any large sums of currency over $10,000, marijuana, cocaine, heroin, methamphetamine, or guns in the car. Carney replied "no" to each of these questions and said that he had a pocketknife. Five minutes and twenty seconds after entering the patrol car, Trooper Connors confirmed that the Versa was registered to Hayes, and Carney

19

handed him the registration. Trooper Connors remarked that the registration states that the Versa is blue, but the car is black. He asked Carney whether the Versa is dark blue or black. Trooper Connors said the Versa looked black to him but the registration stated it was blue and suggested that maybe someone at the Department of Motor Vehicles entered the color incorrectly. Carney said the Versa appeared to be more black than blue to him. Trooper Connors asked if the couple had luggage in the car. Carney responded that they had a couple of bags in the trunk and that they had purchased a chicken coop, which was on the back seat. Carney confirmed that Hayes lives in Abingdon. At eight minutes into the stop and after they had been in the patrol car around six and one-half minutes, Trooper Connors asked Carney to meet him at the front passenger tire of the patrol car.

At eight minutes into the stop, Trooper Connors returned to the passenger's side of the Versa, asked Hayes if she was the registered owner of the vehicle, and asked for her driver's license. While Hayes attempted to pull her driver's license from a plastic pocket in her wallet, Trooper Connors asked her from where she and Carney were coming. Hayes said they live in Abingdon, had been out riding around, and had gotten a chicken coop. Trooper Connors asked Hayes if they had stayed in Tennessee, and she answered that they had not stayed in Tennessee, repeating that they had been out riding around and had gotten the chicken coop. Trooper Connors asked where they were coming from right now, to which Hayes replied that they had gone to Georgia to visit her daughter but did not make it because of an ice storm. She again denied staying in Tennessee, saying that the couple had left Abingdon last night or this morning sometime. Hayes removed her driver's license from her wallet approximately one minute and forty-five seconds after Trooper Connors asked for it. Trooper Connors told Hayes that he had a drug detection dog in his car that could detect narcotics and that if she was honest with him, he would work with her,

but if she lied to him, they would have some issues. Hayes denied having marijuana, cocaine, heroin, or methamphetamine in the car, but broke eye contact with Trooper Connors when she answered these questions. Trooper Connors asked Hayes if they had stayed anywhere since leaving Virginia, and Hayes replied that she could not remember. Hayes said they had been to a knife store but could not answer whether the couple had stayed in a hotel or in their car.

After talking with Hayes for approximately four minutes, Trooper Connors returned to his patrol car and told Carney to get back into the front passenger seat of the police car. Trooper Connors asked Carney again about the couple's itinerary. Carney agreed that they had stayed with Hayes's daughter a couple of days. Trooper Connors asked whether either Carney or Hayes were under the care of a doctor, and Carney replied that Hayes is, commenting that she had been through a divorce recently. During this questioning, Carney said that he had been to Hayes's daughter's house before. At approximately thirteen minutes into the stop, Carney asked Trooper Connor if he had to answer all these questions. Trooper Connors said that Carney did not have to answer his questions but that the situation was odd. Carney said that it had been a long few days and that they were tired. At this point, Trooper Connors radioed the dispatcher to check for outstanding warrants for Carney and Hayes in Virginia and Sullivan County, Tennessee.

While waiting for the dispatcher's response, Trooper Connors asked Carney to stand outside again and removed his drug detection dog Laky from his patrol car. At fifteen minutes after stopping the Versa, Trooper Connors lead Laky around the Versa for a "free-air sniff." Laky did not alert on the Versa when they walked around it clockwise. Trooper Connors then led Laky around the car counterclockwise, and Laky alerted by sitting by the rear, passenger's side tire. Trooper Connors presented the area to Laky again, and Laky alerted on the same spot. Approximately seventeen minutes elapsed from the time that Trooper Connors stopped the Versa

to Laky's alert. One or two minutes after the dog sniff, the dispatcher radioed Trooper Connors with information from the warrant check.

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Fifth Amendment provides the right not to incriminate oneself. U.S. Const. amend V. Defendants Hayes and Carney argue that their rights under the Fourth Amendment were violated (1) because Trooper Connors lacked probable cause to stop them for a traffic violation on January 23, 2019, and (2) Trooper Connors unlawfully detained them beyond the time necessary to issue a warning citation for a traffic violation. They also contend (3) that Trooper Connors violated their Fifth Amendment protection against self-incrimination by questioning them without advising them of the *Miranda* warnings. Finally, the Defendants assert (4) that the alert by the drug detection dog Laky is unreliable and did not provide probable cause to search the car. The Court examines each of these issues in turn.

