UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:19-CR-73-TAV-HBG |
| | ) | |
| WANDA HAYES and | ) | |
| PATRICK CARNEY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Tennessee Trooper William Connors stopped defendants for speeding, but seventeen (17) minutes into the stop, his drug dog alerted to the presence of drugs in defendants' car. Defendants, who were subsequently charged with conspiracy to distribute methamphetamine [Doc. 1], filed a motion to suppress all evidence seized and statements made during the stop [Doc. 27]. Defendants argue Trooper Connors initiated the stop and unreasonably prolonged it in violation of their Fourth Amendment rights, a theory the government contests [Doc. 28]. This Court referred the motion to suppress to United States Magistrate Judge H. Bruce Guyton, whose Report and Recommendation (the R&R) recommending suppression [Doc. 35] is now before the Court. The Court agrees with Judge Guyton's conclusion that the initial stop violated defendants' Fourth Amendment rights and will therefore accept his recommendation to **GRANT** the motion to suppress.

**I.     Background**

The Court presumes familiarity with the R&R in this case, and it notes that the government stated the magistrate judge's summary of the evidence was "largely accurate,

with minor exceptions" [Doc. 36 p. 2 (stating as an example that the R&R "revers[ed] the lanes in which the trooper and defendants were traveling, respectively.")]. Defendants did not object to the magistrate judge's factual summary [Doc. 38 p. 1–2]. Thus, for purposes of background, the Court incorporates the findings of fact articulated in the R&R, which were based upon the testimony and exhibits introduced at the suppression hearing, highlighting the following findings in particular:

> On the early morning of January 23, 2019, Trooper William Connors of the Tennessee Highway Patrol was on duty and parked in the median of I-40 near mile marker 409, watching the three eastbound lanes. Trooper Connors saw a black Nissan Versa crest the hill in the middle lane, followed by a tractor-trailer. At the point at which Trooper Connors's patrol car would have been in view, the Versa moved into the right lane and was passed by the tractor-trailer, so that the tractor-trailer was between it and the patrol car. Trooper Connors activated his in-car camera, entered the left lane of I-40 eastbound, accelerated to over 100 miles per hour, and passed four other vehicles, before the Versa came into view.
> Trooper Connors caught up to the Versa approximately one minute after entering the road and while he was traveling at 77 miles per hour. Seven seconds later, Trooper Connors slowed to 70 miles per hour and traveled at that speed for six seconds in the left lane, while the Versa was in the right lane and no other vehicles were between them. At that point, Trooper Connors stated aloud "70 in a 65 zone on this black vehicle" in order to document his estimate of the Versa's speed on his in-car camera. As Trooper Connors, crossed from the left to the middle lane and from the middle lane to the right lane, the distance between his patrol car and the Versa narrowed, both horizontally and vertically. One minute and forty-three seconds after pulling onto I-40, Trooper Connors was traveling directly behind the Versa in the right lane. When he first pulled behind the Versa, Trooper Connors was going 71 miles per hour and continuing to gain on the Versa. Five seconds later, Trooper Connors activated his blue lights to stop the Versa. At that point, Trooper Connors was traveling at 67 miles per hour.
> At approximately 6:00 a.m., the Versa stopped on the shoulder of I-40 at mile marker 412. The driver left the right turn signal activated, even after the car stopped. As he pulled to a stop behind the Versa, Trooper Connors radioed the car's license plate to the dispatcher. Trooper Connors walked to the passenger's side of the Versa and saw Defendant Carney in the

driver's seat looking through his wallet and Defendant Hayes in the passenger's seat looking through the glove compartment. Trooper Connors tapped on the passenger side window, which one of the Defendants rolled down, and asked for a driver's license and registration. Carney handed Trooper Connors his driver's license. Then, Trooper Connors asked Carney to bring the registration and join him at the back of the Versa. When Carney joined him behind the Versa, Trooper Connors asked if he had any weapons on him. Carney said, "No," extending his arms out to his sides. Trooper Connors then told Carney to join him in his patrol car. Approximately one minute and forty seconds after stopping the Versa, when Trooper Connors and Carney were both seated in the front of the patrol car, Trooper Connors told Carney that he stopped him for going 70 miles per hour in a 65 zone but that he was not going to write a citation for the traffic violation.