### A.  Probable Cause for Traffic Stop

Defendants Hayes and Carney argue that Trooper Connors lacked probable cause or reasonable suspicion to stop them on January 23, 2019, because his estimation that the Versa was traveling five miles per hour over the speed limit is unreliable. They contend that Trooper Connors's claim that he "paced" their vehicle is not a reliable means of determining speed, because he followed the Versa for an insufficient length of time. They point out that Trooper Connors acknowledged that he did not perform a "true pace" of the Versa. Additionally, they discount Trooper Connors's claim that he also gauged the Versa's speed with his radar, pointing out that he did not document the use of radar on his report or to the dispatcher. Finally, they argue the fact

22

the Versa changed lanes after coming over the hill is insufficient to provide reasonable suspicion of criminal activity.

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388; *see Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct"). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). A stop based on probable cause that a traffic violation has occurred is reasonable, without regard to the subjective motives of the officer. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 391.

The Government contends that Trooper Connors had probable cause to believe the Defendants were going five miles per hour over the speed limit, based on his pacing of the Versa

23

and his radar reading.[2]  Trooper Connors testified that the speed limit on that section of I-40 is 65 miles per hour.  Trooper Connors said that he first "estimated" the Versa's speed with pacing and then confirmed his estimate with his radar [Tr. at 24-25].  Trooper Connors testified that after he caught up to the Versa, he "backed [his] speed off until [he] match[ed] theirs," and he was going 70 miles per hour [Tr. at 23].  The video recording [Exh. 1] from Trooper Connor's in-car camera reveals that Trooper Connors was traveling in the right lane and the Versa was in the left lane, with no vehicles in the middle lane between them, for only a few seconds.  The Court finds that Trooper Connors did not maintain the pacing for a sufficient length of time to determine the Versa's speed.

In order to determine a vehicle's speed by pacing, the officer must travel at a constant distance from the subject vehicle for a length of time.  Then, the officer may determine the subject vehicle's speed by using his or her own speed.  In *United States v. Whaley*, this Court upheld an officer's probable cause determination, based upon pacing, when the officer had a "considerable opportunity" to observe the defendant's driving, as he matched the defendant's speed, which exceeded the speed limit by fifteen miles per hour.  No. 1:04-CR-122, 2005 WL 8168971, *2 (E.D. Tenn. Jan. 11, 2005).  In *Whaley*, the officer also testified that the speedometer of his unmarked police car was periodically checked with radar.  *Id.*; *see also United States v. Letourneau*, 944 F.

---

[2] The Government argues that the Defendants violated Tennessee Code Annotated § 55-8-152. Section 55-8-152(a) provides that "[e]xcept as provided in subsection (c), it is unlawful for any person to operate or drive a motor vehicle upon any highway or public road of this state in excess of sixty-five miles per hour (65 mph)."  Subsection (c) of the statute provides that the speed limit is seventy (70) miles per hour on "controlled access highways with four (4) or more lanes, which are designated as being on the state system of highways or the state system of interstate highways." The Court questions whether state laws regarding speeding apply on a federal interstate.  If § 55-8-152 does apply, the Court observes that I-40 is a controlled-access interstate highway with six lanes, which indicates that subsection (c), rather than subsection (a), would apply in this case, and the speed limit would be 70 miles per hour.  In any event, for purposes of this report, the Court will take as true Trooper Connors's assertion that in January 2019, the speed limit was 65 miles per hour on this section of I-40.

Supp. 619, 622 (N.D. Ohio 1996) (crediting officer's testimony that he determined the defendant's speed through pacing using his "calibrated speedometer"). In the instant case, even Trooper Connors admitted that he did not conduct a "true, actual pace," [Tr. at 24], because he did not pace the Versa for a sufficient distance, which he stated would have been two tenths of a mile [Tr. at 76]. Also, there was no testimony regarding the accuracy of Trooper Connor's speedometer. Thus, the Court finds that Trooper Connors's pacing of the Versa did not give him probable cause to believe the Versa was speeding.

The Court also concludes that Trooper Connors did not have probable cause to stop the Versa for speeding based upon a radar reading. Trooper Connors testified that he stated aloud that the Versa was going 70 miles per hour in a 65 mile-per-hour zone in order to document the Versa's speed on his in-car recording system [Tr. at 26]. At the point on the recording when Trooper Connors stated aloud that the Versa was going 70 miles per hour in a 65 zone, he had yet to move behind the Versa. Thus, he could not have used his radar to determine the Versa's speed at that point. Instead, Trooper Connors testified that his brief pacing of the Versa was to estimate the vehicle's speed, before deploying his radar [Tr. at 24]. Once Trooper Connors pulled directly behind the Versa, he was traveling at 71 miles per hour and decelerating as he continued to gain on the Versa. Trooper Connors testified that at this point, he determined the Versa's speed with his radar [Tr. at 25]. However, unlike with his earlier estimate of the Versa's speed via pacing, Trooper Connors did not document a radar reading orally, after pulling behind the Versa. He also did not mention determining the Versa's speed with his radar on his report either by checking the box labeled "radar" or by stating that he checked the speed with radar in the narrative section [Exh. 3]. The Court finds that Trooper Connors's claim that he confirmed the Versa's speed with his radar is not credible, because it is contradicted by the other evidence before the Court (the audio

25

recording and the report). *See United States v. Ruiz*, 832 F. Supp. 2d 903, 913-14 (M.D. Tenn. 2011) (finding officers later testimony that he also determined the defendant's speed with radar to lack credibility, when that statement was contradicted by both the dashboard camera recording, which showed pacing, and the officer's report). Thus, Trooper Connors did not have probable cause to believe that the Defendants were traveling five miles per hour over the speed limit.