 Trooper Connors confirmed Carney's name on the driver's license, asked who was in the car with him, and asked how he knew her. Carney identified his passenger as Wanda Hayes and said that she was his girlfriend. Trooper Connors asked where the couple was coming from, to which Carney responded Hayes's daughter's house. Trooper Connors asked where the daughter's house was located, and Carney replied, "Atlanta." Trooper Connors asked where in Atlanta Hayes's daughter lived, and Carney said he was not sure, because it was the first time he had been there. Trooper Connors asked where the couple stayed, while there, and Carney responded that they stayed with Hayes's daughter. As Trooper Connors asked this series of questions, Carney looked through some paperwork, while Trooper Connors keyed information into his in-car computer.

 At two minutes and fifty seconds into the stop, Trooper Connors asked if Carney was on probation or parole, which Carney denied, and whether he had ever been arrested. Carney said he had been arrested. Trooper Connors explained that when he performed a check of Carney's history, it would show Carney's arrests. Carney said he was arrested when he was younger.

 Trooper Connors asked what time the couple left Atlanta. Carney responded that they left around 3:00 or 3:30 a.m. Trooper Connors asked why they left so early, and Carney replied they were avoiding the traffic. Trooper Connors asked how long Carney had known Hayes, and Carney said, "A couple of years." Trooper Connors asked whether Carney and Hayes lived together or separately, to which Carney responded that they lived separately. Trooper Connors confirmed that Carney said that they were at Hayes's daughter's house and asked how long they were there. Carney said they were there a couple of days. Trooper Connors continued to enter information into his in-car computer and again confirmed that Carney was not currently on probation or parole.

Approximately four minutes after stopping the Versa, Trooper Connors asked why Carney and his passenger had gone to visit Hayes's daughter, and Carney replied that Hayes wanted to see her daughter and granddaughter. Trooper Connors asked if Hayes was on probation or parole, to which Carney said, "No." Trooper Connors asked, "Does she live in an apartment or house down there?" to which Carney responded that both Hayes and her daughter have a house in Atlanta. Trooper Connors asked if the house was within the Atlanta city limits, but Carney did not know. Trooper Connors asked if the couple did anything fun while in Atlanta, to which Carney responded, "No, not really. Just hung out." Trooper Connors asked if Hayes was originally from Georgia, and Carney said she was from the Piney Rock area of Virginia.

At five minutes and thirty seconds after stopping the Versa, Trooper Connors confirmed Carney's address and birthday. Trooper Connors then informed Carney that there was a lot of criminal activity on the interstate and asked if there were any large sums of currency over $10,000, marijuana, cocaine, heroin, methamphetamine, or guns in the car. Carney replied "no" to each of these questions and said that he had a pocketknife. Five minutes and twenty seconds after entering the patrol car, Trooper Connors confirmed that the Versa was registered to Hayes, and Carney handed him the registration. Trooper Connors remarked that the registration states that the Versa is blue, but the car is black. He asked Carney whether the Versa is dark blue or black. Trooper Connors said the Versa looked black to him but the registration stated it was blue and suggested that maybe someone at the Department of Motor Vehicles entered the color incorrectly. Carney said the Versa appeared to be more black than blue to him. Trooper Connors asked if the couple had luggage in the car. Carney responded that they had a couple of bags in the trunk and that they had purchased a chicken coop, which was on the back seat. Carney confirmed that Hayes lives in Abingdon. . . .

. . . .

While waiting for the dispatcher's response, Trooper Connors asked Carney to stand outside again and removed his drug detection dog Laky from his patrol car. At fifteen minutes after stopping the Versa, Trooper Connors lead Laky around the Versa for a "free-air sniff." Laky did not alert on the Versa when they walked around it clockwise. Trooper Connors then led Laky around the car counterclockwise, and Laky alerted by sitting by the rear, passenger's side tire. Trooper Connors presented the area to Laky again, and Laky alerted on the same spot. Approximately seventeen minutes elapsed from the time that Trooper Connors stopped the Versa to Laky's alert. One or two minutes after the dog sniff, the dispatcher radioed Trooper Connors with information from the warrant check.