Instead, the Court finds that Trooper Connors stopped the Versa in order to conduct an interdiction investigation. However, Trooper Connors did not have reasonable suspicion to conduct an investigatory or *Terry* stop of the Versa. "[A] brief investigative stop, or *Terry* stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 12 (1989) & *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). To determine whether an investigatory stop comports with the Fourth Amendment, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). A court reviewing the legality of an investigative stop must consider the totality of the circumstances in evaluating the presence of reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Martin*, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a *Terry* stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274.

In the instant case, at the point Trooper Connors stopped the Versa, he knew the following: The Versa was traveling eastbound on I-40 in the early morning just before 6:00 a.m. The Versa

changed lanes after cresting a hill.  The tractor-trailer which remained in the lane from which the Versa had moved was traveling faster than the Versa and blocked the view of the Versa as it passed Trooper Connors.  Finally, Trooper Connors knew that the Versa had a Virginia license plate. None of these facts, even considered together, provide reasonable suspicion to believe that the occupants of the Versa were engaged in criminal activity.  Trooper Connors testified that he believed the Versa moved into the right lane at the point at which the driver could have seen him, because the driver wanted to hide behind the tractor-trailer.  The Court notes that the video recording reveals that it was dark that morning, so it is unclear whether the driver of the Versa saw Trooper Connor's patrol car parked in the median at the time the driver changed lanes.  In any event, the Court finds that Trooper Connors's belief that the Versa was hiding from him was merely a hunch and does not rise to the level of reasonable suspicion.

The stop of the Versa violated the Fourth Amendment, because Trooper Connors had neither probable cause, nor reasonable suspicion for the seizure.  The standard for conducting a traffic stop in this circuit "gives police agencies as much or arguably more authority than that of any other circuit," permitting "police officers to stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop."  *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995).  However, our appellate court observes that because "we have extended this authority to the broadest extent possible, . . . we have a duty to see that the authority is not abused."  *Id.*; *see also United States v. Freeman*, 209 F.3d 464, 470-71 (6th Cir. 2000) (Clay, J., concurring) (observing that in permitting officers broad latitude to stop for any infraction even though the officer's real purpose is to find evidence of another crime, the court has a duty to insure that an officer is not abusing his or her authority).  An officer's subjective motives for stopping a vehicle do not matter, if a traffic

infraction has occurred, but in the instant case, Trooper Connors overreached his authority when he stopped the Versa without probable cause that it was speeding. Accordingly, the Court finds that all evidence seized from the Versa, along with the statements of the Defendants during the stop, must be suppressed.

### B. Scope and Duration of Traffic Stop

The Defendants also argue that Trooper Connors prolonged the traffic stop beyond the scope of its lawful purpose and lacked reasonable suspicion to question them or perform a dog sniff. Although the Court has found the seizure of the Defendants was unconstitutional, it will also examine the propriety of the scope and duration of the stop, in the event that the District Judge disagrees with the analysis above. "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied,* 528 U.S. 1176 (2000).

There is no set length of time after which a traffic stop becomes per se unreasonable. *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010). In addition to issuing a citation, actions

such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are all typical inquiries incident to a traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Additionally, "[i]f an officer has a reasonable and articulable suspicion of criminal activity, he may extend the traffic stop long enough to confirm or dispel his suspicions." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012). When evaluating whether a crime is afoot, law enforcement officers may draw upon their training and experience "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation omitted).

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop). Our appellate court has determined that "context-framing questions," such as travel history and plans, "will rarely suggest a lack of diligence." *Everett*, 601 F.3d at 495. Also, questions relating to officer safety are appropriate. *Id.* Some amount of questioning unrelated to the traffic stop is permitted, so long as "the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." *Id.*; *United States v. Kenneth Kevin Cochrane*, Nos. 11-4081 & -4082, 2012 WL 6621131, *3 (6th Cir. Dec. 20, 2012) (holding that officers may ask unrelated, "extraneous questions" during a traffic stop, if the questions do not prolong the stop). However, if the totality of the circumstances reveals that the officer, without reasonable suspicion, abandoned

pursuit of the traffic stop to investigate another crime, then the officer did not act with the diligence required by the Fourth Amendment. *Everett*, 601 F.3d at 495.