[Doc. 35 p. 16–22].

4

Based on his factual findings, the magistrate judge concluded that the initial stop was unconstitutional because Trooper Connors lacked probable cause to believe the Versa was speeding and lacked reasonable suspicion to believe the Versa's occupants were engaged in criminal activity [*Id.* at 24–27]. Thus, the magistrate judge recommended the suppression of both defendants' statements and the evidence seized from the Versa [*Id.* at 28, 37]. Moreover, the magistrate judge found that even if the initial stop was justified, Trooper Clark unreasonably prolonged the stop because he should have concluded the seventeen-minute traffic stop within five (5) to six (6) minutes, and he did not develop independent reasonable suspicion to extend the stop within that period [*Id.* at 30–34]. As a result, the magistrate judge recommended that the evidence from the search of the Versa be suppressed [*Id.* at 37]. The magistrate judge also found that Trooper Connor's questioning of defendants was custodial and that his failure to provide *Miranda* warnings when he placed defendant Carney in his car provides an additional basis to suppress defendants' statements [Doc. 35 p. 41]. Finally, the magistrate judge found that the drug dog was properly trained and reliable [Doc. 35 p. 41–44].

The government objects to the magistrate judge's conclusions that Trooper Connors stopped defendants' car without probable cause, that Trooper Connors prolonged the stop unreasonably, and that the trooper's questioning of defendants was custodial [Doc. 36 p. 1–2]. The government also asserts, for the first time, that even if the stop was unconstitutional, Trooper Clark acted in good faith, so the exclusionary rule should not

5

apply [Doc. 36 p. 8–9]. Defendants have responded in opposition to the government's objections [Doc. 38].

## II. Standard of Review

A court must conduct a *de novo* review of those portions of a magistrate judge's report and recommendation to which a party objects unless the objections are frivolous, conclusive, or general. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "Objections disputing the correctness of the magistrate's recommendation, but failing to specify the findings believed to be in error are too general and therefore insufficient." *Stamtec, Inc. v. Anson*, 296 F. App'x 516, 519 (6th Cir. 2008) (citing *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006)). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations" made by the magistrate judge. 28 U.S.C. § 636(b)(1).

## III. Analysis

The Court has reviewed the R&R and the record in this case and agrees with the conclusion of the magistrate judge that the initial stop was unconstitutional. The Court therefore believes it unnecessary to address the government's objections to the magistrate judge's determinations regarding the prolongation of the stop or the *Miranda* warnings, but it will briefly discuss its finding that Trooper Connors unreasonably prolonged the stop. Additionally, the Court will exercise its discretion not to consider the government's

argument that the exclusionary rule should not apply in this case because the government failed to raise it before the magistrate judge.

### A. Whether the Initial Stop Violated the Fourth Amendment

The magistrate judge found no probable cause for a stop for two reasons: (1) because Trooper Connors did not pace the car for a sufficient distance to give him probable cause to believe the Versa was speeding, and (2) because Judge Guyton found Trooper Connor's claim that he confirmed the Versa was speeding with his radar not to be credible [Doc. 35 p. 24–26]. The government does not appear to object to the first basis [Doc. 36 p. 10 (admitting Trooper Collins did not complete a "true pace" of defendants' vehicle)][1]; rather, it objects specifically to the magistrate judge's credibility determination by arguing that he "erred as a matter of law by presuming that the absence of corroboration, standing alone, amounts to contradiction" and he "erred as a matter of fact by finding that Trooper Connors's testimony was contradicted and that Trooper Connors stopped defendants' vehicle without probable cause that it was speeding" [Doc. 36 p. 5]. The Court agrees with the magistrate judge's finding that Trooper Connors lacked probable cause or reasonable suspicion for the stop and will therefore accept Judge Guyton's suppression recommendation.