In the instant case, the Court finds that Trooper Connors had all the information he needed from the Defendants to conclude the traffic stop within two minutes of stopping the Versa. Trooper Connors radioed the Versa's license plate number to the dispatcher, as he pulled behind the Versa on the shoulder of the road. He obtained Defendant Carney's driver's license, while the Defendant was still seated in the car, and asked Carney to bring the Versa's registration and meet him at the back of the Versa. Trooper Connors then asked Defendant Carney if he had any weapons and to join him in his patrol car. As soon as they were seated in the patrol car, which was approximately, one minute and forty seconds after stopping the Versa, Trooper Connors told Defendant Carney that he stopped the Versa for going 70 miles per hour in a 65 zone but that he was not going to give him a traffic citation. At this point, the Court finds that Trooper Connors had or had access to all the information he needed to complete the warning citation and conclude the traffic stop. He had Defendant Carney's driver's license, Defendant Carney had the Versa's registration in hand,[3] and Trooper Connors could radio the dispatcher for a records check.[4]

Trooper Connors then questioned Defendant Carney about his relationship with the passenger, his itinerary, his criminal history, and the contents of the Versa, before taking the Versa's registration from him. During this time, the video recording reveals that Trooper Connors

---

[3] Defendant Carney likely also had the proof of insurance in the stack of paperwork he brought from the Versa, but Trooper Connors did not ask for proof of insurance again, after Carney got out of the Versa. Notably, Trooper Connors's report [Exh. 3] does not state that the Defendants failed to provide proof of insurance.

[4] Trooper Connors also testified that he could perform a records check himself on his in-car computer, but he could not check all the outlying counties.

was typing on his in-car computer.  However, none of the questions Trooper Connors asked were related to his duties concerning the traffic violation, with the possible exception of confirming Defendant Carney's name, address, and birthday.  Upon examining the registration, Trooper Connors discovered that the registration listed the Versa as blue, while it appeared to be black to him.  Trooper Connors then asked Defendant Carney additional questions about whether he had luggage in the car and commented about the chicken coop the Defendant was transporting.

Eight minutes into the stop, Trooper Connors returned to the Versa and asked Defendant Hayes for her driver's license.  Defendant Hayes struggled to remove her driver's license from a plastic compartment in her wallet.  During the approximately two minutes it took Defendant Hayes to produce her driver's license, Trooper Connors questioned her about the couple's itinerary.  He questioned her for an additional two minutes after she gave him her driver's license, asking additional itinerary questions, as well as whether the car contained illegal drugs.  Approximately, twelve minutes after stopping the Versa, Trooper Connors directed Defendant Carney back into the patrol car, where he questioned him for an additional minute, going over the itinerary questions again, before Defendant Carney asked whether he had to answer all these questions from the trooper.  At that point, approximately thirteen minutes after stopping the Versa, Trooper Connors radioed the driver's license numbers for both Defendants to the dispatcher, requesting a check for outstanding warrants in both Virginia and Sullivan County.  While awaiting the dispatcher's response, Trooper Connors led his drug dog around the Versa.

"'An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not *measurably extend* the duration of the stop.'"  *Everett*, 601 F.3d at 490 (quoting *Arizona v. Johnson*, 555 U.S. 323 (2009)) (omission in original, italics added).  The Court "evaluate[s] the

reasonableness of the prolonging of a stop by considering the totality of the circumstances, which requires considering both the duration of the extraneous questioning and its subject matter." *United States v. Stepp,* 680 F.3d 651, 662 (6th Cir. 2012). As noted above, "questions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer" are generally appropriate. *Id.*

In the instant case, although Trooper Connors engaged in the duties necessary to a traffic stop—checking the driver's license and registration, determining whether the Defendants had outstanding warrants, and writing the warning citation—the Court finds that he unduly prolonged these tasks in order to pursue a drug interdiction investigation. The Court finds that the "extraneous questions" that Trooper Connors asked regarding the Defendants' relationship with each other, why they visited Defendant Hayes's daughter, whether they lived together, etc., *measurably* prolonged the traffic stop beyond its purpose. Although there were some pertinent questions regarding their travel plans (i.e., where they were going, from whence they came, when they left) mixed in with the extraneous ones, the Court finds that the bulk of the questioning during the fifteen minutes leading up to the dog sniff was not pertinent to the traffic stop, officer safety, or the context of the Defendants' travels.

In *Stepp*, our appellate court determined that "six minutes of questioning measurably prolonged the traffic stop beyond its original purposes because the topics covered more than just context-framing questions and the extraneous questions lasted a not insubstantial amount of time." *Id.* at 663. Here, Trooper Connors questioned Defendants Carney and Hayes for eleven to twelve minutes and the bulk of that questioning was extraneous. Trooper Connors's questioning of the Defendants was an unreasonable expansion of the traffic stop, and "unless an independent reasonable suspicion of criminal activity arose" during his questioning of the Defendants, their

32

continued detention beyond the five or six minutes[5] necessary to conclude the traffic stop violated the Fourth Amendment. *Id.* at 664.