Stopping a vehicle and detaining its occupants "amounts to a seizure under the Fourth Amendment." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). An

---

[1] On cross-examination, Trooper Connors admitted that he did not conduct "a true pace" because it requires two-tenths of a mile, and Trooper Connors did not pace the Versa for that distance [Suppression Hearing Transcript ("Tr."), Doc. 32 p. 76].

officer who stops a car for a completed traffic violation must have probable cause to believe a violation has occurred. *United States v. Jeffries*, 475 F. App'x 471, 477 (6th Cir. 2012). "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *United States v. Jackson,* 470 F.3d 299, 306 (6th Cir. 2006)). "[I]n determining if [a] traffic stop violates the Fourth Amendment," a court must inquire "whether the officer 'had an objectively verifiable reason' for pulling over Defendant's [vehicle] in light of the facts and circumstances known to the officer at the time of the stop." *United States v. Huff*, 630 F. App'x 471, 496 (6th Cir. 2015) (quoting *United States v. Tullock*, 578 F. App'x 510, 513 (6th Cir. 2014)); *see also United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (noting the probable cause determination is "fact-dependent and will turn on what the officer knew *at the time he made the stop*"); *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (an officer must have facts and circumstances within her knowledge "of which [she] had reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense" (citing *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)).

The magistrate judge did not err in finding that the evidence before the Court rendered Trooper Connors's testimony as to confirming the speed with radar less than credible and that, as a result, the probable cause standard was not satisfied. Trooper Connors testified that he initially paced the Versa and then used his radar to confirm the Versa was speeding [Suppression Hearing Transcript ("Tr."), Doc. 32 p. 24–25, 73]; *see*

*also* Government's Post-Hearing Brief, Doc. 34 p. 2 ("Trooper Connors confirmed his car's moving radar was properly calibrated and the radar confirmed the defendants were traveling 70 mph in a 65 mph zone" (citing Tr. p. 26))]. However, as the magistrate judge noted, Trooper Connors did not state that he confirmed the speed with radar in his report, either by checking the box labeled "radar" or by noting he used radar in the report's narrative section [Ex. 3].[2] He did not state that he checked the speed with radar in his personal notes, where he recorded every stop he made and the justification [Tr. p. 73–74]. He also did not state orally that he used radar or that his radar demonstrated defendants were speeding, even though he did note orally that the Versa was going seventy (70) mph in a sixty-five (65) mph zone [*Id.* at 26]; as the magistrate judge reasoned [Doc. 35 p. 25], Trooper Connors cannot have made the latter statement after using his radar because at that point, he had not yet moved behind the Versa, which is when the radar would have been able to read the vehicle's speed [Tr. p. 26–27].

Moreover, Trooper Connors testified that "as soon as [he got] behind" the Versa, "they immediately let off . . . their brake or . . . the gas" [*Id.* at 27]. He stated originally that he based this observation on the tractor trailer in front of the Versa "start[ing] to create distance from [them]" and then, after this statement drew an objection, said he was "going off the radar speed" [*Id.* at 27, 68]. Later, he explained that "their vehicle speed slows

---

[2] Trooper Connors explained that the report only has one drop-down box for the method used to determine the speed of a car, and Trooper Connors stated that he always selects whatever method he used first [Doc. 32 p. 25]. Yet, neither the report's narrative section, nor his personal notes contained such a restriction, so it would be reasonable to expect Trooper Connors to note his use of radar, a more reliable means of measuring speed than pacing, to confirm the Versa was speeding in the report's narrative section or his personal notes.

9

because my vehicle speed obviously has to slow because they're slowing down, which you can see, which is documented on the left side of the screen there" [*Id.* at 30]. Trooper Connors also testified that he initiated the traffic stop immediately after the Versa slowed down [*Id.* at 27].

The Court's viewing of the front-facing dashboard camera video confirmed that Trooper Connors paced the vehicle for less than ten (10) seconds at a constant speed of seventy (70) mph [Ex. 1]. Then Trooper Connors began moving from the far left to the far right lane of the three-lane highway [*Id.*]. As he did so, his speed changed from seventy (70) mph to seventy-one (71) mph to seventy-two (72) mph to seventy-one (71) mph, and he gained on the Versa as he moved [*Id.*]. After he pulled behind it, he continued to gain on the Versa for about five (5) seconds as he decelerated from seventy-one (71) mph to sixty-eight (68) mph before turning on his lights, and his speed continued to drop so that he was going sixty-five (65) mph when the Versa's brake lights came on [*Id.*]. Notably, the tractor trailer did not appear to pull away from the Versa until one (1) to two (2) seconds after the Versa's brake lights came on [*Id.*].