The Court examines the totality of the circumstances to determine whether, during the traffic stop, Trooper Connors developed a reasonable suspicion that the Defendants were engaged in criminal activity. *Id.* For a suspicion of criminal activity to be reasonable, the "officer must point to 'specific and articulable facts' that are 'more than an ill-defined hunch.'" *Id.* The Court must examine the circumstances of the stop using a "common sense approach." *Id.* Trooper Connors testified that the following circumstances caused him to believe that the Defendants were engaged in criminal activity: (1) the Defendants provided odd and inconsistent answers about their travel itinerary; (2) the Defendants were nervous and exhibited "micro-expressions," such as displaying grooming techniques and not making eye contact; and (3) the Defendants were coming from Atlanta, Georgia, which is a "source city" for drugs and returning to the Virginia-Tennessee border area, which is a hub for methamphetamine trafficking.

The Court finds that the main reason Trooper Connors suspected the Defendants were engaged in criminal activity were their inconsistent answers to his questions about their travel itinerary. Defendant Carney stated that the couple had been in Atlanta, Georgia, for a couple of days visiting and staying with Defendant Hayes's daughter and granddaughter.[6] The Court finds

---

[5] As stated above, at approximately two minutes into the stop, Trooper Connors had or had access to all the information he needed to complete the warning citation and the records check, and it took the dispatcher approximately four minutes to complete the records check once Trooper Connors radioed to request it. The Court finds that Trooper Connors would have had ample time to return to the Versa for Defendant Hayes's driver's license and radio that information to the dispatcher, while awaiting the information from the dispatcher on Defendant Carney.

[6] Trooper Connors stated he thought it was suspicious that Defendant Carney said the couple had not done anything fun while in Atlanta, when they were purportedly there to visit Defendant Hayes's grandchild. The Court does not find this answer to be suspicious. First, Defendant Carney

Case 3:19-cr-00073-TAV-HBG   Document 35   Filed 02/21/20   Page 33 of 45
PageID #: 357

that nothing that Trooper Connors learned from Defendant Carney during the six minutes he questioned him in the patrol car the first time raised any suspicion of criminal activity.

The Court finds that some of Defendant Hayes's answers to Trooper Connors's itinerary questions differed from that of Defendant Carney's. Defendant Hayes said that they had attempted to go to Georgia to visit her daughter but never made it there, due to an ice storm. She also seemed to indicate that they were coming from Abingdon that morning, and she could not remember if they had stayed anywhere since leaving Virginia. Inconsistencies in travel plans between the occupants of a vehicle can be a factor supporting reasonable suspicion. *See* Hill, 195 F.3d at 272; *see also United States v. Leeshawn Howard & Jonathan Josue Macias*, No. 3:18-CR-29-TAV-HBG, Doc. 35 (E.D. Tenn. Oct. 5, 2018) (Report & Recommendation) (finding inconsistent description of travel history to be one factor contributing to reasonable suspicion). However, in the instant case, the Court finds these inconsistencies do not relate to criminal activity. Moreover, the Court finds that the audio-recording of Defendant Hayes's part of the conversation suggests that she was confused and flustered by Trooper Connors persistent questioning on her travels.

Trooper Connors also testified that the Defendant Carney engaged in certain mannerisms that indicated his discomfort with the questioning. The trooper stated that Defendant Carney performed "grooming techniques," such as stroking his hair, which indicated to Trooper Connors that the Defendant was nervous. However, the Court finds any grooming techniques were not pronounced and are also consistent with fatigue from travel in the early morning. Moreover, nervousness, alone, does not provide reasonable suspicion of criminal activity. *See United States*

_____

appears to be indicating that they did not go on any fun outings, because he responded to Trooper Connors's question of whether they did anything fun while there, by stating that they "just hung out." Second, common sense suggests that the failure to enjoy a visit with someone else's relatives is not necessarily unusual and is certainly not an attitude reserved to drug traffickers.

*v. Pacheo*, 841 F.3d 384, 393 (6th Cir. 2016) (observing that while nervousness can be a factor in the "reasonable suspicion calculus," alone it is insufficient to warrant an investigatory stop). Our appellate court has characterized nervousness as "an unreliable indicator, especially in the context of a traffic stop." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). Trooper Connors also testified that Defendant Carney laughed when asked about large amounts of currency in the car and dropped his voice when denying that the car contained methamphetamine. He asserted that such "micro-expressions" can indicate criminal activity. However, Court also finds that this innocent behavior, even in combination with any nervousness, does not provide reasonable suspicion.

Trooper Connors characterized Defendant Hayes as being "overly nervous" and said that she dropped eye contact with him, when he asked whether there were any drugs in the car. Defendant Hayes was not in view of the camera during the traffic stop, so the Court has only Trooper Connor's observations and characterization of her demeanor, along with what it can discern from the audio recording. The Court notes that it took Defendant Hayes approximately two minutes to remove her driver's license from her wallet, which supports a finding that she was nervous. However, Defendant Hayes, who did not know why Defendant Carney was being questioned at length in Trooper Connor's patrol car "would have been understandably nervous at what appeared to be a departure from a routine traffic stop." *Mesa*, 62 F.3d at 162 (commenting on passenger's nervous demeanor, given that the driver, her sister, was questioned at length in the back of a police car following a traffic stop). Defendant Hayes also appeared to become confused and flustered with Trooper Connors's continued questioning about her travel itinerary. The Court finds that Defendant Hayes's demeanor provided minimal support for Trooper Connors's suspicions.