Certainly, this evidence does not corroborate Trooper Connors's testimony, and it makes clear that the magistrate judge's conclusion rested on more than "the absence of corroboration, standing alone" [Doc. 35 p. 25]. Rather, "the other evidence before the Court" [*Id.*] supports an inference contradicting the claim that "the radar confirmed the defendants were traveling 70 mph in a 65 mph zone" [Doc. 34 p. 2]. Trooper Connors failed to do a "true pace," which suggests he was acting quickly, if not hastily. He gained

10

on the Versa as he crossed the highway, maintaining a speed just over seventy (70) mph, and he continued to gain on the Versa after he pulled behind it, even though his speed dropped to sixty-eight (68) mph before he turned on his lights. This indicates that if the Versa was traveling at seventy (70) mph when Trooper Connors did his incomplete pace, it decelerated as Trooper Connors crossed the highway and was going slower than seventy (70) mph when he pulled behind.

The Court also notes Trooper Connors was behind the Versa for only five (5) seconds before turning on his lights, he initiated the stop without stating that the radar indicated the Versa was speeding, and his speed dropped to sixty-five (65) mph—the speed limit—before the Versa put on its brakes. In combination, these facts support the inference that Trooper Connors was acting too quickly and the Versa was traveling too slowly for him to confirm it was speeding with his radar.

Finally, although Trooper Connors said the Versa "immediately" decelerated after he moved behind it, the tractor trailer did not pull away from the Versa as he asserted until one (1) to two (2) seconds after the Versa put on its brakes. At that time, Trooper Connor's speed was dropping from sixty-five (65) mph to fifty-five (55) mph as the Versa slowed and pulled over [Tr. p. 26–27]. The Versa's relatively constant following distance from the tractor trailer between the time Trooper Connors pulled behind it and the time the Versa braked suggests that the Versa did not significantly decelerate immediately after Trooper Connors moved behind it; instead, the evidence indicates the Versa and the tractor trailer

11

were both traveling slower than seventy (70) mph and probably about sixty-five (65) mph when Trooper Connors pulled behind the Versa.[3]

This evidence, especially considering Trooper Connors only recorded pacing as the stop's basis, indicates that Trooper Connors did not confirm the Versa was traveling at seventy (70) mph with his radar. If the Versa was traveling at seventy (70) mph when Trooper Connors incompletely paced it, the Versa apparently decelerated as Trooper Connors moved across the highway so that it was traveling below seventy (70) mph, likely at the speed limit, when he got behind it.[4] As a result, if he then used his radar, the radar would not have shown the Versa was traveling at seventy (70) mph. Additionally, the inconsistency between Trooper Connors's testimony regarding the tractor trailer and the video evidence tends to undermine his credibility. Thus, the magistrate judge did not err as a matter of law or fact by stating that Trooper Connors's claim was "contradicted by the other evidence before the Court" [Doc. 35 p. 25].[5]

---

[3] Slowing to the speed limit is consistent with the habits of drivers with a police car in the rearview mirror, and defendant Carney and the tractor trailer driver likely noticed Trooper Connors's patrol car before he crossed the highway.

[4] The Court disagrees with Trooper Connors's reasoning that the fact that he slowed down after pulling behind the Versa demonstrates the Versa was slowing [Doc. 32 p. 30]; rather, the fact of his gaining on the Versa as he crossed the highway reveals that would have had to slow down regardless because he was going faster than the Versa *before* he entered its lane. The fact that he continued to gain on the Versa after moving behind it, even though he was decelerating from seventy-one (71), supports this conclusion.