Finally, Trooper Connors said the fact that the Defendants were coming from Atlanta, Georgia, which is a source city for drugs, and traveling toward their home near the Tennessee-Virginia border, which he characterized as a hub for methamphetamine trafficking, was a factor in his suspicion that the car contained illegal drugs. The Court also finds this factor to provide minimal support.

In the instant case, the Court finds that Trooper Connors engaged in prolonged, extraneous questioning of Defendant Carney, which did not give him reasonable suspicion to continue investigating potential drug crimes. Although his subsequent conversation with Defendant Hayes perhaps aroused some suspicion, given her inconsistent answers and nervous demeanor, the Court finds these were weak indicators that did not provide a basis to detain the Defendants for an additional five minutes to lead a drug detection dog around the Versa. *See Richardson*, 385 F.3d at 630 (holding nervousness, confusing statements on travel plans, and the passenger moving into the driver's seat did not provide reasonable suspicion); *Mesa*, 62 F.3d at 163 (holding that officer exceeded scope of traffic stop by questioning nervous defendant on matters unrelated to speeding in back of police car). Significantly, Trooper Connors lacked factors that have contributed to reasonable suspicion in other cases, such as the occupants of the vehicle having criminal histories involving illegal drugs, *see Johnson*, 482 F. App'x at 146; *Stepp*, 680 F.3d at 667, or having no luggage, despite claiming to be on vacation, *see Howard & Macias*, No. 3:18-CR-29-TAV-HBG, Doc. 35. Defendant Hayes's inconsistencies and nervousness, even in combination with the fact that the Defendants were traveling from Atlanta to southwest Virginia, does not rise to the level of reasonable suspicion.

Accordingly, the Court finds that even if Trooper Connors had properly stopped the Defendants for a traffic violation, the seventeen-minute stop was unreasonable in both duration

36

and scope. For this reason, the Court also recommends that the evidence gained during the search of the Versa be suppressed. "Notwithstanding the importance of drug interdiction, . . . [the Court is] still charged with the responsibility of seeing that the interdiction occurs without the Constitution being violated. Such was not the case here." *Mesa*, 62 F.3d at 163.

## C. Timing of *Miranda* Warnings

The Defendants argue that Trooper Connors violated their Fifth Amendment right against self-incrimination by questioning them at length during the traffic stop, while they were not free to leave and without advising them of the *Miranda* warnings. They maintain that Trooper Connors acknowledged that the purpose of his questioning was to elicit discrepancies in travel plans in order to provide a reason to search the Versa. The Defendants assert that Trooper Connors's questions about incriminating matters, such as drug use, were designed to elicit incriminating responses and were the functional equivalent of custodial interrogation. Thus, they argue that in the absence of the *Miranda* warnings, their answers to Trooper Connors's questions must be suppressed.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." To insure this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 523 U.S. 122 (1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Salvo*, 133 F.3d at 948.

Law enforcement officers must advise a person of the *Miranda* warnings, when the person is questioned while in police custody. *Miranda*, 384 U.S. at 478-79; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (holding that the obligation to administer *Miranda* warnings only arises if there has been "such a restriction on a person's freedom as to render him 'in custody'"). In the instant case, Trooper Connors undoubtedly questioned the Defendants to determine whether they were involved in criminal activity, specifically possession of illegal drugs. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" under *Miranda* "express questioning [by the police] or its functional equivalent[,]" which is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"). The issue in this case is whether Defendants Carney and Hayes were in custody for purposes of the Fifth Amendment at the time Trooper Connors questioned them.

To determine whether an individual is in custody for purposes of receiving the *Miranda* warnings, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. *Stansbury*, 511 U.S. at 318 (holding that the court looks to "the objective circumstances of the interrogation, not on the subjective views" of the questioning officers or the defendant); *Salvo*, 133 F.3d at 948. In other words, would a reasonable individual in the same position as the Defendants have felt free to leave. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). Our appellate court has set forth several factors useful in determining whether an individual is in custody:

> the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do

so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Salvo*, 133 F.3d at 950; *see also Swanson*, 341 F.3d at 529. Ultimately, the Court must decide "'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *cert. denied*, 490 U.S. 1019 (1989); *Swanson*, 341 F.3d at 529.

In the instant case, the Defendants did not have unrestrained freedom to move about, nor were they free to leave, as they were the subject of a traffic stop. While acknowledging that a traffic stop curtails the driver's and the passengers' freedom of movement, the Supreme Court has held that an individual briefly detained for a routine traffic stop "is not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984). In so holding, the Court likened a traffic stop to a "*Terry* stop" and observed that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440. However, an investigatory detention can evolve into a custodial interrogation. *Knox*, 839 F.2d at 292 & 296 (Jones, J., concurring).