[5.] Moreover, the Court notes that our judicial system traditionally defers to the credibility determinations of the fact-finder who is "best equipped to make those determinations." *United States v. Caldwell*, No. 1:13-cr-128, 2015 WL 179583 (E.D. Tenn. Jan. 14, 2015) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985)) (applying principle to magistrate judge's credibility conclusions during suppression hearing); *see also United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990) (stating that "cases like this one," involving a Fourth Amendment unconstitutional seizure claim, "are going to turn largely on credibility determinations made by the district judge at the suppression hearing.").

Similarly, the magistrate judge did not err as a matter of fact by finding that Trooper Connors stopped defendant's vehicle without probable cause that it was speeding. The government failed to show that Trooper Connors had facts within his knowledge at the time of the stop that gave him probable cause to believe a traffic offense had occurred. *Ferguson*, 8 F.3d at 391. The objective facts that might support a conclusion the Versa was speeding are Trooper Connors's pace, as reflected in his recorded statement that the Versa was going seventy (70) in a sixty-five (65) mph zone, and his assertion that he used radar to confirm the Versa was speeding. *Cf. Tullock*, 578 F. App'x at 513 (noting Trooper Stielow could recall "few objective facts to justify the traffic stop," such as "the speed the vehicles were traveling, the amount of distance between them, or for how long a period Tullock drove too closely to the car in front of him"). However, the pace does not support probable cause because it was incomplete, and Trooper Connors did not record that he used radar in his report, his personal notes, or the audio recording. Thus, the existence of probable cause hinges on the credibility of Trooper Connors' testimony that his radar confirmed the Versa was traveling seventy (70) mph in a sixty-five (65) mph zone.

Yet, as discussed above, the objective facts presented at the suppression hearing indicate that the Versa was traveling slower than seventy (70) mph, and likely at the speed limit, by the time Trooper Connors could have read its speed using radar. And, this inconsistency between Trooper Connors's claim and the other evidence, including the contradiction of when he said the tractor trailer pulled away, fatally undermines the credibility of Trooper Connors's assertion that his radar confirmed his estimate of the

13

Versa's pace.[6] Thus, finding that Trooper Connors lacked "reasonably trustworthy information" supporting knowledge that the Versa was speeding, *Wesley*, 779 F.3d at 429, the Court holds that Trooper Connors could not have had probable cause to stop it.[7]

The government does not object to the magistrate judge's conclusion that Trooper Connors also lacked reasonable suspicion to make a stop [Doc. 35 p. 26–27], but for the sake of completeness, the Court notes that it agrees the facts known to Trooper Connors at the time of the stop did not provide reasonable suspicion to believe the Versa's occupants were engaged in criminal activity. *Carter v. Hamaoui*, 699 F. App'x 519, 527 (6th Cir. 2017) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Simpson*,

---

[6] The government seeks to distinguish the case cited by the magistrate judge in support of its conclusion that Trooper Connors's testimony was not credible, *United States v. Ruiz*, 832 F. Supp. 2d 903 (M.D. Tenn. 2011). In that case, the government states, the officer's testimony "was directly contradicted by two defense witnesses, unsupported by another officer who was present at the time, had 'major inconsistencies' with his near-contemporaneous police report, and was characterized by unusual and admitted nervousness by an experienced officer" [Doc. 36 p. 5]. In contrast here, the government argues, the officer's testimony was not inconsistent with the report; the report was merely incomplete, and Trooper Connors explained that it was incomplete because the system only allows an officer to select one method, and he ordinarily lists "whatever method [he] use[d] first" [Doc. 36 p. 3–5]. Although the Court agrees there was more evidence of contradiction and inconsistency in *Ruiz*, as the Court has discussed, it is not true that the magistrate judge's—or this Court's—credibility determination relies on merely the absence of corroboration for Trooper Connors's testimony in his report; rather, it rests on the inconsistency between his claim and the other evidence. And, as defendants argue, *Ruiz* does not "require direct contradiction before a court can find a witness not credible" or "establish some minimum amount of contradiction prior to a court attaining the authority to reject part or all of a witness's testimony" [Doc. 38 p. 8].