In the instant case, the Court finds that Trooper Connors requiring Defendant Carney to get into his patrol car in order to permit the trooper to question him while entering information into his in-car computer caused the traffic stop to evolve into a custodial interrogation. Trooper Connors's detention of Defendant Carney in his patrol car raised the level of custody beyond that of the typical traffic or *Terry* stop. An examination of the *Salvo* factors supports this conclusion. First, the Court finds Trooper Connors's purpose in questioning Defendant Carney was to gain

information relating to a drug interdiction investigation. Trooper Connors testified that he is trained to put the driver of the car in his patrol car, while filling out paperwork during a traffic stop, in order to permit him to ask questions relating to an interdiction investigation.

Second, the Court finds that the location of the questioning—the interior of the patrol car—was coercive. An officer may properly ask a driver to get out of his or her vehicle during a traffic stop. *Pennsylvania v. Mimms,* 434 U.S. 106, 111 (1977); *United States v. Alexander,* 467 F. App'x 355, 362 (6th Cir.), *cert. denied*, 566 U.S. 1004 (2012). However, the Court finds that placing a detained individual inside a police car heightens the custodial nature of the detention. For example, the officers' placing the suspect into the back seat of a patrol car and continuing to question him, after he declined consent to search his car, can transform a *Terry* stop into an arrest. *United States v. Richardson,* 949 F.2d 851, 857-58 (6th Cir. 1991); *see also United States v. Bradshaw*, 102 F.3d 204, 211-12 (6th Cir. 1996) (holding that "[d]etention in a police car does not automatically constitute an arrest" but may do so when the detention exceeds "the purpose and objective of the stop"), *cert. denied* 520 U.S. 1178 (1997). In *Mesa*, our appellate court observed that an officer unreasonably exceeded his authority in conducting a traffic stop, when he placed the driver in the back of his patrol car and asked questions unrelated to the traffic infraction. 62 F.3d at 162-63. In the instant case, the Court finds the location of Trooper Connors' questioning of Defendant Carney was coercive, while the questioning of Defendant Hayes in her own car was not.

Additionally, the Court finds that the circumstances of the interrogation grew increasingly intimidating as the questioning continued. Although Trooper Connors's tone in his initial questioning of Defendant Carney was genial, he confronted Defendant Hayes with inconsistencies in her answers and warned her to be honest with him. The second time Trooper Connors questioned Defendant Carney in his patrol car, he pressed him for answers to the point that

Defendant Carney asked whether he had to answer. Neither Defendant was handcuffed, but as discussed above, they were never free to leave. Moreover, Defendant Carney's movements were restrained, in that he was detained in the police car. Accordingly, the Court finds that under the unique circumstances of this case, Trooper Connors's questioning of the Defendants was custodial and the *Miranda* warnings were required at the point he placed Defendant Carney in his patrol car. The failure to provide the *Miranda* warnings provides an additional reason to suppress the Defendants' statements to Trooper Connors.

### D. Reliability of Drug Dog

The Defendants argue that the alert by the drug dog Laky did not provide probable cause to search the Versa, because Laky is not reliable. They contend that a drug detection dog, like Laky, who is trained to detect the odor of narcotics including marijuana, is unreliable, because the dog cannot distinguish the odor of marijuana from that of hemp, which comes from the same plant as marijuana and which is now legal to possess in Tennessee. The Government responds that the production of hemp is highly regulated in Tennessee and, at the time of the stop, was restricted to an industrial pilot program. It asserts that both Defendants have Virginia drivers' licenses, and no evidence exists that they were working in industrial hemp farming. The Government concludes that Laky is trained and certified and that his alert provided probable cause to search the Versa.

An alert by a properly trained and certified drug detection dog provides probable cause to believe that a vehicle contains controlled substances. *See Florida v. Harris*, 568 U.S. 237, 245 (2013); *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012). Here, Trooper Connors testified that Laky alerted on the right rear passenger's side door of the Versa. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can

presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Harris*, 568 U.S. at 246-47. In the instant case, the Government provided a copy of the narcotics certification for Trooper Connors and Laky issued by the United States Police Canine Association, on May 31, 2018 [Exh. 4]. Thus, the Court presumes that that Laky's alert provided probable cause to search the Versa.

A defendant may challenge a drug dog's reliability by cross-examining the dog's handler or by presenting a fact or expert witness. *Id.* at 247. Additionally, "even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the [handler and dog] team was working under unfamiliar conditions." *Id.* In short, the "sniff is up to snuff" if "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248.