[7] *Cf. United States v. Dillard-Cribbs*, No. 6:17-cr-38-7, 2018 WL 916365, at *4 (E.D. Ky. Feb. 16, 2018) (finding trooper "failed to provide sufficient objectively verifiable evidence to support a finding of independent probable cause to stop [defendant] for speeding," where trooper testified that defendant was speeding and that he "always uses his radar" but did not recall using his radar to determine defendant's speed and there was no evidence of the posted speed limit or defendant's speed or that the trooper had to speed to catch up with defendant).

14

520 F.3d 531, 541 (6th Cir. 2008)) ("The law requires at least reasonable suspicion of criminal activity or an *ongoing* misdemeanor in order to effect a traffic stop.").[8]

### B. Whether Trooper Connors Unreasonably Prolonged the Stop

Because the Court finds that Trooper Connors lacked either probable cause or reasonable suspicion to justify his stop of the Versa, it need not address the government's objections to the magistrate judge's conclusions that Trooper Connors unreasonably prolonged the stop or that Trooper Connors's questioning of defendants was custodial. *United States v. Saucedo*, 226 F.3d 782, 789 (6th Cir. 2000) ("The two-part *Terry* 'objective reasonableness' paradigm inquires 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances that justified the interference in the first place.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968))).

However, the Court notes that, even if Trooper Connors had had probable cause to make the stop, the Court finds that he unreasonably prolonged the stop in violation of the Fourth Amendment. The Supreme Court's opinion in *United States v. Rodriguez*, 575 U.S. 348 (2015), provides a bright-line rule that "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) ("But *Rodriguez* clarifies that any extension of

---

[8.] Prior to the stop, the only information Trooper Connors had regarding the Versa and its occupants, other than his suspicion it was speeding, was that the car was driving eastbound on I-40 just before 6:00 a.m., it was from Virginia, and it moved to the right after cresting a hill with the result that a tractor trailer that had been traveling behind the Versa moved alongside it and blocked it from view as the vehicles passed Trooper Connors [Doc. 32 p. 18–19, 75, 77]. Although Trooper Connors believed the Versa's maneuver indicated the Versa was trying to hide from him [*Id.* at 19], as the magistrate judge noted, "Trooper Connors's belief that the Versa was hiding from him was merely a hunch and does not rise to the level of reasonable suspicion" [Doc. 35 p. 27].

15

a traffic stop absent independent reasonable suspicion is improper. This is a bright-line rule." (citing *Rodriguez*, 575 U.S. at 355–57)). The Court agrees with the magistrate judge that defendants' "continued detention beyond the five or six minutes necessary to conclude the traffic stop violated the Fourth Amendment" where Trooper Connors "had all the information he needed from the Defendants to conclude the traffic stop within two minutes of stopping the Versa" and he did not learn anything from defendant Carney during that six-minute period that provided independent reasonable suspicion of criminal activity [Doc. 35 p. 30, 32–33]. Specifically, the Court agrees with the magistrate judge's finding that inconsistent travel plans, nervous mannerisms, and certain "micro-expressions" did not provide reasonable suspicion [*Id.* at p. 34–35]. *See United States v. Stepp*, 680 F.3d 651, 665 (6th Cir. 2012) ("We have held on numerous occasions . . . that nervousness is 'an unreliable indicator, especially in the context of a traffic stop.'" (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)); *see also Richardson*, 385 F.3d at 630–31 (finding that nervousness, conflicting explanations of travel plans, and movement to driver's seat did not support reasonable suspicion).

The government's objections are unavailing because they fail to address the magistrate judge's determination that the stop should have concluded no later than six (6) minutes into the stop and that Trooper Connors did not learn anything within these six (6) minutes that supported reasonable suspicion. The government contends that "[w]ithin seventeen minutes . . . Trooper Connors amassed numerous indicators, developing reasonable suspicion of possible criminal activity" and that "[b]ased on the totality of the

16

circumstances of this traffic stop, the duration of time between the stop, the questioning of the defendants regarding their travel plans, and the alert by Laky on the vehicle were well within the range of reasonableness" [Doc. 36 p. 7]. Defendants argue in response [Doc. 38 p. 11] that a seventeen-minute interrogation is not a "diligent and efficient pursuit of a records check for a speeding warning" and that the stop concluded pursuant to *Rodriguez* the moment Trooper Connors told Mr. Carney he was going to issue a warning citation but not a ticket [Doc. 38 p. 10–11].