In this case, the Defendants do not argue that Laky is improperly trained, that he failed to alert, or that Trooper Connors cued him. Instead, they argue that drug detection dogs generally are no longer a reliable means of detecting narcotics, because they cannot distinguish between the odor of marijuana and that of hemp. Accordingly, they maintain that when a drug detection dog alerts, the officer cannot know if the dog is alerting to the smell of hemp or any of the illegal narcotics the dog is trained to detect. In support of this argument, the Defendants attach a copy of a November 13, 2019 news article regarding the changes in the TBI crime laboratory's testing protocols to permit the TBI to distinguish marijuana from hemp [Exh. 33-1]. The short article contains the following quote from TBI Assistant Director of Forensic Services Mike Lyttle: "It's the same plant. A dog trained to test for marijuana cannot tell the difference between hemp and

marijuana.  That dog has now become useless thanks to hemp" [Doc. 33-1, p.2].  The Defendants also cite to opinions from the Supreme Court of Colorado and a Delaware Superior Court for their premise that "[c]ourts have acknowledged the reduced utility of drug-sniffing dogs in the wake of marijuana and hemp legalization" [Doc. 33, p.13].  *See People v. McKnight*, 446 P.3d 397, 410 (Colo. 2019) (concluding, based upon the Colorado Constitution, that a dog sniff is a search requiring probable cause, because the dog was trained to detect marijuana, which may be legally possessed in small amounts in Colorado); *State v. Jernigan*, __ A.3d __, 2019 WL 2480808, **8-9 (Del. Super. Ct. June 13, 2019) (determining that the officer should have checked the defendant's status as a legal user of medical marijuana before searching his car based upon the smell of raw marijuana).

The Court is not persuaded by the Defendants' argument that the legalization of hemp eliminates any probable cause gained from a trained and certified drug detection dog's alert.  First, it is not clear to the Court what expertise, if any, Assistant Director Lyttle has with regard to drug detection dogs and their training.  Moreover, the cases cited by the Defendants are state cases in jurisdictions where marijuana has been legalized to some degree.  However, the possession of marijuana remains illegal under federal law.  *Gonzalez v.* Raich, 545 U.S. 1, 27 (2005) (observing that the Controlled Substances Act "designates marijuana as contraband for any purpose").  State laws legalizing marijuana or some part of the marijuana plant do not preempt federal law.  *United States v. Hicks*, 722 F. Supp. 2d 829, 833 (E.D. Mich. 2010) (holding that "[i]t is indisputable that state medical-marijuana laws do not, and cannot, supercede federal laws that criminalize the possession of marijuana").  Finally, and most significantly, the Court disagrees that federal courts must find that the legalization of hemp means that the odor of marijuana can no longer provide

probable cause for a search. *See United States v. Vaughn*, __ F. Supp. 3d __, No. 4:19-CR-14, 2019 WL 6878859 (E.D. Tenn. Dec. 17, 2019) (Collier, D.J.).

The Winchester division of this Court recently addressed whether law enforcement officers have probable cause to search based upon their detection of the odor of marijuana, in the face of the legalization of hemp. *Id.* In *Vaughn*, the Court found probable cause for the issuance of a search warrant based in part upon the officers smelling the odor of marijuana when the defendants' apartment door was opened. *Id.* at *6. The defendants argued that the odor the officers detected could have been hemp. *Id.* The court noted that probable cause "requires 'a fair probability, given the totality of the circumstances, that contraband or evidence will be found in a particular place.'" *Id.* (quoting *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)). The court reasoned:

> Absolute certainty is not required [for probable cause]. *See id.* As a result, Defendants' contention that the smell could have been hemp does not change the fact that it also could be, and was, marijuana. The officers' detection of a marijuana odor meant there was a fair probability that marijuana would be found within the apartment, which is sufficient for probable cause.

*Id.* (addressing the hemp argument on the merits, despite the defendants' failure to raise it before the magistrate judge). The undersigned finds the same analysis applies to drug detection dogs. An alert by a drug detection dog, trained to detect marijuana and other illegal narcotics, means there is a fair probability, not an absolute guarantee, that one of the illegal narcotics, which the dog is trained to detect, will be found in that location. Accordingly, the Court finds that Laky's alert provided probable cause for Trooper Connors to believe that the Versa contained marijuana, cocaine, heroin, or methamphetamine. However, in the instant case, the fruits of the search of the Versa must be suppressed due to the unconstitutional seizure and detention that preceded the dog sniff.

44

## V.    CONCLUSION

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds the seizure of the Defendants and search of their car violated the Fourth Amendment, because the trooper lacked probable cause to stop the Defendants' car for a traffic violation and did not have reasonable suspicion to detain the Defendants, until the drug detection dog alerted.  The Court also finds that the trooper should have provided the *Miranda* warnings before questioning the Defendants, after he placed Defendant Carney in his patrol car. Accordingly, the undersigned respectfully **RECOMMENDS** that the Defendants' Joint Motion to Suppress [**Doc. 27**] be granted, and the evidence seized from the Defendant's car, as well as their statements to Trooper Connors, be suppressed.[7]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

45