As the magistrate judge found, Trooper Connors had all the information necessary to complete the warning citation and the records check at about two (2) minutes into the stop, and it took the dispatcher about four (4) minutes to respond with the records information [Doc. 35 p. 33 p. 5]. Additionally, as defendants note [Doc. 38 p. 10], although Trooper Connors did not call in the records check until about thirteen (13) minutes into the stop, he testified that he could have done so immediately upon making the stop but that he is not trained to so by the interdiction team [Tr. p. 79–80]. Applying *Rodriguez*'s bright-line rule, Trooper Connors lacked authority to prolong the traffic stop beyond the time when tasks tied to the alleged traffic infraction, speeding, were or should have been concluded, 575 U.S. at 354, which was six (6) minutes into the stop at the latest. Accordingly, the Court finds that Trooper Connors's prolongation of the stop beyond the six-minute mark violated the Fourth Amendment. *Hernandez*, 949 F.3d at 256.

## C. Whether the Exclusionary Rule Should Apply

Evidence obtained in violation of the Constitution is generally subject to "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United* States, 555 U.S. 135, 139 (2009). However, exclusion is not "a necessary consequence of a Fourth Amendment violation." *Id.* (internal citations omitted). The Sixth Circuit has interpreted the Supreme Court as "effectively creat[ing] a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'" *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) (citing *Herring*, 55 U.S. at 141).

The government raises the argument for the first time in its objection to the R&R that, even if the Court finds that Trooper Connors violated the Fourth Amendment in this case, suppression is not appropriate because suppression is only proper where "police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system" [Doc. 36 p. 9 (citing *Herring*, 555 U.S. at 144)]. Trooper Collins's conduct does not meet this standard, the government contends, because he did not "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," and because the exclusionary rule is not intended to punish and deter "legitimate law enforcement investigations of the type conducted in this case" [*Id.* at 10]. Defendants respond that the good faith exception does not apply in this case because Trooper Connors acted deliberately, as a result of his training [Doc. 38 p. 13], and they argue this case will have an important deterrent effect in "tell[ing]

18

the government that it must stop training officers to impermissibly extend traffic stops to fish" [*Id.* at 13–14].

When an argument is not presented to a magistrate judge, the district court may exercise its discretion to hold that the argument is forfeited. *AES-Apex Employer Servs., Inc. v. Rotondo*, 924 F.3d 857, 867–68 (6th Cir. 2019) (citing *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998)); *see also Murr v. United States*, 200 F.3d 895, 902 (6th Cir. 2000) ("Courts have held that while the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.*, permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate" (citations omitted)).

Here, the government should have anticipated that the magistrate judge could recommend suppression and should have argued from the beginning that the evidence should not be suppressed regardless of the stop's constitutionality. The government has not explained why it did not raise this argument before the magistrate judge, and the Court agrees with the reasoning of other courts that allowing a party to raise an argument for the first time in an objection to an R&R "defeats the purpose of the R&R process and frustrates judicial efficiency." *United States v. Evans*, No. CR 13-22-DLB-1, 2019 WL 1077371, at *4–5 (E.D. Ky. Mar. 7, 2019); *see also Greenhow v. Secretary of Health & Human Servs.*, 863 F.2d 633, 638–39 (9th Cir. 1988), *overruled on other grounds by United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different

19

theory to the district court would frustrate the purpose of the Magistrates Act."). Consequently, the Court will treat the government's good faith argument as forfeited and accept the magistrate judge's recommendation of suppression.

## IV. Conclusion

For the reasons discussed herein, and upon careful and *de novo* review of the record and the law, the Court hereby **OVERRULES** the government's objections to the R&R [Doc. 36]. The Court **ACCEPTS** the R&R in all respects, including the magistrate judge's recommendation that the evidence seized from the Versa and defendants' statements during the stop be suppressed [Doc. 35 p. 28]. Accordingly, the Court hereby **GRANTS** defendants' motion to suppress [Doc. 27].

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE